UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ PETERSEN ENERGIA INVERSORA,          │
│ S.A.U. ET AL.,                       │
│                                      │
│                  Plaintiff,          │      No. 15 Civ. 02739 (LAP)
│                                      │
│ -against-                            │
│                                      │
│ ARGENTINE REPUBLIC ET AL.,           │
│                                      │
│                  Defendants.         │
├─────────────────────────────────────┤
│ ETON PARK CAPITAL MANAGEMENT         │
│ L.P. ET AL.,                         │
│                                      │
│                  Plaintiff,          │      No. 16 Civ. 08569 (LAP)
│                                      │
│ -against-                            │      MEMORANDUM & ORDER
│                                      │
│ ARGENTINE REPUBLIC ET AL.,           │
│                                      │
│                  Defendants.         │
└─────────────────────────────────────┘
```

LORETTA A. PRESKA, Senior United States District Judge:[1]

Plaintiffs Petersen Energia Inversora S.A.U., Petersen Energia, S.A.U., Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P., (together "Plaintiffs") seek turnover of Defendant the Argentine Republic's ("Defendant" or "the Republic" or "Argentina") 51% of YPF S.A.'s ("YPF") Class D shares (the "Shares") in partial satisfaction of the Court's judgment in the aggregate amount of approximately $16.1 billion, which remains unpaid, pursuant to Federal Rule of Civil

_____

[1] References to the docket refer to the lead case, Petersen Energia Inversora, S.A.U. et al. v. Argentine Republic et al., No. 15 Civ. 02739.

Procedure 69(a)(1), New York Civil Practice Law and Rules ("NY CPLR") § 5225(c), and New York Uniform Commercial Code ("NY UCC") § 8-112(e).[2]  Plaintiffs request that the Court order the Republic to (i) transfer the Shares to a global custody account at the Bank of New York Mellon ("BNYM") in New York within 14 days from the date of this order; and (ii) instruct BNYM to initiate a transfer of the Republic's ownership interests in its YPF shares to Plaintiffs or their designees within one business day of the date on which the shares are deposited into the account.  (Pl. Mot.) Defendant opposes the motion.[3]  The United States of America filed

---

[2] (Pl. Mot. for Injunction and Turnover ("Pl. Mot."), dated Apr. 22, 2024 [dkt. no. 555]; Pl. Mem. in Support of Mot. ("Pl. Mem."), dated Apr. 22, 2024 [dkt. no. 556]; Fourth Expert Report of John C. Coffee, Jr. ("Coffee 4"), dated Apr. 22, 2024 [dkt. no. 557]; Second Expert Report of Nancy C. Lissemore ("Lissemore 2"), dated Apr. 22, 2024 [dkt. no. 558]; Decl. of Randy M. Mastro ("Mastro Decl. 1"), dated Apr. 22, 2024 [dkt. no. 559]; Pl. Reply, dated May 30, 2024 [dkt. no. 587]; Decl. of Alberto B. Bianchi, dated May 30, 2024 [dkt. no. 588]; Decl. of Dr. Alfredo L. Rovira, dated May 30, 2024 [dkt. no. 589]; Fifth Expert Report of John C. Coffee, Jr., dated May 30, 2024 [dkt. no. 590]; Decl. of Randy M. Mastro ("Mastro Decl. 2"), dated May 30, 2024 [dkt. no. 591]; Pl. Sur-Reply, dated July 8, 2024 [dkt. no. 598]; Pl. Letter, dated Aug. 27, 2024 [dkt. no. 647].)

[3] (Def. Opp'n to Pl. Mot. ("Def. Opp'n"), dated May 16, 2024 [dkt. no. 577]; Decl. of Robert J. Giuffra Jr. ("Giuffra Decl."), dated May 16, 2024 [dkt. no. 578]; Expert Decl. of Rafael M. Manovil, dated May 16, 2024 [dkt. no. 579]; Expert Report of Alfonso Santiago ("Santiago"), dated May 16, 2024 [dkt. no. 580]; Third Report of Professor Steven Davidoff Solomon, dated May 16, 2024 [dkt. no. 581]; Def. Sur-Reply, dated June 27, 2024 [dkt. no. 597]; Def. Letter, dated Aug. 26, 2024 [dkt. no. 639].)

a statement of interest.[45]  For the reasons set forth below, Plaintiffs' motion is GRANTED.

## I.  Background

The Court assumes familiarity with the factual background and procedural history of the case, which have been set out at length in prior opinions of this Court and the Court of Appeals.  The Court recounts only the facts necessary to determine the instant motion.

### a. Factual Background

Prior to 1993, YPF, a petroleum company, was wholly owned and operated by the Republic.  Petersen Energia Inversora, S.A.U v. Argentine Republic et al. ("Petersen II"), 15 Civ. 2739 (LAP), 16 Civ. 8569 (LAP), 2023 WL 2746022, at *2 (S.D.N.Y. Mar. 31, 2023).

In 1993, the Republic decided to privatize YPF through a worldwide IPO of its shares.  Id.  The Republic acted "in its capacity as shareholder of [YPF]" to amend YPF's bylaws to include protections for investors.  Petersen Energia Inversora S.A.U. v. Argentine Republic et al. ("Petersen I"), 895 F.3d 194, 199 (2d

---

[4] (U.S. Statement of Interest, dated Nov. 6, 2024 [dkt. no. 679]; Pl. Response to U.S. St., dated Nov. 14, 2024 [dkt. no. 684].)
[5] The parties and the United States filed supplemental briefs regarding the impact of the Court of Appeals' decision in Peterson v. Bank Markazi, 121 F.4th 983 (2d Cir. 2024) on this motion.  (See dkt. nos. 695-96, 698, 702, 708, 710.)  The parties and the United States agree that the decision has no impact on the Court's determination of this motion.

Cir. 2018).   Notably, the amended bylaws included, <u>inter alia</u>, Section 7, the tender offer provisions.  <u>Id.</u> at 199-200.

In the Republic's efforts to privatize YPF, the Republic specifically targeted its IPO at United States investors.   The Republic sponsored an ADR program listed on the New York Stock Exchange ("NYSE") for YPF's Class D shares with BNYM as the depository bank, and it registered both YPF's Class D shares and its ADRs representing interests in those shares with the United States Securities and Exchange Commission ("SEC").  (Lissemore 2 ¶¶ 23-25.)  <u>See also</u> <u>Petersen I</u>, 895 F.3d at 199.   The Republic "raised billions of dollars in investment capital with the largest share (more than $1.1 billion in total) coming from the sale of ADRs [American Depositary Receipt ("ADR")] in the United States on the NYSE."  <u>Id.</u> at 200.   Repsol S.A. ("Repsol") emerged from the IPO as YPF's majority shareholder.  <u>Id.</u>   The Republic remained a holder of YPF's Class A shares.  <u>Id.</u>   After the IPO, YPF's shares, via the ADRs, were traded publicly on the NYSE and other exchanges. <u>Id.</u>

On April 16, 2012, the Republic "exercised indirect control" of Repsol's 51% of YPF's Class D shares, specifically the right to "use its shares to govern the company," "direct corporate policy," or "otherwise exercise all the considerable power of a majority shareholder."  <u>Petersen Energía Inversora, S.A.U. v. Argentine</u>

Republic et al. ("Petersen III"), 15 Civ. 2739 (LAP), 16 Civ. 8569 (LAP), 2023 WL 5827596, at *1 (S.D.N.Y. Sept. 8, 2023).

On May 3, 2012, the Republic enacted Law 26,741 (the "YPF Expropriation Law"), which became effective on May 7, 2012, id. at *3, and "was intended to escape the obligation to pay the tender offer," id. at *4. Article 15 of the YPF Expropriation Law states that YPF "shall continue to operate as [a] publicly traded corporation[]." (Giuffra Decl. Ex. 1.) Article 16 requires the Republic to execute the Shares pursuant to various principles, including in a manner "safeguarding shareholder interest and generating value on their behalf." (Id.) Additionally, Article 10 states that the Republic's expropriation of the Shares from Repsol is conducted for the "public interest" and prohibits "any future transfer of the shares without permission of the National Congress by a two-thirds vote of its members."[6] (Id.; dkt. no. 470-7 Articles 4-5 (Expropriation must include a declaration of public utility.).)

By expropriating Repsol's 51% of YPF's Class D shares, the Republic breached Sections 7 and 28 of YPF's bylaws because it never made a tender offer for Plaintiffs' shares. Petersen II, 2023 WL 2746022, at *8-11.

---

[6] The Court does not opine on whether this law applies (a) to voluntary transfers only or (b) to voluntary transfers and transfers made necessary by a court order. (Pl. Reply at 2; Def. Sur-Reply at 4.)

As a result of the expropriation, the Republic holds 51% of YPF's Class D shares,[7] which are uncertificated securities held in book-entry form[8] in an account at Caja de Valores, S.A. ("CdV"), the central securities depository of Argentina.  (Mastro Decl. 1 Ex. 1 at 101.)  The Republic holds the shares at CdV directly, rather than in "street name" through a broker or other intermediary.  (Dkt. no. 45-2 at ECF 4; see also Pl. Mem. at 17.) When book-entry shares are transferred from one owner to another, no physical transfer occurs; instead, the transfer is noted in the registry.  (Mastro Decl. 1 Ex. 14 at 32 ("If securities are dematerialized: May dematerialized security positions be re-certificated and held outside the CSD? No.").)

---

[7] The Republic argues that the Court cannot transfer 49% of the Shares because the YPF Expropriation Law "designates 49% of the [shares] to Argentine Provinces that are part of OFEPHI."  (Def. Opp'n at 7.)  The provinces' contingent interest in the Republic's shares, which will ripen into an actual interest only if the Republic decides to transfer the Shares, is not itself subject to attachment and cannot prevent transfer of the Republic's interest. See, e.g., Matter of Supreme Merch. Co. v. Chem. Bank, 70 N.Y.2d 344, 350 (1987) (CPLR § 5201 "preclude[s] a levy against contingent obligations not certain to ripen into something real.").  Additionally, YPF's Form 20-F for the year ended December 31, 2023 confirms that the "Argentine National State" owns 200.6 million Class D shares of YPF (51% of the total), while the "Argentine provincial governments" own 7,624 Class B shares (which Plaintiffs do not seek to execute upon).  (Mastro Decl. 2 Ex. 3 at 90.)

[8] Section 7(a) of YPF's bylaws states that its shares "shall not be represented by certificates.  Instead, they shall be book-entry shares and shall be recorded in accounts kept under their holder's names in the Corporation, commercial banks, investment banks or securities clearing houses as authorized by the Board of Directors."  (Dkt. no. 45-2 at ECF 4.)

Since April 2012, the Republic has controlled YPF's major business and financial decisions through its majority share of the company. The parties agree that the Republic votes to elect the Board and to approve initiatives generally proposed by the Board, including those that require shareholder approval under the Republic's laws. (Pl. Mem. at 3, 12-13; Def. Opp'n at 6.)

Additionally, as disclosed in YPF's Form 20-F for the year ended December 31, 2013: "The Argentine federal government controls the Company, and consequently, the federal government is able to determine substantially all matters requiring approval by a majority of our shareholders, including the election of a majority of our directors, and is able to direct our operations." (Mastro Decl. 1 Ex. 6 at 10.) As disclosed in YPF's Form 20-F for the year ended December 31, 2022:

> The Argentine Republic owns 51% of the shares of YPF S.A. and, consequently, the Argentine government is able to decide all matters requiring approval by a majority of shareholders[.] . . . We cannot assure you that decisions taken by our controlling shareholder would not differ from your interests as a shareholder.

(Id. Ex. 1 at 6.)

More recently, YPF continues to tap into the United States' markets by: (i) sponsoring the ADR program for its Class D shares with BNYM and listing the shares on the NYSE, which requires maintaining the registration of its Class D shares and ADSs with the SEC; and (ii) offering bonds on the debt capital markets.

(Lissemore 2 ¶¶ 27-29; Coffee 4 ¶¶ 11-18; Mastro Decl. 1 Exs. 11-12.)

## II.  **Applicable Law**

Federal Rule of Civil Procedure 69(a)(1) provides that the "procedure on execution" and "proceedings supplementary to and in aid of judgment or execution" enforcing a money judgment "must accord with the procedure of the state where the court is located." See, e.g., All. Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A., 190 F.3d 16, 20 (2d Cir. 1999).  In New York, NY CPLR § 5201 establishes what property is subject to enforcement and who the proper garnishee is.[9]  NY CPLR § 5225 provides the mechanism for courts to order the payment or delivery of the property.  In addition, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1610(a), addresses enforcement against a foreign sovereign.

### a. **NY CPLR § 5201**

NY CPLR § 5201(b) states that judgments are only enforceable "against any property which could be assigned or transferred." New York law controls whether shares in a foreign corporation "could be assigned or transferred" under NY CPLR § 5201(b).  See, e.g., 245 Park Member LLC v. HNA Grp. (Int'l) Co. Ltd., No. 23-842-CV, 2024 WL 1506798, at *3 (2d Cir. Apr. 8, 2024) (New York

---

[9] A "garnishee" is a person who owes a debt to a judgment debtor, or a person other than the judgment debtor who has property in his possession or custody in which a judgment debtor has an interest. N.Y. C.P.L.R. § 105(i).

law controls whether membership interest in Delaware LLC is assignable and transferable); Hotel 71 Mezz Lender LLC v. Falor, 14 N.Y.3d 303, 314 (2010) (same). And, under New York law, shares in a company are freely transferable and assignable. See, e.g., Koehler v. Bank of Berm. Ltd., 12 N.Y.3d 533, 541 (2009).

NY CPLR § 5201(c), titled "proper garnishee for particular property or debt," outlines who the proper garnishee is for certain property. NY CPLR § 5201(c)(4) states that

> where property . . . is evidenced by a . . . negotiable document of title or a certificate of stock of an association or corporation, the . . . document or certificate shall be treated as property capable of delivery and the person holding it shall be the garnishee.

It further states,

> except that section 8—112 of the uniform commercial code shall govern the extent to which and the means by which any interest in a certificated security, uncertificated security or security entitlement (as defined in article eight of the uniform commercial code) may be reached by garnishment, attachment or other legal process.[10]

---

[10] Defendant argues that NY UCC § 8-110(a)(5) provides that the "local law of the issuer's jurisdiction," here Argentine law, "governs . . . whether an adverse claim can be asserted against a person to whom transfer of a[n] . . . uncertificated security is registered or a person who obtains control of the uncertificated security." (Def. Opp'n at 26 (emphasis added).) The Court is unpersuaded because Plaintiffs do not assert an "adverse claim" to the Shares; on the contrary, Plaintiffs acknowledge that the Republic validly owns the Shares, which is why Plaintiffs argue that they should be subject to execution governed by New York law and the FSIA. F.R.C.P. 69(a)(1) (New York law governs execution procedure here).

The Republic's Shares qualify as "uncertificated securit[ies]" under the UCC because they exist only in book-entry form.[11]  Under NY UCC § 8-112, Plaintiffs may reach Defendant's uncertificated securities by (1) legal process upon the issuer at its chief executive office in the United States, (§ 8-112(b)); (2) legal process upon the secured party, (§ 8-112(d));[12] or (3) "aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the certificated security, uncertificated security, or security entitlement or in satisfying the claim by means allowed at law or in equity in regard to property that cannot readily be reached by other legal process," (§ 8-112(e)).

---

[11] NY UCC § 8-102(18) defines "uncertificated security" as "a security that is not represented by a certificate."  The term "security entitlement" refers to the rights and property interest of a person who holds securities indirectly through a broker or other securities intermediary.  See N.Y. U.C.C. § 8-102(7), (17). The Shares are not "security entitlement[s]" because they are registered to the Republic and not held in street name.  N.Y. U.C.C. § 8-102(7), (17); see also N.Y. U.C.C. § 8-501(d) ("If a securities intermediary holds a financial asset for another person, and the financial asset is registered in the name of . . . the other person, and has not been indorsed to the securities intermediary or in blank, the other person is treated as holding the financial asset directly rather than as having a security entitlement with respect to the financial asset.").

[12] Because the Republic holds the Shares directly through CdV, as opposed to in street name through a broker or other intermediary, they are "uncertificated securit[ies] registered in the name of a secured party."  N.Y. U.C.C. § 8-112(d).

### b. NY CPLR § 5225[13]

NY CPLR § 5225(a) sets forth New York's procedure for enforcement of money judgments against property in the possession or custody of the judgment debtor. <u>See, e.g.</u>, <u>Koehler</u>, 12 N.Y.3d at 537-38. It provides that

> where it is shown that the judgment debtor is in possession or custody of money or other personal property in which he has an interest, the court shall order that the judgment debtor pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor. . . .

N.Y. C.P.L.R. § 5225(a). NY CPLR § 5225(b) applies when the property is not in the judgment debtor's possession. <u>Koehler</u>, 12 N.Y.3d at 541. It provides that the Court may order a third-party garnishee to turn over the property – but only "upon a special proceeding" commenced against that garnishee. N.Y. C.P.L.R. § 5225(b).

Under either NY CPLR §§ 5225(a) or (b), control is not enough: the judgment debtor (§ 5225(a)) or a third-party garnishee (§ 5225(b)) must have "possession or custody." <u>Commonwealth of N. Mariana Islands v. Canadian Imperial Bank of Com.</u>, 990 N.E.2d 114, 115 (N.Y. 2013) (under NY CPLR § 5225(b) third-party garnishee

---

[13] The Republic argues that NY CPLR § 5225 applies only to a "person," which does not include sovereigns. (Def. Opp'n at 28 n. 15.) However, the Court finds that § 5225 must apply to sovereigns, at least where the sovereign owes a commercial debt and is being asked to pay that debt with commercial assets.

"must have actual, not merely constructive, possession or custody of the assets").

Additionally, NY CPLR § 5225(c) provides that "[t]he court may order any person to execute and deliver any documents necessary to effect payment or delivery."

Turnover orders pursuant to NY CPLR § 5225 are effective against assets regardless of their location if the Court has personal jurisdiction over the judgment debtor or the third-party garnishee.  In Koehler, the New York Court of Appeals expressly addressed funds held outside of New York, holding that "CPLR article 52 contains no express territorial limitation barring the entry of a turnover order that requires . . . [the transfer of] money or property into New York from another state or country." 12 N.Y.3d at 539, 541 ("[A] New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property. . . ."); see also Motorola Credit Corp. v. Uzan, 739 F. Supp. 2d 636, 641 (S.D.N.Y. 2010) (same); In re Gaming Lottery Sec. Litig., No. 96 Civ. 5567 (RPP), 2001 WL 123807, at *3 (S.D.N.Y. Feb. 13, 2001) (noting that the Court "has the power under CPLR § 5225(a) to order a turnover of funds held in another jurisdiction" and ordering the turnover of funds "in an account at the Royal Bank of Scotland"); In re Feit & Drexler, Inc. v. Drexler, 760 F.2d 406, 414 (2d Cir. 1985) (holding that the district court, sitting in bankruptcy, had the power to compel the

defendant to deliver property from outside the court's territorial
jurisdiction because the court had personal jurisdiction over the
defendant); <u>Miller v. Doniger</u>, 814 N.Y.S.2d 141 (2006) (affirming
order directing the judgment debtor to "turn over his out-of-State
Wachovia account"); <u>Starbare II Partners L.P. v. Sloan</u>, 629
N.Y.S.2d 23 (1995) (directing the defendant to turn over artwork
located outside the state pursuant to NY CPLR 5225(a)).

   In <u>Bainbridge Fund Ltd. v. Republic of Argentina</u>, this Court
found that it has the power to order a sovereign to bring assets
held in that sovereign country's central bank and deliver them to
New York.  690 F. Supp. 3d 411, 421-22 (S.D.N.Y. 2023).  "The FSIA
. . . does not supersede CPLR 5225 and prevent the Court from
ordering the Republic, a judgment debtor over which it has personal
jurisdiction, to bring assets from outside of New York into New
York to pay [Plaintiff]."  <u>Id.</u> at 416.  The Court further stated
that "[t]he execution immunity provision of the FSIA is no bar
because by its plain terms it 'immunizes only foreign-state
property '<u>in the United States</u>.''"  <u>Id.</u> (citation omitted).
Additionally, the Court determined that the "more prudent course"
is to evaluate whether the assets are subject to execution immunity
before ordering that they be brought to the United States.  <u>Id.</u> at
417.

13

### c. Foreign Sovereign Immunities Act, 28 U.S.C. § 1610(a)

Under the FSIA,

[t]he property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if . . . the property is or was used for the commercial activity upon which the claim is based. . . .

28 U.S.C. § 1610(a)(2).  Accordingly, to be amenable to execution under this section, property of a foreign state must satisfy three requirements: (1) it must be "in the United States;" (2) it must be "used for a commercial activity in the United States;" and (3) it must be (or have been) "used for the commercial activity upon which the claim is based."  Id.  In other words, the sovereign

must use the property but may do so anywhere,[14] and the activity must occur in the United States but may be conducted by anyone.[15]

Plaintiffs have the initial burden of production to show that an exception to foreign sovereign immunity under the FSIA applies. Beierwaltes v. L'Office Federale de la Culture de la Confederation Suisse (Fed. Office of Culture of the Swiss Confederation), 999 F.3d 808, 816-17 (2d Cir. 2021); see also Bainbridge Fund Ltd., 690 F. Supp. 3d at 419.  Defendant then bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply.  Id.

### III. Discussion

The Republic opposes the entry of the proposed order by arguing, inter alia, that (1) the Shares are immune from turnover

---

[14] The Republic argues that the statute requires that the "use" occur in the United States, as opposed to requiring that the commercial activity occur in the United States.  (Def. Opp'n at 13-17.)  The Court disagrees.  What matters is not where the Shares were used, but where the resulting commercial activity takes place. Exp.-Imp. Bank of the Republic of China v. Grenada, 768 F.3d 75, 89-91 (2d Cir. 2014) (declining to attach funds "because they are not used by the Statutory Corporations for commercial activity that takes place in the United States" (emphasis added)); Attestor Master Value Fund LP v. Argentina, 113 F.4th 220, 233 (2d Cir. 2024) (the FSIA required that "the commercial activity in which Argentina used [the property] took place at least in part in the United States." (emphasis added)); But see Aurelius Cap. Partners, LP v. Republic of Argentina, No. 07 Civ. 11327 (TPG), 2010 WL 768874, at *4 (S.D.N.Y. Mar. 5, 2010) ("even if the property is being used for commercial activity, this use is not occurring in the United States").

[15] The Republic argues that the commercial activity must be carried out by the foreign state.  (Def. Opp'n at 17.)  However, that requirement is not found in the statute.  (Pl. Reply at 10.)

under the FSIA, (see infra Sections III.a. and III.c.); (2)
Plaintiffs have not shown that the assets are subject to turnover
under New York law, (see infra Section III.b.); and (3)
international comity counsels against turnover, (see infra Section
III.d.).  The Court addresses each argument in turn.

### a. Whether the Shares are Immune from Execution under the FSIA

Because the Court determined in Bainbridge that the "more
prudent course" is to "evaluate whether the assets are otherwise
subject to execution immunity before ordering that they be brought
to the United States," 690 F. Supp. 3d at 417, the Court first
turns to whether two elements of an exception under the FSIA are
met: (i) the Shares must be "used for a commercial activity in the
United States;" and (ii) it must be (or have been) "used for the
commercial activity upon which the claim is based."  28 U.S.C.
§ 1610(a)(2).

### i. Whether the Shares are "Used for a Commercial Activity in the United States"

To satisfy this element, the Republic must "actively utilize
[the Shares] in service of that commercial activity [in the United
States]."  Exp.-Imp. Bank of the Republic of China v. Grenada, 768
F.3d 75, 90 (2d Cir. 2014); see also id. at 89 (". . . when the
property in question is put into action, put into service, availed
or employed for a commercial activity . . .").

The Republic does not dispute that YPF sponsoring an ADR program for its Class D shares with BNYM in New York, listing its shares on the NYSE, registering its shares with the SEC, and selling its debt to United States institutional investors under SEC Rule 144A, all constitute "commercial activity in the United States." (Def. Opp'n at 24.)   See, e.g., EM Ltd. v. Republic of Argentina, 389 F. App'x 38, 44 (2d Cir. 2010) (facilitating investment and sale of securities is "commercial activity" under the FSIA); Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 615-17 (1992) (issuing bonds is commercial activity).   The question for the Court's consideration is whether the Republic used its Shares "for [the] commercial activity in the United States." 28 U.S.C. § 1610 (a).

In Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela, 932 F.3d 126, 152 (3d Cir. 2019), the Third Circuit affirmed attachment of Petróleos de Venezuela, S.A.'s ("PDVSA") (Venezuela's state oil company and its alter ego) controlling shares in PDV Holding, Inc. ("PDVH") (a separate entity whose corporate veil was not pierced).   The Court observed that PDVSA used its shares in PDVH "to run its business as an owner, to appoint directors, approve contracts, and to pledge PDVH's debts for its own short-term debt." Id. at 151.   Accordingly, the Court held that PDVSA used its shares in PDVH for a commercial activity in the United States by directing the activities of PDVH in the

United States and thus the PDVH shares were subject to execution
under § 1610(a).  Id. at 151-52; see also Foremost-McKesson, Inc.
v. Islamic Republic of Iran, 905 F.2d 438, 450 (D.C. Cir. 1990)
(holding that Iran engaged in commercial activity when it "used
its majority position" in a dairy company "to lock Foremost out of
the management of the company and deny Foremost its share of the
company's earnings.").  Similarly, in In re 650 Fifth Ave. Co.,
No. 08 Civ. 10934 (KBF), 2014 WL 1284494 (S.D.N.Y. Mar. 28, 2014),
vacated and remanded sub nom. Kirschenbaum v. 650 Fifth Ave. &
Related Props., 830 F.3d 107 (2d Cir. 2016), and vacated and
remanded, 830 F.3d 66 (2d Cir. 2016), the Court held that Iranian
front companies "used" partnership shares in a real estate company
for commercial activity in the United States, because: (i) the
company owned a building in New York that generated revenue; and
(ii) the shares "were the mechanism through which the partners
owned the Building and determined the distribution of revenue that
it produced."  Id. at *17.[16]  Accordingly, a foreign sovereign's
use of its controlling shares to direct a company's commercial
activity in the United States satisfies the FSIA requirement that
the shares be "used for a commercial activity in the United
States."

---

[16] On appeal, the Court of Appeals vacated the district court's
prior alter ego finding and therefore the Court of Appeals did not
address the district court's FSIA analysis.  Kirschenbaum v. 650
Fifth Ave. Co., 830 F.3d 107 (2d Cir. 2016).

Each year YPF advises United States investors that the
Republic exercises a high degree of control over YPF.[17]  Since
April 2012, the Republic has controlled YPF's major business and
financial decisions through its majority share ownership and
generated value for the company through use of the United States'
markets.  The parties agree that the Republic votes to elect the
Board and to approve initiatives generally proposed by the Board,
including those that require shareholder approval under the
Republic's laws like international debt issuances and the
delisting of its shares from the NYSE.[18]  (Dkt. no. 45-2 at 21-24
§§ 17(vi); Pl. Mem. at 3, 11-13; Def. Opp'n at 6.)  For example,
at an annual shareholder meeting held on April 29, 2016, the
Republic voted to approve an increase in the amount of YPF's Global
Medium-Term Notes Program from $2.0 billion to $10.0 billion.

---

[17] As disclosed in YPF's Form 20-F for the year ended December 31,
2013: "The Argentine federal government controls the Company, and
consequently, the federal government is able to determine
substantially all matters requiring approval by a majority of our
shareholders, including the election of a majority of our
directors, and is able to direct our operations."  (Mastro Decl.
1 Ex. 6 at 10.)  As disclosed in YPF's Form 20-F for the year ended
December 31, 2022: "The Argentine Republic owns 51% of the shares
of YPF S.A. and, consequently, the Argentine government is able to
decide all matters requiring approval by a majority of
shareholders[.] . . . We cannot assure you that decisions taken by
our controlling shareholder would not differ from your interests
as a shareholder."  (Id. Ex. 1 at 6.)

[18] The Court does not address whether all of YPF's commercial
activity in the United States is attributable to the Republic
merely because the Republic holds a majority share in YPF; instead,
the Court focuses on the commercial activity in the United States
that the parties agree requires the Republic's direct approval.

(Coffee 4 ¶ 29; Mastro Decl. 1 Ex. 1 at 74.)  Similarly, at a meeting held on April 28, 2023, the Republic granted the Board of Directors the authority "to create Global Programs for the issuance of negotiable obligations."  (Mastro Decl. 1 Ex. 7 at 26-27.) Since April 2012, YPF has sold more than $2.4 billion in debt just to United States investors.  (Coffee 4 ¶ 14.)  Accordingly, the Republic's use of its controlling shares to direct YPF's commercial activity in the United States is sufficient to establish that the Shares are "used for a commercial activity in the United States."

### ii. Whether the Shares Are or Were "Used for the Commercial Activity Upon Which the Claim is Based"

For purposes of § 1610(a)(2) of the FSIA, a claim is "'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit." Petersen I, 895 F.3d at 204 (citation omitted); De Letelier v. Republic of Chile, 748 F.2d 790, 796 (2d Cir. 1984) ("Congress specifically designed the execution immunity rules to 'conform' to the jurisdictional immunity provisions of § 1605." (citation omitted)).  In cases "involving breach of contract or related equitable claims, courts routinely identify the breach (or formation plus breach) as the gravamen." Friedman v. Gov't of Abu Dhabi, United Arab Emirates, 464 F. Supp. 3d 52, 68 (D.D.C. 2020) (collecting cases and citing Petersen I, 895 F.3d at 207).  When there is "nothing [inherently] wrongful" about the formation of the contract, the "commercial activity" analysis for FSIA purposes

turns on the "gravamen" of the "alleged breach" serving as the "foundation" of the suit, not the act of formation.  <u>MMA Consultants 1, Inc. v. Republic of Peru</u>, 719 F. App'x 47, 52 (2d Cir. 2017) (rejecting commercial activity analysis based on formation).   Because Plaintiffs have identified "nothing inherently wrongful" about the formation of the YPF bylaws, the Court need not determine whether the Shares were used in the formation of the YPF bylaws at issue.   <u>Id.</u>

The Court of Appeals held that "the gravamen of Petersen's claim is that Argentina denied Petersen the benefit of the bargain promised by YPF's bylaws when Argentina repudiated its obligation to tender for Petersen's [YPF] shares."   <u>Petersen I</u>, 895 F.3d at 207.   The Court of Appeals also held that the Republic's actions were commercial in nature.   <u>Id.</u> ("Th[e tender-offer] obligation and Argentina's subsequent repudiation of it were indisputably commercial.").

Although "the tender obligation is not attached to the shares that the Republic acquired," the Republic used its control of Repsol's shares to effectuate the breach of the tender offer obligation because that control ensured that (1) the bylaws would never be enforced and (2) the Republic holds the Shares today. The fundamental promise of the tender offer provisions of the YPF bylaws was that investors would not be stranded as minority shareholders in a government-run enterprise without being offered

a compensated exit.  See Petersen II, 2023 WL 2746022, at *12
("[T]he Republic promised security holders that it would provide
them with a compensated exit if it reacquired control over the
requisite number of shares.").  The Republic used its control of
Repsol's shares to "displac[e]" the Repsol-elected Board and
render it "devoid of any powers, functions, or duties." Petersen
III, 2023 WL 5827596, at *1.  The Republic "appropriated the rights
of the Board to itself, and used those rights to cancel the
shareholder meeting" scheduled for April 25, 2012.  Id. at *2.
That cancellation "ensure[d] that Repsol would have no ability to
vote its shares," id. at *1, including to enforce the bylaws'
tender offer obligation, (see dkt. no. 45-2 at 30 § 28(C)
(requiring YPF to withhold the Republic's right to vote if it
acquired a controlling stake and declined to make a tender offer)).

Moreover, following the enactment of the YPF Expropriation
Laws, the Republic continued to use the Repsol shares to breach
its obligations—using the shares to vote at shareholder meetings,
appoint a new Board, run the company, and evade the tender offer
requirement.  Petersen II, 2023 WL 2746022, at *3.  As this Court
previously recognized, the YPF Expropriation Law "was intended to
escape the obligation to pay the tender offer." Petersen III,
2023 WL 5827596, at *4.  The Republic invoked its "political
rights" in the Repsol shares at the June 4, 2012 shareholders'
meeting for the express purpose of overruling minority

shareholders' objection that YPF failed to invoke Sections 7(h) and 28 of the bylaws. (Dkt. no. 112-4 at 7-8.) Thus, by controlling Repsol's shares, the Republic stranded minority shareholders in a government-run enterprise – the precise outcome against which the bylaws were designed to protect and therefore the crux of the Republic's breach. Accordingly, the facts – (1) that the Republic's breach of its tender offer obligation was indisputably part of the gravamen of Plaintiffs' claims and (2) that the Republic used the Shares to effectuate that breach - are sufficient to establish that the Shares were "used for the commercial activity upon which the claim is based."

### b. Whether the Shares are Immune from Turnover Under New York Law

Because the Shares are "used for a commercial activity in the United States" and "used for the commercial activity upon which the claim is based," and therefore are not otherwise subject to execution immunity, the Court now analyzes whether the Shares are subject to turnover under New York law. 28 U.S.C. § 1610(a)(2); Bainbridge, 690 F. Supp. 3d at 417.

### i. Whether the Shares Can be Transferred under NY CPLR § 5225

Under New York law, the Court must first determine if the property is subject to enforcement and who the proper garnishee is. N.Y. C.P.L.R. § 5201. Under NY CPLR § 5201(b), the Shares "could be assigned or transferred," regardless of Article 10 of

the YPF Expropriation Law's restriction, (see infra Section
III.c.). Since May 21, 2014, each "Constancia de Acciones" (Proof
of Shares) issued by CdV confirms that the Shares are fully
transferable, without any restriction. (Mastro Decl. 2 Ex. 1.)
Additionally, as recently as May 2024, the Milei administration
has reaffirmed its intention to reprivatize YPF, a process that
would necessarily involve the transfer of the Shares. (Mastro
Decl. 2 Ex. 4 at 4.)

NY CPLR § 5201(c) outlines who the proper garnishee is for
"particular property." Given the Shares are uncertificated
securities, they fall within the category of "particular property"
and thus lead the Court to the conclusion that

> the person holding [the Shares] shall be the garnishee; except
> that section 8—112 of the uniform commercial code shall govern
> the extent to which and the means by which any interest in a
> certificated security, uncertificated security or security
> entitlement (as defined in article eight of the uniform
> commercial code) may be reached by garnishment, attachment or
> other legal process.

N.Y. C.P.L.R. § 5201 (c)(4). Under NY UCC § 8-112, Plaintiffs may
reach the Shares by (1) legal process upon the issuer at its chief
executive office in the United States (§ 8-112 (b)); (2) legal
process upon the secured party (§ 8-112 (d)); or (3) "aid from a
court of competent jurisdiction, by injunction or otherwise, in
reaching the certificated security, uncertificated security, or
security entitlement or in satisfying the claim by means allowed
at law or in equity in regard to property that cannot readily be

reached by other legal process" (§ 8-112 (e)). While control is not enough to prove "possession or custody" under federal common law, the statutes (NY CPLR § 5201(c) and NY UCC § 8-112(d)) aid the Court in identifying who is in "possession or custody" and therefore appropriate to bring the proceedings against under NY CPLR § 5225. Commonwealth of N. Mariana Islands, 990 N.E.2d at 115. Because NY UCC § 8-112(d) states that the Shares can be reached by legal process upon the secured party, here, the Republic, this aids the Court in concluding that the Republic "holds" or has "possession or custody" of the Shares for purposes of applying NY CPLR § 5225(a). Accordingly, Plaintiffs appropriately moved for turnover under New York law.

### ii. Whether the Shares are Immune from Turnover by Being Outside the United States

Regarding whether the Shares are immune from turnover by virtue of being outside of the United States, the Court previously ruled on this exact issue in Bainbridge, 690 F. Supp. 3d at 416. Here, the Court similarly holds that the FSIA does not supersede NY CPLR § 5225 and prevent the Court from ordering the Republic, a judgment debtor over which it has personal jurisdiction, to bring the Shares from outside of New York into New York to pay Plaintiffs.

### c. Whether the Shares Qualify as "in the United States" under Section 1610(a) of the FSIA Once Transferred

The Court must determine whether the Shares would qualify as property of the Republic "in the United States" under Section 1610(a) of the FSIA after the Court orders the Republic to take the following two steps: (i) transfer forthwith the Shares to a global custody account at BNYM in New York for turnover to Plaintiffs; and (ii) instruct BNYM to transfer the Republic's ownership interests in the Shares to Plaintiffs or their designees.[19]

A global custody account is an account that indirectly holds foreign securities on behalf of an investor. More specifically, a global custody account (BNYM in New York) maintains a network of local sub-custodians in foreign markets, and each sub-custodian in turn is a member of the central securities depositary in its own market (Argentina). (Mastro Decl. 1 Ex. 15, ii-iv; Mastro Decl.

---

[19] The Republic asserts that there is "no evidence that such an account could be created by BNYM, which presumably would have to satisfy its own due diligence before doing so." (Def. Opp'n at 12.) BNYM historically had contractual relationships with both the Republic (for which it serves as trustee and paying agent on sovereign debt issuances) and YPF (for which it maintains the ADR program and serves as depositary). While the Republic may not have an existing global custody account with BNYM, NY CPLR § 5225(c) requires that the Republic will execute and deliver any documents necessary to set up such an account. Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., B.V., 814 N.Y.S.2d 4, 14 (2007) (ordering judgment-debtor under NY CPLR § 5225(c) to "execute appropriate documents" to transfer shares in foreign corporations to plaintiffs).

1 Ex. 16.)  Transferring the Shares to a global custody account at BNYM in New York means that CdV would identify BNYM's sub-custodian as the beneficial owner, but the Shares would remain in the register maintained by CdV in Argentina.  (Pl. Mem. at 17-18; Def. Opp'n at 5-6, 12.)  Once the Shares are transferred into a global custody account at BNYM in New York, the Republic's ownership interest in the Shares will qualify as security entitlements.  N.Y. U.C.C. §§ 8-102(7), (17); N.Y. U.C.C. § 8-112, Official Cmts., ¶ 3.  The Republic's security entitlements will have a New York situs, because the global account will be held at the New York office of BNYM.  JPMorgan Chase Bank, N.A. v. Herman, 168 A.3d 514, 521-22 (Conn. App. Ct. 2017) (judgment-debtor's security entitlement had Connecticut situs under UCC § 8-112 because its account was with Connecticut office of brokerage firm, even though securities certificates were held by securities depositary in New York); EM Ltd. v. Republic of Argentina, 389 F. App'x 38, 43-44 (2d Cir. 2010) (holding that Argentina's beneficial interests in trust had New York situs and were attachable under FSIA, even though corpus of trust consisted of ADSs that represented interests in shares of Argentine corporation).  Accordingly, the Republic's ownership interest in the Shares will qualify as property "in the United States," as required by the FSIA after the Court orders the Republic to take the two proposed steps.

### d. Whether International Comity Counsels Against Granting the Proposed Order[20]

The Republic argues that international comity counsels against granting the proposed order. The "fundamental principle of international comity" is that "a state may not require a person to do an act in another state that is prohibited by the law of that state or the law of the state of which he is a national." Motorola Credit Corp. v. Uzan, 388 F.3d 39, 60 (2d Cir. 2004) (citations omitted). Additionally, under the act-of-state doctrine, courts cannot "declar[e] invalid, and thus ineffective as a rule of decision, . . . the official act of a foreign sovereign." Celestin v. Caribbean Air Mail, Inc., 30 F.4th 133, 137 (2d Cir. 2022) (internal quotation marks and citation omitted). The Court previously recognized the expropriation of the Shares as "a valid act." Petersen Energia Inversora, S.A.U. v. Argentine Republic et al., No. 15 Civ. 2739 (LAP), 2016 WL 4735367, at *8 (S.D.N.Y. Sept. 9, 2016), aff'd in part, appeal dismissed in part

---

[20] Prescriptive comity refers to "the respect sovereign nations afford each other by limiting the reach of their laws." Hartford Fire Ins. Co. v. California, 509 U.S. 764, 817 (1993). Prescriptive comity is distinct from "adjudicative comity," which "asks whether, where a statute might otherwise apply, a court should nonetheless abstain from exercising jurisdiction in deference to a foreign nation's courts that might be a more appropriate forum for adjudicating the matter." In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 100-01 (2d Cir. 2019).

sub nom. Petersen I, 895 F.3d.  (See also Pl. Reply at 6; Def. Opp'n at 9.)

The Republic argues that Plaintiffs' requested relief would require the Republic either to change its laws or violate them.[21] The Republic points to Article 10 of the YPF Expropriation Law, which forbids any transfer of the Shares without permission of the National Congress by two-thirds vote of its members, and the Permanent Supplementary Budget Law, which provides for payments only of final judgments.

International comity comes into play only when there is a true conflict between the law of the United States and that of a

---

[21] The Court does not evaluate the parties' arguments regarding international comity as it pertains to the analysis of NY CPLR § 5225 and the FSIA because the Court relies on its decision in Bainbridge, 690 F. Supp. 3d at 411.  In addition, the FSIA already reflects Congress's resolution of comity principles in execution proceedings against a foreign state.  Republic of Austria v. Altmann, 541 U.S. 677, 699 (2004) (Comity principles in the FSIA provide a "comprehensive framework for resolving any claim of sovereign immunity."); accord Dole Food Co. v. Patrickson, 538 U.S. 468, 479 (2003) (The FSIA already grants immunity to foreign states and their property "as a gesture of comity."); see also Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic Republic, No. 10 Civ. 5256 (KMW) (DCF), 2013 WL 1703873, at *7 (S.D.N.Y. Apr. 19, 2013).  But see Peterson v. Islamic Republic of Iran, 876 F.3d 63, 94 & n.23 (2d Cir. 2017), vacated on other grounds, Clearstream Banking S.A. v. Peterson, 140 S. Ct. 813 (2020) (Comity questions left open by the FSIA include whether "a court order will infringe on sovereign interests of a foreign state."); Republic of Argentina v. NML Cap., Ltd., 573 U.S. 134, 142-46 & nn.4 & 6 (2014) (holding that a comity analysis may be appropriate when ordering discovery about a foreign state's assets, because the FSIA has "nothing to say" about that discovery); Aurelius Cap. Master, Ltd. v. Republic of Argentina, 589 F. App'x 16, 18 (2d Cir. 2014) (same).

foreign jurisdiction.  In re Maxwell Commc'n Corp., 93 F.3d 1036, 1049 (2d Cir. 1996) ("International comity comes into play only when there is a 'true conflict' between American law and that of a foreign jurisdiction."); Hartford Fire Ins. Co., 509 U.S. at 799 (A "true conflict" exists only if it would be "impossible" for a party to comply with the laws of both countries.).

There is no unavoidable conflict between Argentine law and Plaintiffs' requested relief.  The Republic has several choices it can legally pursue: (1) receive the permission of the National Congress by two-thirds vote, (2) take action to change the law, or (3) satisfy the judgment through a separate agreement with Plaintiffs.  Courts have enjoined sovereigns to act within their own territory where necessary.  See, e.g., NML Cap., Ltd. v. Republic of Argentina, 699 F.3d 246, 254-55, 263 (2d Cir. 2012) (affirming injunction requiring Argentina to specifically perform its obligations under equal treatment provision in bonds).

Assuming arguendo, that there is a true conflict between Plaintiffs' requested relief and Argentine laws, comity considerations counsel in favor of granting Plaintiffs' requested relief.  The United States has a strong interest in enforcing its judgments, and that interest outweighs any putative Argentine interest in avoiding execution on assets that are fully subject to

execution under the FSIA.[22]   <u>JW Oilfield Equip., LLC v. Commerzbank</u>
<u>AG</u>, 764 F. Supp. 2d 587, 596-98 (S.D.N.Y. 2011) (requiring German
bank to turn over funds in judgment-debtor's account in violation
of German law, based on the United States' "strong interest in
enforcing its judgments").

Foreign governments cannot simply override the exceptions to
the FSIA by invoking its own law to shield its assets from
execution in the United States.  If comity could supersede the
FSIA and allow foreign law to control which sovereign assets are
subject to execution, every foreign state could render itself
judgment-proof in United States courts just by passing a law
requiring its own approval for any transfer of its property.  <u>Simon</u>
<u>v. Republic of Hungary</u>, 911 F.3d 1172, 1180 (D.C. Cir. 2018)

---

[22] Defendants argue that this will put the United States at jeopardy
"given the possibility of reciprocal adverse treatment of the
United States in foreign courts."  (Def. Opp'n at 9.)  <u>See</u> <u>Fed.</u>
<u>Republic of Germany v. Philipp</u>, 592 U.S. 169, 184 (2021) ("We
interpret the FSIA as we do other statutes affecting international
relations: to avoid, where possible, producing friction in our
relations with [other] nations and leading some to reciprocate by
granting their courts permission to embroil the United States in
expensive and difficult litigation.") (internal quotation marks
and citations omitted).  While it is the Court's view that this
concern is addressed in the FSIA requirements, this
"apprehension[] [is] better directed to that branch of government
with authority to amend. . ."  <u>Republic of Argentina</u>, 573 U.S. at
146; <u>see also</u> <u>Turkiye Halk Bankasi A.S. v. United States</u>, 598 U.S.
264, 280 (2023) ("In the context of a civil proceeding, this Court
has recognized that a suit not governed by the FSIA 'may still be
barred by foreign sovereign immunity under the common law.'"
(citations omitted)).

(rejecting Hungary's comity-based argument that "would in actuality amount to a judicial grant of immunity"), <u>vacated on other grounds</u>, 141 S. Ct. 691 (2021); <u>De Csepel v. Republic of Hungary</u>, 27 F.4th 736, 753 (D.C. Cir. 2022) (reaffirming <u>Simon's</u> rejection of Hungary's comity-based argument on same ground).

While the Republic demands that this Court extend comity, it simultaneously refuses to make any effort to honor the Court's unstayed judgment. <u>NML Cap., Ltd. v. Republic of Argentina</u>, 2015 WL 1087488, at *7 (S.D.N.Y. Mar. 12, 2015) ("[I]f Citibank's predicament is a matter of comity, it is only because the Republic has refused to observe the judgments of the court to whose jurisdiction it acceded. Comity does not suggest abrogating those judgments, or creating exceptions to the Injunction designed to enforce them."); <u>see also</u> <u>Motorola Credit Corp.</u>, 388 F.3d at 60 (declining to grant comity to Turkish injunction prohibiting turnover of shares because "orders of foreign courts are not entitled to comity if the litigants who procure them have deliberately courted legal impediments to the enforcement of a federal court's orders" (internal quotation marks and citations omitted)). Comity is not a one-way street.

Accordingly, while the Court need not engage in a comity analysis, those comity considerations counsel in favor of granting the proposed order.

## IV.   __Conclusion__

For the reasons set out above, Plaintiffs' motion is GRANTED. The Republic shall (i) transfer its Class D shares of YPF to a global custody account at BNYM in New York within 14 days from the date of this order; and (ii) instruct BNYM to initiate a transfer of the Republic's ownership interests in its Class D shares of YPF to Plaintiffs or their designees within one business day of the date on which the Shares are deposited into the account.

Satisfied that oral argument is not needed in addition to the papers submitted by the parties, the Republic's request for oral argument, (dkt. no. 582), is DENIED. __Doctor's Assoc., Inc. v. Distajo__, 66 F.3d 438, 448 (2d Cir. 1995); __see also__ __SecurityNational Mortg. Co. v. Lehman Bros. Holdings Inc.__, No. 20 MC 00027 (LAK) (DF), 2020 WL 9815257, at *1 (S.D.N.Y. July 10, 2020).

The Clerk of the Court is respectfully directed to close dkt. no. 555 in 15 Civ. 02739 and dkt. no. 481 in 16 Civ. 08569.

**SO ORDERED.**

Dated:     June 30, 2025
           New York, New York

_Loretta A. Preska_
_____
LORETTA A. PRESKA
Senior United States District Judge