## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse  40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

### MOTION INFORMATION STATEMENT

Docket Number(s): 25-01689

Caption [use short title]

Motion for: stay pending appeal and immediate administrative stay.

Eton Park Capital Management, L.P. et al.

v. Argentine Republic

Set forth below precise, complete statement of relief sought:

Appellant respectfully requests a stay pending the appeal of the District Court's Turnover Order, dated June 30, 2025, and seeks an immediate administrative stay in the interim.

MOVING PARTY: Argentine Republic

OPPOSING PARTY: Eton Park Capital Management, L.P. et al.

☐ Plaintiff     ☑ Defendant

☑ Appellant/Petitioner     ☐ Appellee/Respondent

MOVING ATTORNEY: Robert J. Giuffra, Jr.

OPPOSING ATTORNEY: Paul D. Clement

[name of attorney, with firm, address, phone number and e-mail]

Sullivan & Cromwell LLP

125 Broad Street, New York, NY 10004

(212) 558-400 / giuffrar@sullcrom.com

Clement & Murphy, PLLC

706 Duke Street, Alexandria, VA 22314

(202) 742-8900 / paul.clement@clementmurphy.com

Court- Judge/ Agency appealed from: Southern District of New York (Preska, J.)

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes     ☐ No (explain):_____

Opposing counsel's position on motion:
☐ Unopposed     ☑ Opposed     ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes     ☐ No     ☐ Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:

Has this request for relief been made below?     ☑ Yes  ☐ No
Has this relief been previously sought in this court?     ☐ Yes  ☑ No

Requested return date and explanation of emergency: July 14, 2025

Appellant requests that an interim stay be issued by Monday, July 14, 2025, which is the date by which Appellant has been ordered to comply with the District Court's June 30, 2025 Order. Appellant respectfully requests that this Court rule by 10:00 a.m. on that date, so that the Appellant may seek relief from the Supreme Court, if necessary.

(as to stay motion but not emergency interim stay)

Is the oral argument on motion requested?     ☑ Yes     ☐ No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set?     ☐ Yes     ☑ No  If yes, enter date:_____

Signature of Moving Attorney:

_____  Date: 07/10/2025     Service : ☑ Electronic     ☐ Other [Attach proof of service]

Form T-1080 (rev. 10-23)

# 25-1689

## In the United States Court of Appeals for the Second Circuit

---

ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P.,
*Plaintiffs-Appellees*,

v.

ARGENTINE REPUBLIC,
*Defendant-Appellant*.

---

On Appeal from the United States District Court
for the Southern District of New York
(No. 1:16-cv-08569) (Hon. Loretta A. Preska)

---

### EMERGENCY MOTION FOR STAY PENDING APPEAL AND IMMEDIATE ADMINISTRATIVE STAY

---

Amanda F. Davidoff
Thomas C. White
Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC  20006-5215
(202) 956-7500
davidoffa@sullcrom.com

Robert J. Giuffra, Jr.
Sergio Galvis
Adam F. Brebner
Pedro José Izquierdo
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
giuffrar@sullcrom.com

*Attorneys for the Argentine Republic*

# TABLE OF CONTENTS

*Page*

INTRODUCTION.................................................................................1

BACKGROUND ...............................................................................4

ARGUMENT ....................................................................................6

I.  THE REPUBLIC IS LIKELY TO PREVAIL ON THE MERITS .........7

    A.  Federal Common Law Bars Execution on Foreign-Sovereign Property Outside the United States .......................................8

    B.  The FSIA Independently Bars Turnover Here ...................................12

    C.  The Turnover Order Violates Longstanding Principles of International Comity.............................................................16

II.  THE REPUBLIC WILL BE IRREPARABLY INJURED ABSENT A STAY ...............................................................................18

III.  PLAINTIFFS WOULD SUFFER NO HARM FROM A STAY ............20

IV.  THE PUBLIC INTEREST WEIGHS HEAVILY IN FAVOR OF A STAY.............................................................................21

CONCLUSION.............................................................................22

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Autotech Techs. LP* v. *Integral Research & Dev. Corp.*,
 499 F.3d 737 (7th Cir. 2007) ...................................................................10

*Bainbridge Fund Ltd.* v. *Republic of Argentina*,
 690 F. Supp. 3d 411 (S.D.N.Y. 2023) ......................................................10

*Citibank, N.A.* v. *Aralpa Holdings Ltd. P'ship*,
 2024 WL 664782 (S.D.N.Y. Feb. 16, 2024) .............................................20

*Conn. Bank of Com.* v. *Republic of Congo*,
 309 F.3d 240 (5th Cir. 2002) ......................................................................9

*EJ Brooks Co.* v. *Cambridge Sec. Seals*,
 2016 WL 908633 (S.D.N.Y. Mar. 2, 2016)................................................21

*EM Ltd.* v. *Republic of Argentina*,
 695 F.3d 201 (2d Cir. 2012) ........................................................................9

*Ezrasons, Inc.* v. *Rudd*,
 2025 WL 1436000 (N.Y. May 20, 2025) ...................................................12

*In re 650 Fifth Ave. & Related Props.*,
 2014 WL 1284494 (S.D.N.Y. Mar. 28, 2014)............................................15

*In re 650 Fifth Ave. & Related Props.*,
 2020 WL 3000382 (S.D.N.Y. June 4, 2020) .................................18, 19, 21

*In re Austrian, German Holocaust Litig.*,
 250 F.3d 156 (2d Cir. 2001) ......................................................................18

*In re Johns-Manville Corp.*,
 27 F.3d 48 (2d Cir. 1994) ..........................................................................21

*Mashpee Wampanoag Tribe* v. *Bernhardt*,
 2020 WL 3034854 (D.D.C. June 5, 2020)..................................................19

*Mohammed* v. *Reno*,
 309 F.3d 95 (2d Cir. 2002) ..........................................................................8

*Motorola Credit Corp.* v. *Uzan*,
   388 F.3d 39 (2d Cir. 2004) ...................................................17

*Nken* v. *Holder*,
   556 U.S. 418 (2009)..............................................................6

*Peterson* v. *Islamic Republic of Iran*,
   627 F.3d 1117 (9th Cir. 2010) ..........................................10

*Peterson* v. *Islamic Republic of Iran*,
   876 F.3d 63 (2d Cir. 2017) ..........................................10, 11

*Republic of Argentina* v. *NML Capital, Ltd.*,
   573 U.S. 134 (2014)........................................................10, 11

*Rubin* v. *Islamic Republic of Iran*,
   830 F.3d 470 (7th Cir. 2016) .........................................11, 14

*Samantar* v. *Yousuf*,
   560 U.S. 305 (2010)..........................................................8, 9

*SDF9 Cobk LLC* v. *AF & AR LLC*,
   2015 WL 3440259 (E.D.N.Y. May 27, 2015) ...................20

*Seneca Nation of Indians* v. *Paterson*,
   2010 WL 4027795 (W.D.N.Y. Oct. 14, 2010) ...................19

*Societe Nationale Industrielle Aerospatiale* v. *U.S. Dist. Ct. for S. Dist. of Iowa*,
   482 U.S. 522 (1987)........................................................16, 17

*Thapa* v. *Gonzales*,
   460 F.3d 323 (2d Cir. 2006) ...............................................6

*Turkiye Halk Bankasi A.S.* v. *United States*,
   598 U.S. 264 (2023)............................................................12

*U.S. S.E.C.* v. *Citigroup Glob. Mkts. Inc.*,
   673 F.3d 158 (2d Cir. 2012) ..............................................20

*United States* v. *Texas*,
   507 U.S. 529 (1993)..............................................................9

*Ute Indian Tribe of Uintah & Ouray Reservation* v. *Utah*,
  790 F.3d 1000 (10th Cir. 2015) ............................................................... 19

*Walters* v. *Indus. & Com. Bank of China*,
  651 F.3d 280 (2d Cir. 2011) ..................................................... 8, 9, 10

*Wisdom Imp. Sales Co.* v. *Labatt Brewing Co.*,
  339 F.3d 101 (2d Cir. 2003) ...................................................... 18

**Statutes**

28 U.S.C. § 1609 ................................................................................. 8

28 U.S.C. § 1610 ........................................................................... *passim*

28 U.S.C. § 1611 ................................................................................. 8

N.Y. C.P.L.R. § 5225 ....................................................................... 13

**Other Authorities**

*Restatement (Third) of Foreign Relations Law* § 441 (1987) ................................. 17

## INTRODUCTION

This emergency motion relates to the appeal of a record-setting $16.1 billion judgment against the Argentine Republic, which is separately pending before this Court. That judgment rests on a series of fundamental errors about Argentine-law questions of first impression. *See Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*, Nos. 23-7370, 23-7463, 23-7614; *Eton Park Capital Management, L.P.* v. *Argentine Republic*, Nos. 23-7376, 23-7471, 23-7667. But while its deeply flawed judgment awaits this Court's review, the district court entered another unprecedented order: on June 30, 2025, it required the Republic to transfer sovereign property located in Argentina—its 51% of Class D shares in the biggest Argentine energy company, YPF S.A. (the YPF Shares)—to a New York bank by July 14, 2025, for turnover to plaintiffs. *See* Dkt. 742 (Turnover Order, attached as Exhibit A).[1] To state that more simply: the district court has required a sovereign nation to transfer its foreign-located majority stake in its largest energy company to a U.S. bank for further transfer to plaintiffs. To flip the script, this order is akin to a foreign trial court directing the U.S. Government to pack up the gold stored at Fort Knox and ship it abroad based on that court's erroneous interpretation of U.S. law.

The district court's Turnover Order violates fundamental principles of U.S. and international law and demands this Court's immediate review. *First*, the district

---

[1] Unless specified, all docket citations are to the *Petersen* district court docket.

court concluded—over the U.S. Government's objection—that there is no execution immunity for foreign-located sovereign property. *Second*, the court held that execution of the Republic's YPF Shares is permissible under Section 1610(a)(2) of the Foreign Sovereign Immunities Act (FSIA), even though the shares: (1) are located in Argentina; (2) have been used only in Argentina; and (3) were not "used for the commercial activity upon which the claim is based" under plaintiffs' own liability theory, *see* Dkt. 437 at 50. *Third*, the court rejected foundational principles of international comity, directing the Republic to take action in Argentina that would violate Argentine law. The Republic is likely to succeed on its appeal of any one of those holdings, each of which would be a sea change in how the U.S. legal system interacts with the rest of the world.

The stakes could not be higher for Argentina. If the Turnover Order is not stayed while on appeal, the Republic will suffer irreparable harm to its sovereignty, and be forced to choose between changing its own domestic laws, violating those laws, or disregarding a U.S. court's order. Additionally, compliance with the Turnover Order—even if possible—would result in the irrevocable loss of a controlling stake in Argentina's largest energy company. At bottom, the Turnover Order would result in a U.S. court reversing a lawful foreign expropriation, "a decidedly sovereign—rather than commercial—activity" carried out in the "national

public interest." *Petersen Energía Inversora S.A.U.* v. *Argentine Republic*, 895 F.3d 194, 202, 205 (2d Cir. 2018).

Plaintiffs and their litigation funder, on the other hand, will suffer no harm in waiting for this Court's decisions in the Republic's appeal of the $16.1 billion judgment and its appeal of the Turnover Order. The Republic and its YPF Shares are not going anywhere, as Argentine law prohibits their transfer without supermajority approval of the Argentine Congress. The Republic is also prepared to brief its appeal of the Turnover Order on an expedited basis.

Finally, the public interest is served by maintaining the status quo. Immediate enforcement of the Turnover Order would adversely affect numerous non-parties and destabilize YPF and the Argentine economy, all before this Court can consider this unprecedented order and the judgment underlying it.

The Turnover Order sets a July 14 deadline for the Republic to transfer the YPF Shares, and the district court has not yet taken action on the Republic's stay request. This Court should therefore order an immediate administrative stay to allow it to consider this motion, and should stay the Turnover Order while the Republic appeals it. The Republic respectfully requests that this Court rule on the administrative stay by 10:00 a.m. on Monday, July 14, so that the Republic can seek relief from the Supreme Court, if necessary.

## BACKGROUND

1.      On September 15, 2023, the district court entered a combined $16.1 billion judgment in two actions against the Republic, based on its alleged violation of YPF's corporate bylaws.  That judgment is currently on appeal.  *See* Dkt. 504.  As the Republic has explained in that appeal,[2] the district court made numerous errors of Argentine and U.S. law.  For instance, it refused to dismiss these claims—under Argentine law, against the Republic, concerning the alleged violation of the bylaws of an Argentine corporation after an expropriation in Argentina—under *forum non conveniens* or international comity.   The court also repeatedly misconstrued Argentine public and private law, including by (i) recognizing the first-ever contract action for damages for "breach" of corporate bylaws; (ii) disregarding the bylaws' exclusive penalty provision; and (iii) overriding Argentina's comprehensive system for third-party claims arising from an expropriation.  In addition, the court grossly inflated damages by relying on a currency-conversion rule that New York abrogated decades ago.  Briefing on that appeal concluded on September 6, 2024, and this Court has not set an oral argument date.

2.      Plaintiffs' attempts to execute on this extraordinary judgment have been equally extraordinary.  While the Republic's appeal is pending, plaintiffs filed

---

[2]      *See Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*, No. 23-7370 (2d Cir. filed Sept. 6, 2024), Dkt. 228 at 29-81.

a motion in the district court seeking an order requiring the Republic (1) to transfer its YPF Shares *held in Argentina* into a global custody account at Bank of New York Mellon (BNYM) in New York, and (2) to instruct BNYM to transfer ownership interests in those shares to plaintiffs or their designees. *See* Dkt. 555. The Republic opposed plaintiffs' motion because the FSIA, principles of international comity, the act-of-state doctrine, federal common law, and New York law all prohibit reaching into a foreign nation to grab its property for turnover in the United States. The United States filed a Statement of Interest supporting the Republic, "reiterat[ing] its long-standing position that foreign sovereign property located abroad is not subject to execution in U.S. courts." Dkt. 679 (U.S. Statement) at 1.

On June 30, 2025, without oral argument, the district court granted plaintiffs' motion. The court ordered the Republic to "(i) transfer its Class D shares of YPF to a global custody account at BNYM in New York within 14 days" and "(ii) instruct BNYM to initiate a transfer of the Republic's ownership interests in its Class D shares of YPF to Plaintiffs" the following day. Turnover Order 33. The court simultaneously entered a nearly identical order in a separate action against the Republic. *See Bainbridge Fund Ltd.* v. *The Republic of Argentina*, No. 16-cv-8605 (LAP), Dkt. 189. And plaintiffs in 15 other actions quickly filed "me too" motions thereafter. *See Attestor Master Value Fund LP* v. *The Republic of Argentina*, No. 14-cv-5849 (LAP), Dkt. 197.

3.    On July 1, 2025, the day after the district court's Turnover Order, the Republic moved the district court for a stay pending appeal. After letter briefing, which concluded on July 8, the district court has not ruled on the Republic's motion. The Republic noticed its appeal on July 10, 2025.

## ARGUMENT

This Court should stay the district court's Turnover Order pending appeal. A stay turns on four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken* v. *Holder*, 556 U.S. 418, 434 (2009) (citation omitted). These factors are evaluated on a "sliding scale"—"more of one excuses less of the other." *Thapa* v. *Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (citation omitted). The "first two factors . . . are the most critical." *Nken*, 556 U.S. at 434.

Each of the four factors favors the Republic—indeed, overwhelmingly so.

*First*, the Republic's appeal raises substantial legal questions on which the Republic is likely to succeed. No other U.S. district court has ever issued an order like this one, which casts aside federal-common-law principles barring the execution of a foreign sovereign's extraterritorial assets, dramatically expands the scope of the FSIA Section 1610(a)'s "used for a commercial activity in the United States"

exception, and directs a foreign sovereign to change its own laws to comply with the U.S. court's order.

*Second*, absent a stay, the Republic will be irreparably injured. Plaintiffs have stated that they intend to sell the Republic's majority stake in YPF, Argentina's largest energy company, which has operated under the Republic's majority ownership for over a decade. A change in control of YPF would be impossible to unwind and, in the interim, could cause immense uncertainty and destabilize the company and the Argentine economy.

*Third*, plaintiffs will not be injured by the issuance of a stay because Argentine law prohibits the Republic from transferring the YPF Shares without a two-thirds vote of the Argentine Congress.

*Fourth*, the public interest supports a stay because the turnover of the YPF Shares would substantially harm not just the Republic but also YPF; its minority shareholders, commercial partners, and 23,000 employees; the hydrocarbon-producing Argentine Provinces; the people of Argentina; and the United States's global reputation.

## I.    THE REPUBLIC IS LIKELY TO PREVAIL ON THE MERITS.

On at least three independent grounds, the Republic is likely to prevail on the merits, including that (1) federal common law bars execution on sovereign property outside the United States; (2) turnover here would be barred by the FSIA regardless;

and (3) the Turnover Order violates principles of international comity. At the very least, the Republic has demonstrated a "substantial possibility" of success on these serious legal issues. *Mohammed* v. *Reno*, 309 F.3d 95, 101 (2d Cir. 2002) (citation omitted).

### A. Federal Common Law Bars Execution on Foreign-Sovereign Property Outside the United States.

Before the FSIA's enactment, "property of foreign states was absolutely immune from execution"—whether within or outside the United States—as a matter of federal common law. *Walters* v. *Indus. & Com. Bank of China*, 651 F.3d 280, 289 (2d Cir. 2011) (citation omitted). In 1976, Congress passed the FSIA, in part, "to codify the restrictive theory of sovereign immunity." *Samantar* v. *Yousuf*, 560 U.S. 305, 319 (2010). The FSIA provides that "the property *in the United States* of a foreign state" is "immune from attachment arrest and execution except as provided in sections 1610 and 1611." 28 U.S.C. § 1609 (emphasis added). Sections 1610 and 1611, in turn, specify when foreign-sovereign property located in the United States is available for execution. *See* 28 U.S.C. §§ 1610, 1611.

In enacting the FSIA against the backdrop of an established sovereign-immunity regime, Congress only "partially lower[ed] the barrier of immunity from execution." H.R. Rep. No. 94-1487, at 27 (1976). Congress did not mention foreign-sovereign property outside the United States—thus preserving the longstanding common-law immunity from execution of such property. *See United States* v. *Texas*,

8

507 U.S. 529, 534 (1993) ("In order to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law.") (citation omitted). Indeed, the Supreme Court has made clear that the FSIA does not occupy the field of foreign sovereign immunity: "[e]ven if a suit is not governed by the [FSIA], it may still be barred by foreign sovereign immunity under the common law." *Samantar*, 560 U.S. at 324.

Thus, federal courts have long agreed that the FSIA's abrogation of execution immunity for some foreign sovereign property *in* the United States does not vitiate execution immunity for all foreign sovereign property *outside* the United States. As the Fifth Circuit has explained, Congress "did not intend to reverse completely the historical and international antipathy to executing against a foreign state's property." *Conn. Bank of Com.* v. *Republic of Congo*, 309 F.3d 240, 252 (5th Cir. 2002).

The overwhelming weight of authority in this Circuit and elsewhere holds that a foreign sovereign's extraterritorial property remains absolutely immune from execution as a matter of U.S. law. *See, e.g.*, *EM Ltd.* v. *Republic of Argentina*, 695 F.3d 201, 208 (2d Cir. 2012) ("district court sitting in Manhattan does not have the power to attach Argentinian property in foreign countries"); *Walters*, 651 F.3d at 297 (China's assets "*outside* of the United States" are "categorically immune from execution under the FSIA"); *Peterson* v. *Islamic Republic of Iran*, 627 F.3d 1117, 1130 (9th Cir. 2010) (property not "in the United States" was "immune from

execution"); *Autotech Techs. LP* v. *Integral Research & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007) ("The FSIA did not purport to authorize execution against a foreign sovereign's property . . . wherever . . . located around the world."); *see also* U.S. Statement 5.

In rejecting this longstanding consensus, the district court relied on its own earlier decision in *Bainbridge Fund Ltd.* v. *Republic of Argentina*, 690 F. Supp. 3d 411 (S.D.N.Y. 2023), which in turn rested almost exclusively on this Court's now-vacated decision in *Peterson* v. *Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017), *judgment vacated sub nom. Clearstream Banking S.A.* v. *Peterson*, 140 S. Ct. 813 (2020). In *Peterson*, this Court held that a New York court could "recall to New York extraterritorial assets owned by a foreign sovereign." *Peterson*, 876 F.3d at 92. The *Peterson* panel pointed to the Supreme Court's decision in *Republic of Argentina* v. *NML Capital, Ltd.*, 573 U.S. 134 (2014), which supposedly "abrogated decades of pre-existing sovereign immunity common law" and held that the FSIA solely governs sovereign immunity. *Peterson*, 876 F.3d at 69, 89. Before the Supreme Court, the U.S. Government filed a brief explaining that this Court had overread the Supreme Court's *NML* decision. U.S. Br. 13-15, *Clearstream Banking S.A.* v. *Peterson*, 17-1529 & 17-1534 (U.S. Dec. 9, 2019). After an intervening statutory amendment, the Supreme Court vacated this Court's decision and remanded.

Now that *Peterson* has been vacated, the district court erred by continuing to rely on *Peterson's* misreading of *NML*. As *NML*'s opening sentence makes clear, the question there was about whether the FSIA "limits the scope of discovery available to a judgment creditor in a federal postjudgment execution proceeding against a foreign sovereign," not whether a foreign sovereign's extraterritorial assets are immune from execution. *NML*, 573 U.S. at 136; *see id.* at 140 (describing the "single, narrow question" before the Court). The Supreme Court did not quietly wipe away centuries of execution law. As to execution, *NML* recognized that U.S. "courts generally lack authority in the first place to execute against property in other countries," which occurs "under the relevant jurisdiction's law." 573 U.S. at 144; *see Rubin* v. *Islamic Republic of Iran*, 830 F.3d 470, 475 (7th Cir. 2016) (citing *NML* in explaining that, to be "even potentially subject to attachment and execution," property must be "within the territorial jurisdiction of the district court").

To be sure, the Supreme Court also noted that the briefing in *NML* did not support the distinct proposition that "extraterritorial assets enjoyed absolute execution immunity in United States courts"—an observation that the *Peterson* panel emphasized. 573 U.S. at 144; *see Peterson*, 876 F.3d at 90. But that execution question was not before the Court. And the Supreme Court plainly does not view *NML* as having resolved that question, given that it called for the views of the Solicitor General in *Peterson*. *See* U.S. Br. 1, *Clearstream Banking S.A.* v. *Peterson*,

17-1529 & 17-1534 (U.S. Dec. 9, 2019). Moreover, since *NML*, the Supreme Court has further confirmed that the FSIA does not solely occupy the field of foreign sovereign immunity. *See Turkiye Halk Bankasi A.S.* v. *United States*, 598 U.S. 264, 280 (2023).

The U.S. Government reiterated these principles in the district court. As it explained in supporting the Republic, "common law sovereign immunity principles that predate the FSIA continue to preclude execution by judgment creditors against foreign sovereign property outside the United States." U.S. Statement 5. "Accordingly, to the extent New York's turnover statute, CPLR 5225, can be construed as applying to a foreign sovereign's property outside of the United States, such execution is barred by federal common law." *Id.*[3]

### B. The FSIA Independently Bars Turnover Here.

Even if a foreign sovereign's non-U.S. assets were subject to execution, the FSIA permits execution only in narrow circumstances not present here. The district court erred in holding that the Republic's YPF Shares fell into the exception enumerated in FSIA Section 1610(a)(2), Turnover Order 16-23, for a foreign state's

---

[3]  On appeal, the Republic also intends to argue that New York's statute should be construed to preclude execution on non-U.S. sovereign property, which would violate both traditional common-law principles and international law. *See* pp. 16-18, *infra*. New York generally construes its laws not to abrogate common-law immunity principles without a "clear and specific" statement to that effect. *Ezrasons, Inc.* v. *Rudd*, 2025 WL 1436000, at *4 (N.Y. May 20, 2025).

property (1) "in the United States," (2) "used for a commercial activity in the United States," and (3) "used for the commercial activity upon which the claim is based." 28 U.S.C. § 1610(a)(2). The Turnover Order fails each of those requirements.

*First*, the Republic's YPF Shares are not and cannot be "in the United States." 28 U.S.C. § 1610(a). As the district court recognized, the Republic's YPF Shares, like all YPF shares, are book-entry shares maintained only in Argentina with Caja de Valores. S.A., a privately owned securities depositary in Argentina. Turnover Order 6, 27 (even after "[t]ransferring the Shares to a global custody account at BNYM in New York," "the Shares would remain in the register maintained by [Caja de Valores] in Argentina"). Because this first element of Section 1610(a) cannot be satisfied, the court should have ended its analysis.

Circumventing this statutory requirement, the district court concluded that it could order Argentina to deliver the YPF Shares into the United States under C.P.L.R. Section 5225. Turnover Order 23-27. As the U.S. Government explained, the court's interpretation "renders the FSIA's clear statutory prerequisite that foreign sovereign property be located in the United States a nullity." U.S. Statement 8. Section 1610(a) covers only the execution or attachment of "[t]he property in the United States of a foreign state," not property that a district court could simultaneously order to be brought here and then deemed exempt from immunity. *See* U.S. Statement 8-9 ("Every [non-vacated] decision of a court of appeals that has

addressed the issue . . . has treated the presence of foreign sovereign property in the United States as a prerequisite to execution in U.S. courts.").

*Second*, the Republic's YPF Shares are not "used for a commercial activity in the United States." 28 U.S.C. § 1610(a). As the district court found, the Republic "used" its YPF Shares to "vote[] to elect the Board and to approve initiatives generally proposed by the Board." Turnover Order 19. But under Argentine law, all YPF shareholder meetings must—and do—take place *in Argentina*. *See* Dkt. 577 at 6. In other words, the commercial activity for which the Republic has used the YPF Shares—whether voting or any other shareholder activity—occurred exclusively in Argentina. Even if *YPF* subsequently conducted its own commercial activity in the United States, YPF is a separate entity whose actions cannot be attributed to the Republic. *See Rubin*, 830 F.3d at 480 ("foreign state[s] may lose execution immunity only by virtue of their own commercial use of their property in the United States").

The district court nevertheless created a sweeping new rule for commercial activity: "a foreign sovereign's use of its controlling shares to direct a company's commercial activity in the United States satisfies" the FSIA's commercial-activity-in-the-United States requirement, regardless of where the sovereign's shareholder activities occur. Turnover Order 18. In support of its extraordinary rule, the court cited three cases. None applies. In *Crystallex International Corp.* v. *Bolivarian*

14

*Republic of Venezuela*, the Third Circuit concluded that Venezuela, through its alter-ego PDVSA, voted PDVSA's shares in a wholly owned *U.S. subsidiary*, and that voting the shares of a U.S. company constituted using those shares for commercial activity in the United States. 932 F.3d 126, 151-52 (3d Cir. 2019). Similarly, in *In re 650 Fifth Ave. & Related Properties*, the district court held that Iran used shares in a New York entity in New York. 2014 WL 1284494, at *13, 17 (S.D.N.Y. Mar. 28, 2014), *vacated & remanded sub nom. Kirschenbaum* v. *650 Fifth Ave. & Related Props.*, 830 F.3d 107 (2d Cir. 2016). And in *Foremost-McKesson, Inc.* v. *Islamic Republic of Iran*, the court assessed jurisdictional immunity based on *Iran's* conduct—not the activities of the corporation it allegedly controlled—in "a corporate dispute between majority and minority shareholders." 905 F.2d 438, 450 (D.C. Cir. 1990). Each decision turned on U.S. commercial activities of the defendant, or its alter-ego. By contrast, the district court here held for the first time that the mere voting of shares in a non-U.S. corporation *outside* of the United States constitutes "use for a commercial activity in the United States."

*Third*, the Republic's YPF Shares have never been used "for the commercial activity upon which the claim is based." 28 U.S.C. § 1610(a)(2). In its liability decision, now on appeal, the district court held that the expropriated "shares were not the source of the tender offer obligation" underlying plaintiffs' claims, and thus that Argentina's General Expropriation Law did not preempt those claims. Dkt. 437

at 53; *see id.* at 50 ("[T]he tender offer obligation is not attached to the shares that the Republic acquired."). In the Turnover Order, by contrast, the court held that the expropriated shares were used "to effectuate the breach of the tender offer obligation because [control of the shares] ensured that (1) the bylaws would never be enforced and (2) the Republic holds the Shares today." Turnover Order 21. These inconsistent rulings confirm why this Court should first resolve the merits of the district court's $16.1 billion judgment.

### C. The Turnover Order Violates Longstanding Principles of International Comity.

Even if it were otherwise permitted under the FSIA, the Turnover Order violates established principles of international comity. International comity is "the recognition which one nation allows within its territory to . . . another nation, having due regard to both international duty and convenience, and to the rights of its own citizens or of other persons who are under the protections of its laws." *Societe Nationale Industrielle Aerospatiale* v. *U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 543 n.27 (1987) (citation omitted). Under prescriptive comity, "it is well established that 'a state may not require a person to do an act in another state that is prohibited by the law of that state.'" *Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (quoting *Restatement (Third) of Foreign Relations Law* § 441 (1987)). Here, the district court ruled that this doctrine did not apply because no

16

"unavoidable conflict" existed between requiring the Republic to turn over its YPF Shares and Argentine law. Turnover Order 30. That is demonstrably wrong.

Since 2012, Argentine law has barred the transfer of the Republic's YPF Shares to *anyone* "without the permission of the National Congress by a two-thirds vote of its members." *See* Dkt. 578-1 (YPF Expropriation Law) Art. 10. Notwithstanding this clear Argentine law, the district court concluded that there is "no unavoidable conflict between Argentine law and Plaintiff's requested relief" because the Republic "has several choices," including to "(1) receive the permission of the National Congress by two-thirds vote, (2) take action to change the law, or (3) satisfy the judgment through a separate agreement with Plaintiffs." Turnover Order 30.

The district court's purported "choices" demonstrate the impermissible conflict between its Turnover Order and Argentine law. The first two choices purport to require the Argentine Congress to change a law enacted years before this litigation. That is not the absence of a conflict; it is directing Argentine lawmakers to eliminate the conflict by bending to a U.S. court's order. And federal courts cannot require "the legislature of a foreign sovereign" to "enact or change a law." *In re Austrian, German Holocaust Litig.*, 250 F.3d 156, 164-65 (2d Cir. 2001). Meanwhile, the third "choice"—that the Republic could hypothetically satisfy the

17

$16.1 billion judgment by settling with plaintiffs—simply assumes away the need to comply with the district court's order.

## II. THE REPUBLIC WILL BE IRREPARABLY INJURED ABSENT A STAY.

Without any doubt, the Republic will be irreparably injured without a stay.

*First*, the turnover will have immediate and irreversible consequences. Even in a run-of-the-mill case, "the denial of a controlling ownership interest in a corporation may constitute irreparable harm." *Wisdom Imp. Sales Co.* v. *Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir. 2003). Here, the Republic's potential loss of majority control is magnified because YPF is Argentina's largest energy company. The change in control from the Republic to unknown third-parties would create uncertainty that could destabilize YPF and affect the Argentine economy. In addition, plaintiffs have made clear that they intend to sell the YPF Shares once transferred to them. Dkt. 587 at 19 (asking district court to "instruct BNYM to transfer the shares to the U.S. Marshal for the S.D.N.Y. *for sale to the public*") (emphasis added). Without a stay, "it will be impossible to put the genie back in the bottle," and thus "irreparable harm . . . is all but guaranteed." *In re 650 Fifth Ave. & Related Props.*, 2020 WL 3000382, at *3 (S.D.N.Y. June 4, 2020).

*Second*, the Turnover Order would irreparably harm the Republic's sovereignty by requiring it to change or violate its own laws. In enacting the YPF Expropriation Law in 2012, the Argentine Congress declared that the Republic's

18

expropriation of the YPF Shares was of "public interest" and prohibited "any future transfer of the shares" without a two-thirds vote. *See* YPF Expropriation Law, Art. 10. In other words, the Republic made a sovereign choice to expropriate 51% of Argentina's largest energy company, whose operations are critical to Argentina's economy. The district court's order overrides that choice, undoing this quintessentially sovereign act. Federal courts have repeatedly found that such an infringement on a core sovereign power constitutes irreparable harm. *See, e.g.*, *Seneca Nation of Indians* v. *Paterson*, 2010 WL 4027795, at *2 (W.D.N.Y. Oct. 14, 2010) ("enforcement of a statute or regulation [that] threatens to infringe upon a . . . right of sovereignty [satisfies] the irreparable harm requirement"); *Ute Indian Tribe of Uintah & Ouray Reservation* v. *Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) ("invasion of . . . sovereignty can constitute irreparable injury") (citation omitted); *Mashpee Wampanoag Tribe* v. *Bernhardt*, 2020 WL 3034854, at *3 (D.D.C. June 5, 2020) ("loss of sovereign authority, self-government, and jurisdiction . . . is unquestionably an irreparable harm").

In opposing a stay in the district court, plaintiffs contended that the Republic "cannot claim irreparable harm" because any harm is "self-inflicted,"—meaning that the Republic did not satisfy the district court's conditions for a stay of its underlying judgment. Dkt. 745 at 2. But the Republic could not satisfy those conditions "legally or practically" under Argentine law, for some of the same reasons that it cannot

comply with the Turnover Order.  Dkt. 531 at 1-2.  In any event, that execution of the underlying money judgment is not stayed does not foreclose a showing of substantial harm from any subsequent turnover order.

## III.  PLAINTIFFS WOULD SUFFER NO HARM FROM A STAY.

In contrast with the Republic's significant harms, plaintiffs would suffer "no appreciable harm" from a stay, which "does nothing more than maintain the status quo." *U.S. S.E.C.* v. *Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 168 (2d Cir. 2012).  The Republic is not going anywhere and *cannot* sell its YPF Shares absent action by the Argentine Congress.  *See* YPF Expropriation Law, Art. 10.  This alone "eliminate[s] the risk of asset dissipation" pending appeal.  *Citibank, N.A.* v. *Aralpa Holdings Ltd. P'ship*, 2024 WL 664782, at *3 (S.D.N.Y. Feb. 16, 2024) (granting stay of turnover order pending appeal where temporary restraining order prohibited disposition of assets); *see SDF9 Cobk LLC* v. *AF & AR LLC*, 2015 WL 3440259, at *3 (E.D.N.Y. May 27, 2015) (granting stay pending appeal where there was "virtually no risk of asset dissipation").  And in suggesting that Argentine law might change, plaintiffs have pointed only to a proposed non-binding resolution that *reaffirms* the existing two-thirds requirement.  Dkt. 745 at 3; *see* Dkt. 746-1 at 2.

To the extent that plaintiffs raise the delay of payment of the judgment as a harm, that delay merits little weight.  *See In re Johns-Manville Corp.*, 27 F.3d 48, 49 (2d Cir. 1994) (affirming stay even though trust beneficiaries would "experience

20

delays in receiving payments" from the trust); *In re 650 Fifth Ave.*, 2020 WL 3000382, at *4 (delay of payment of judgment does "not strongly" "weigh[] against a stay"). The underlying judgment accrues interest and plaintiffs are not operating entities—the *Petersen* plaintiffs are in bankruptcy proceedings in Spain and the *Eton Park* plaintiffs are in liquidation. This Court could also mitigate any concerns on that front by ordering expedited briefing on appeal, to which the Republic would not object.

## IV.  THE PUBLIC INTEREST WEIGHS HEAVILY IN FAVOR OF A STAY.

The public interest unquestionably supports a stay. Unlike the typical "commercial dispute . . . between two companies," *EJ Brooks Co.* v. *Cambridge Sec. Seals*, 2016 WL 908633, at *2 (S.D.N.Y. Mar. 2, 2016), this dispute affects Argentina's sovereignty and national governance. It also has implications far beyond the parties here. YPF is a publicly traded company that employs more than 23,000 people and has 49% of its outstanding equity held by shareholders *other* than the Republic. *See* Dkt. 560 at 6-7. A change of control could, for example, trigger irreversible events under YPF's debt instruments or its bylaws' tender-offer requirement. *Id.*; *see* Dkt. 363-1 § 7. Besides YPF, its investors, and its commercial partners, the Turnover Order would also affect the hydrocarbon-producing Argentine Provinces, which would potentially be affected by changes in company policies or governance. *See* Dkt. 560 at 6. Any impact on YPF, Argentina's largest

21

energy company, could even jeopardize Argentina's ongoing efforts to stabilize its economy in cooperation with the IMF.

Finally, a stay serves judicial efficiency by maintaining the status quo while the underlying judgment is also on appeal. The Republic strongly believes that it will prevail on that appeal, which will moot the Turnover Order. This Court should allow that appeal process to conclude before wading into the enormous task of transferring ownership and control of 51% of Argentina's largest energy company.

## CONCLUSION

The Court should stay the Turnover Order pending appeal and grant an immediate administrative stay in the interim.

Respectfully submitted,

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
Sergio Galvis
Adam F. Brebner
Pedro José Izquierdo
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
giuffrar@sullcrom.com

Amanda F. Davidoff
Thomas C. White
Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006-5215
(202) 956-7500

*Attorneys for the Argentine Republic*

July 10, 2025

## CERTIFICATE OF COMPLIANCE

This motion complies with Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,169 words.

This motion also complies with the requirements of Federal Rule of Appellate Procedure 27(d) and 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.

July 10, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2025, I filed the foregoing motion with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit through the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.

July 10, 2025

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETERSEN ENERGIA INVERSORA, S.A.U. ET AL., <br><br> Plaintiff, <br><br> -against- <br><br> ARGENTINE REPUBLIC ET AL., <br><br> Defendants. | No. 15 Civ. 02739 (LAP) |
| ETON PARK CAPITAL MANAGEMENT L.P. ET AL., <br><br> Plaintiff, <br><br> -against- <br><br> ARGENTINE REPUBLIC ET AL., <br><br> Defendants. | No. 16 Civ. 08569 (LAP) <br><br> MEMORANDUM & ORDER |

LORETTA A. PRESKA, Senior United States District Judge:[1]

Plaintiffs Petersen Energia Inversora S.A.U., Petersen Energia, S.A.U., Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P., (together "Plaintiffs") seek turnover of Defendant the Argentine Republic's ("Defendant" or "the Republic" or "Argentina") 51% of YPF S.A.'s ("YPF") Class D shares (the "Shares") in partial satisfaction of the Court's judgment in the aggregate amount of approximately $16.1 billion, which remains unpaid, pursuant to Federal Rule of Civil

---

[1] References to the docket refer to the lead case, <u>Petersen Energia Inversora, S.A.U. et al. v. Argentine Republic et al.</u>, No. 15 Civ. 02739.

Procedure 69(a)(1), New York Civil Practice Law and Rules ("NY CPLR") § 5225(c), and New York Uniform Commercial Code ("NY UCC") § 8-112(e).[2] Plaintiffs request that the Court order the Republic to (i) transfer the Shares to a global custody account at the Bank of New York Mellon ("BNYM") in New York within 14 days from the date of this order; and (ii) instruct BNYM to initiate a transfer of the Republic's ownership interests in its YPF shares to Plaintiffs or their designees within one business day of the date on which the shares are deposited into the account. (Pl. Mot.) Defendant opposes the motion.[3] The United States of America filed

---

[2] (Pl. Mot. for Injunction and Turnover ("Pl. Mot."), dated Apr. 22, 2024 [dkt. no. 555]; Pl. Mem. in Support of Mot. ("Pl. Mem."), dated Apr. 22, 2024 [dkt. no. 556]; Fourth Expert Report of John C. Coffee, Jr. ("Coffee 4"), dated Apr. 22, 2024 [dkt. no. 557]; Second Expert Report of Nancy C. Lissemore ("Lissemore 2"), dated Apr. 22, 2024 [dkt. no. 558]; Decl. of Randy M. Mastro ("Mastro Decl. 1"), dated Apr. 22, 2024 [dkt. no. 559]; Pl. Reply, dated May 30, 2024 [dkt. no. 587]; Decl. of Alberto B. Bianchi, dated May 30, 2024 [dkt. no. 588]; Decl. of Dr. Alfredo L. Rovira, dated May 30, 2024 [dkt. no. 589]; Fifth Expert Report of John C. Coffee, Jr., dated May 30, 2024 [dkt. no. 590]; Decl. of Randy M. Mastro ("Mastro Decl. 2"), dated May 30, 2024 [dkt. no. 591]; Pl. Sur-Reply, dated July 8, 2024 [dkt. no. 598]; Pl. Letter, dated Aug. 27, 2024 [dkt. no. 647].)

[3] (Def. Opp'n to Pl. Mot. ("Def. Opp'n"), dated May 16, 2024 [dkt. no. 577]; Decl. of Robert J. Giuffra Jr. ("Giuffra Decl."), dated May 16, 2024 [dkt. no. 578]; Expert Decl. of Rafael M. Manovil, dated May 16, 2024 [dkt. no. 579]; Expert Report of Alfonso Santiago ("Santiago"), dated May 16, 2024 [dkt. no. 580]; Third Report of Professor Steven Davidoff Solomon, dated May 16, 2024 [dkt. no. 581]; Def. Sur-Reply, dated June 27, 2024 [dkt. no. 597]; Def. Letter, dated Aug. 26, 2024 [dkt. no. 639].)

a statement of interest.[4,5]   For the reasons set forth below, Plaintiffs' motion is GRANTED.

## I.   <u>Background</u>

The Court assumes familiarity with the factual background and procedural history of the case, which have been set out at length in prior opinions of this Court and the Court of Appeals.  The Court recounts only the facts necessary to determine the instant motion.

### a. Factual Background

Prior to 1993, YPF, a petroleum company, was wholly owned and operated by the Republic.  <u>Petersen Energia Inversora, S.A.U v. Argentine Republic et al.</u> ("<u>Petersen II</u>"), 15 Civ. 2739 (LAP), 16 Civ. 8569 (LAP), 2023 WL 2746022, at *2 (S.D.N.Y. Mar. 31, 2023).

In 1993, the Republic decided to privatize YPF through a worldwide IPO of its shares.  <u>Id.</u>  The Republic acted "in its capacity as shareholder of [YPF]" to amend YPF's bylaws to include protections for investors.  <u>Petersen Energia Inversora S.A.U. v. Argentine Republic et al.</u> ("<u>Petersen I</u>"), 895 F.3d 194, 199 (2d

---

[4] (U.S. Statement of Interest, dated Nov. 6, 2024 [dkt. no. 679]; Pl. Response to U.S. St., dated Nov. 14, 2024 [dkt. no. 684].)
[5] The parties and the United States filed supplemental briefs regarding the impact of the Court of Appeals' decision in <u>Peterson v. Bank Markazi</u>, 121 F.4th 983 (2d Cir. 2024) on this motion.  (<u>See</u> dkt. nos. 695-96, 698, 702, 708, 710.)  The parties and the United States agree that the decision has no impact on the Court's determination of this motion.

Cir. 2018).  Notably, the amended bylaws included, _inter alia_, Section 7, the tender offer provisions.  _Id._ at 199-200.

In the Republic's efforts to privatize YPF, the Republic specifically targeted its IPO at United States investors.  The Republic sponsored an ADR program listed on the New York Stock Exchange ("NYSE") for YPF's Class D shares with BNYM as the depository bank, and it registered both YPF's Class D shares and its ADRs representing interests in those shares with the United States Securities and Exchange Commission ("SEC").  (Lissemore 2 ¶¶ 23-25.)  _See also Petersen I_, 895 F.3d at 199.  The Republic "raised billions of dollars in investment capital with the largest share (more than $1.1 billion in total) coming from the sale of ADRs [American Depositary Receipt ("ADR")] in the United States on the NYSE."  _Id._ at 200.  Repsol S.A. ("Repsol") emerged from the IPO as YPF's majority shareholder.  _Id._  The Republic remained a holder of YPF's Class A shares.  _Id._  After the IPO, YPF's shares, via the ADRs, were traded publicly on the NYSE and other exchanges. _Id._

On April 16, 2012, the Republic "exercised indirect control" of Repsol's 51% of YPF's Class D shares, specifically the right to "use its shares to govern the company," "direct corporate policy," or "otherwise exercise all the considerable power of a majority shareholder."  _Petersen Energía Inversora, S.A.U. v. Argentine_

Republic et al. ("Petersen III"), 15 Civ. 2739 (LAP), 16 Civ. 8569 (LAP), 2023 WL 5827596, at *1 (S.D.N.Y. Sept. 8, 2023).

On May 3, 2012, the Republic enacted Law 26,741 (the "YPF Expropriation Law"), which became effective on May 7, 2012, id. at *3, and "was intended to escape the obligation to pay the tender offer," id. at *4. Article 15 of the YPF Expropriation Law states that YPF "shall continue to operate as [a] publicly traded corporation[]." (Giuffra Decl. Ex. 1.) Article 16 requires the Republic to execute the Shares pursuant to various principles, including in a manner "safeguarding shareholder interest and generating value on their behalf." (Id.) Additionally, Article 10 states that the Republic's expropriation of the Shares from Repsol is conducted for the "public interest" and prohibits "any future transfer of the shares without permission of the National Congress by a two-thirds vote of its members."[6] (Id.; dkt. no. 470-7 Articles 4-5 (Expropriation must include a declaration of public utility.).)

By expropriating Repsol's 51% of YPF's Class D shares, the Republic breached Sections 7 and 28 of YPF's bylaws because it never made a tender offer for Plaintiffs' shares. Petersen II, 2023 WL 2746022, at *8-11.

---

[6] The Court does not opine on whether this law applies (a) to voluntary transfers only or (b) to voluntary transfers and transfers made necessary by a court order. (Pl. Reply at 2; Def. Sur-Reply at 4.)

As a result of the expropriation, the Republic holds 51% of YPF's Class D shares,[7] which are uncertificated securities held in book-entry form[8] in an account at Caja de Valores, S.A. ("CdV"), the central securities depository of Argentina.  (Mastro Decl. 1 Ex. 1 at 101.)  The Republic holds the shares at CdV directly, rather than in "street name" through a broker or other intermediary.  (Dkt. no. 45-2 at ECF 4; see also Pl. Mem. at 17.)  When book-entry shares are transferred from one owner to another, no physical transfer occurs; instead, the transfer is noted in the registry.  (Mastro Decl. 1 Ex. 14 at 32 ("If securities are dematerialized: May dematerialized security positions be re-certificated and held outside the CSD? No.").)

---

[7] The Republic argues that the Court cannot transfer 49% of the Shares because the YPF Expropriation Law "designates 49% of the [shares] to Argentine Provinces that are part of OFEPHI."  (Def. Opp'n at 7.)  The provinces' contingent interest in the Republic's shares, which will ripen into an actual interest only if the Republic decides to transfer the Shares, is not itself subject to attachment and cannot prevent transfer of the Republic's interest. See, e.g., Matter of Supreme Merch. Co. v. Chem. Bank, 70 N.Y.2d 344, 350 (1987) (CPLR § 5201 "preclude[s] a levy against contingent obligations not certain to ripen into something real.").  Additionally, YPF's Form 20-F for the year ended December 31, 2023 confirms that the "Argentine National State" owns 200.6 million Class D shares of YPF (51% of the total), while the "Argentine provincial governments" own 7,624 Class B shares (which Plaintiffs do not seek to execute upon).  (Mastro Decl. 2 Ex. 3 at 90.)

[8] Section 7(a) of YPF's bylaws states that its shares "shall not be represented by certificates.  Instead, they shall be book-entry shares and shall be recorded in accounts kept under their holder's names in the Corporation, commercial banks, investment banks or securities clearing houses as authorized by the Board of Directors."  (Dkt. no. 45-2 at ECF 4.)

Since April 2012, the Republic has controlled YPF's major business and financial decisions through its majority share of the company.  The parties agree that the Republic votes to elect the Board and to approve initiatives generally proposed by the Board, including those that require shareholder approval under the Republic's laws.  (Pl. Mem. at 3, 12-13; Def. Opp'n at 6.)

Additionally, as disclosed in YPF's Form 20-F for the year ended December 31, 2013: "The Argentine federal government controls the Company, and consequently, the federal government is able to determine substantially all matters requiring approval by a majority of our shareholders, including the election of a majority of our directors, and is able to direct our operations." (Mastro Decl. 1 Ex. 6 at 10.)  As disclosed in YPF's Form 20-F for the year ended December 31, 2022:

> The Argentine Republic owns 51% of the shares of YPF S.A. and, consequently, the Argentine government is able to decide all matters requiring approval by a majority of shareholders[.] . . . We cannot assure you that decisions taken by our controlling shareholder would not differ from your interests as a shareholder.

(Id. Ex. 1 at 6.)

More recently, YPF continues to tap into the United States' markets by: (i) sponsoring the ADR program for its Class D shares with BNYM and listing the shares on the NYSE, which requires maintaining the registration of its Class D shares and ADSs with the SEC; and (ii) offering bonds on the debt capital markets.

(Lissemore 2 ¶¶ 27-29; Coffee 4 ¶¶ 11-18; Mastro Decl. 1 Exs. 11-12.)

## II.  **Applicable Law**

Federal Rule of Civil Procedure 69(a)(1) provides that the "procedure on execution" and "proceedings supplementary to and in aid of judgment or execution" enforcing a money judgment "must accord with the procedure of the state where the court is located." See, e.g., All. Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A., 190 F.3d 16, 20 (2d Cir. 1999). In New York, NY CPLR § 5201 establishes what property is subject to enforcement and who the proper garnishee is.[9] NY CPLR § 5225 provides the mechanism for courts to order the payment or delivery of the property. In addition, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1610(a), addresses enforcement against a foreign sovereign.

### a. **NY CPLR § 5201**

NY CPLR § 5201(b) states that judgments are only enforceable "against any property which could be assigned or transferred." New York law controls whether shares in a foreign corporation "could be assigned or transferred" under NY CPLR § 5201(b). See, e.g., 245 Park Member LLC v. HNA Grp. (Int'l) Co. Ltd., No. 23-842-CV, 2024 WL 1506798, at *3 (2d Cir. Apr. 8, 2024) (New York

---

[9] A "garnishee" is a person who owes a debt to a judgment debtor, or a person other than the judgment debtor who has property in his possession or custody in which a judgment debtor has an interest. N.Y. C.P.L.R. § 105(i).

law controls whether membership interest in Delaware LLC is assignable and transferable); Hotel 71 Mezz Lender LLC v. Falor, 14 N.Y.3d 303, 314 (2010) (same). And, under New York law, shares in a company are freely transferable and assignable. See, e.g., Koehler v. Bank of Berm. Ltd., 12 N.Y.3d 533, 541 (2009).

NY CPLR § 5201(c), titled "proper garnishee for particular property or debt," outlines who the proper garnishee is for certain property. NY CPLR § 5201(c)(4) states that

> where property . . . is evidenced by a . . . negotiable document of title or a certificate of stock of an association or corporation, the . . . document or certificate shall be treated as property capable of delivery and the person holding it shall be the garnishee.

It further states,

> except that section 8—112 of the uniform commercial code shall govern the extent to which and the means by which any interest in a certificated security, uncertificated security or security entitlement (as defined in article eight of the uniform commercial code) may be reached by garnishment, attachment or other legal process.[10]

---

[10] Defendant argues that NY UCC § 8-110(a)(5) provides that the "local law of the issuer's jurisdiction," here Argentine law, "governs . . . whether an adverse claim can be asserted against a person to whom transfer of a[n] . . . uncertificated security is registered or a person who obtains control of the uncertificated security." (Def. Opp'n at 26 (emphasis added).) The Court is unpersuaded because Plaintiffs do not assert an "adverse claim" to the Shares; on the contrary, Plaintiffs acknowledge that the Republic validly owns the Shares, which is why Plaintiffs argue that they should be subject to execution governed by New York law and the FSIA. F.R.C.P. 69(a)(1) (New York law governs execution procedure here).

The Republic's Shares qualify as "uncertificated securit[ies]" under the UCC because they exist only in book-entry form.[11]   Under NY UCC § 8-112, Plaintiffs may reach Defendant's uncertificated securities by (1) legal process upon the issuer at its chief executive office in the United States, (§ 8-112(b)); (2) legal process upon the secured party, (§ 8-112(d));[12] or (3) "aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the certificated security, uncertificated security, or security entitlement or in satisfying the claim by means allowed at law or in equity in regard to property that cannot readily be reached by other legal process," (§ 8-112(e)).

---

[11] NY UCC § 8-102(18) defines "uncertificated security" as "a security that is not represented by a certificate."   The term "security entitlement" refers to the rights and property interest of a person who holds securities indirectly through a broker or other securities intermediary.   See N.Y. U.C.C. § 8-102(7), (17). The Shares are not "security entitlement[s]" because they are registered to the Republic and not held in street name.   N.Y. U.C.C. § 8-102(7), (17); see also N.Y. U.C.C. § 8-501(d) ("If a securities intermediary holds a financial asset for another person, and the financial asset is registered in the name of . . . the other person, and has not been indorsed to the securities intermediary or in blank, the other person is treated as holding the financial asset directly rather than as having a security entitlement with respect to the financial asset.").

[12] Because the Republic holds the Shares directly through CdV, as opposed to in street name through a broker or other intermediary, they are "uncertificated securit[ies] registered in the name of a secured party."   N.Y. U.C.C. § 8-112(d).

### b. NY CPLR § 5225[13]

NY CPLR § 5225(a) sets forth New York's procedure for enforcement of money judgments against property in the possession or custody of the judgment debtor. See, e.g., Koehler, 12 N.Y.3d at 537-38. It provides that

> where it is shown that the judgment debtor is in possession or custody of money or other personal property in which he has an interest, the court shall order that the judgment debtor pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor. . . .

N.Y. C.P.L.R. § 5225(a). NY CPLR § 5225(b) applies when the property is not in the judgment debtor's possession. Koehler, 12 N.Y.3d at 541. It provides that the Court may order a third-party garnishee to turn over the property – but only "upon a special proceeding" commenced against that garnishee. N.Y. C.P.L.R. § 5225(b).

Under either NY CPLR §§ 5225(a) or (b), control is not enough: the judgment debtor (§ 5225(a)) or a third-party garnishee (§ 5225(b)) must have "possession or custody." Commonwealth of N. Mariana Islands v. Canadian Imperial Bank of Com., 990 N.E.2d 114, 115 (N.Y. 2013) (under NY CPLR § 5225(b) third-party garnishee

---

[13] The Republic argues that NY CPLR § 5225 applies only to a "person," which does not include sovereigns. (Def. Opp'n at 28 n. 15.) However, the Court finds that § 5225 must apply to sovereigns, at least where the sovereign owes a commercial debt and is being asked to pay that debt with commercial assets.

"must have actual, not merely constructive, possession or custody of the assets").

Additionally, NY CPLR § 5225(c) provides that "[t]he court may order any person to execute and deliver any documents necessary to effect payment or delivery."

Turnover orders pursuant to NY CPLR § 5225 are effective against assets regardless of their location if the Court has personal jurisdiction over the judgment debtor or the third-party garnishee. In Koehler, the New York Court of Appeals expressly addressed funds held outside of New York, holding that "CPLR article 52 contains no express territorial limitation barring the entry of a turnover order that requires . . . [the transfer of] money or property into New York from another state or country." 12 N.Y.3d at 539, 541 ("[A] New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property. . . ."); see also Motorola Credit Corp. v. Uzan, 739 F. Supp. 2d 636, 641 (S.D.N.Y. 2010) (same); In re Gaming Lottery Sec. Litig., No. 96 Civ. 5567 (RPP), 2001 WL 123807, at *3 (S.D.N.Y. Feb. 13, 2001) (noting that the Court "has the power under CPLR § 5225(a) to order a turnover of funds held in another jurisdiction" and ordering the turnover of funds "in an account at the Royal Bank of Scotland"); In re Feit & Drexler, Inc. v. Drexler, 760 F.2d 406, 414 (2d Cir. 1985) (holding that the district court, sitting in bankruptcy, had the power to compel the

defendant to deliver property from outside the court's territorial jurisdiction because the court had personal jurisdiction over the defendant); <u>Miller v. Doniger</u>, 814 N.Y.S.2d 141 (2006) (affirming order directing the judgment debtor to "turn over his out-of-State Wachovia account"); <u>Starbare II Partners L.P. v. Sloan</u>, 629 N.Y.S.2d 23 (1995) (directing the defendant to turn over artwork located outside the state pursuant to NY CPLR 5225(a)).

In <u>Bainbridge Fund Ltd. v. Republic of Argentina</u>, this Court found that it has the power to order a sovereign to bring assets held in that sovereign country's central bank and deliver them to New York.  690 F. Supp. 3d 411, 421-22 (S.D.N.Y. 2023).  "The FSIA . . . does not supersede CPLR 5225 and prevent the Court from ordering the Republic, a judgment debtor over which it has personal jurisdiction, to bring assets from outside of New York into New York to pay [Plaintiff]."  <u>Id.</u> at 416.  The Court further stated that "[t]he execution immunity provision of the FSIA is no bar because by its plain terms it 'immunizes only foreign-state property 'in the United States.''"  <u>Id.</u> (citation omitted). Additionally, the Court determined that the "more prudent course" is to evaluate whether the assets are subject to execution immunity before ordering that they be brought to the United States.  <u>Id.</u> at 417.

**c. Foreign Sovereign Immunities Act, 28 U.S.C. § 1610(a)**

Under the FSIA,

> [t]he property in the United States of a foreign state . . .
> used for a commercial activity in the United States, shall
> not be immune from attachment in aid of execution, or from
> execution, upon a judgment entered by a court of the United
> States or of a State after the effective date of this Act, if
> . . . the property is or was used for the commercial activity
> upon which the claim is based. . . .

28 U.S.C. § 1610(a)(2).  Accordingly, to be amenable to execution

under this section, property of a foreign state must satisfy three

requirements: (1) it must be "in the United States;" (2) it must

be "used for a commercial activity in the United States;" and (3)

it must be (or have been) "used for the commercial activity upon

which the claim is based."   Id.   In other words, the sovereign

must use the property but may do so anywhere,[14] and the activity must occur in the United States but may be conducted by anyone.[15]

Plaintiffs have the initial burden of production to show that an exception to foreign sovereign immunity under the FSIA applies. Beierwaltes v. L'Office Federale de la Culture de la Confederation Suisse (Fed. Office of Culture of the Swiss Confederation), 999 F.3d 808, 816-17 (2d Cir. 2021); see also Bainbridge Fund Ltd., 690 F. Supp. 3d at 419. Defendant then bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply. Id.

## III. Discussion

The Republic opposes the entry of the proposed order by arguing, inter alia, that (1) the Shares are immune from turnover

---

[14] The Republic argues that the statute requires that the "use" occur in the United States, as opposed to requiring that the commercial activity occur in the United States. (Def. Opp'n at 13-17.) The Court disagrees. What matters is not where the Shares were used, but where the resulting commercial activity takes place. Exp.-Imp. Bank of the Republic of China v. Grenada, 768 F.3d 75, 89-91 (2d Cir. 2014) (declining to attach funds "because they are not used by the Statutory Corporations for commercial activity that takes place in the United States" (emphasis added)); Attestor Master Value Fund LP v. Argentina, 113 F.4th 220, 233 (2d Cir. 2024) (the FSIA required that "the commercial activity in which Argentina used [the property] took place at least in part in the United States." (emphasis added)). But see Aurelius Cap. Partners, LP v. Republic of Argentina, No. 07 Civ. 11327 (TPG), 2010 WL 768874, at *4 (S.D.N.Y. Mar. 5, 2010) ("even if the property is being used for commercial activity, this use is not occurring in the United States").

[15] The Republic argues that the commercial activity must be carried out by the foreign state. (Def. Opp'n at 17.) However, that requirement is not found in the statute. (Pl. Reply at 10.)

under the FSIA, (see infra Sections III.a. and III.c.); (2)
Plaintiffs have not shown that the assets are subject to turnover
under New York law, (see infra Section III.b.); and (3)
international comity counsels against turnover, (see infra Section
III.d.). The Court addresses each argument in turn.

### a. Whether the Shares are Immune from Execution under the FSIA

Because the Court determined in Bainbridge that the "more
prudent course" is to "evaluate whether the assets are otherwise
subject to execution immunity before ordering that they be brought
to the United States," 690 F. Supp. 3d at 417, the Court first
turns to whether two elements of an exception under the FSIA are
met: (i) the Shares must be "used for a commercial activity in the
United States;" and (ii) it must be (or have been) "used for the
commercial activity upon which the claim is based." 28 U.S.C.
§ 1610(a)(2).

### i. Whether the Shares are "Used for a Commercial Activity in the United States"

To satisfy this element, the Republic must "actively utilize
[the Shares] in service of that commercial activity [in the United
States]." Exp.-Imp. Bank of the Republic of China v. Grenada, 768
F.3d 75, 90 (2d Cir. 2014); see also id. at 89 (". . . when the
property in question is put into action, put into service, availed
or employed for a commercial activity . . .").

16

The Republic does not dispute that YPF sponsoring an ADR program for its Class D shares with BNYM in New York, listing its shares on the NYSE, registering its shares with the SEC, and selling its debt to United States institutional investors under SEC Rule 144A, all constitute "commercial activity in the United States." (Def. Opp'n at 24.)  See, e.g., EM Ltd. v. Republic of Argentina, 389 F. App'x 38, 44 (2d Cir. 2010) (facilitating investment and sale of securities is "commercial activity" under the FSIA); Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 615-17 (1992) (issuing bonds is commercial activity).  The question for the Court's consideration is whether the Republic used its Shares "for [the] commercial activity in the United States." 28 U.S.C. § 1610 (a).

In Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela, 932 F.3d 126, 152 (3d Cir. 2019), the Third Circuit affirmed attachment of Petróleos de Venezuela, S.A.'s ("PDVSA") (Venezuela's state oil company and its alter ego) controlling shares in PDV Holding, Inc. ("PDVH") (a separate entity whose corporate veil was not pierced).  The Court observed that PDVSA used its shares in PDVH "to run its business as an owner, to appoint directors, approve contracts, and to pledge PDVH's debts for its own short-term debt." Id. at 151.  Accordingly, the Court held that PDVSA used its shares in PDVH for a commercial activity in the United States by directing the activities of PDVH in the

United States and thus the PDVH shares were subject to execution under § 1610(a).  Id. at 151-52; see also Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 450 (D.C. Cir. 1990) (holding that Iran engaged in commercial activity when it "used its majority position" in a dairy company "to lock Foremost out of the management of the company and deny Foremost its share of the company's earnings.").  Similarly, in In re 650 Fifth Ave. Co., No. 08 Civ. 10934 (KBF), 2014 WL 1284494 (S.D.N.Y. Mar. 28, 2014), vacated and remanded sub nom. Kirschenbaum v. 650 Fifth Ave. & Related Props., 830 F.3d 107 (2d Cir. 2016), and vacated and remanded, 830 F.3d 66 (2d Cir. 2016), the Court held that Iranian front companies "used" partnership shares in a real estate company for commercial activity in the United States, because: (i) the company owned a building in New York that generated revenue; and (ii) the shares "were the mechanism through which the partners owned the Building and determined the distribution of revenue that it produced."  Id. at *17.[16]  Accordingly, a foreign sovereign's use of its controlling shares to direct a company's commercial activity in the United States satisfies the FSIA requirement that the shares be "used for a commercial activity in the United States."

---

[16] On appeal, the Court of Appeals vacated the district court's prior alter ego finding and therefore the Court of Appeals did not address the district court's FSIA analysis.  Kirschenbaum v. 650 Fifth Ave. Co., 830 F.3d 107 (2d Cir. 2016).

Each year YPF advises United States investors that the Republic exercises a high degree of control over YPF.[17] Since April 2012, the Republic has controlled YPF's major business and financial decisions through its majority share ownership and generated value for the company through use of the United States' markets. The parties agree that the Republic votes to elect the Board and to approve initiatives generally proposed by the Board, including those that require shareholder approval under the Republic's laws like international debt issuances and the delisting of its shares from the NYSE.[18] (Dkt. no. 45-2 at 21-24 §§ 17(vi); Pl. Mem. at 3, 11-13; Def. Opp'n at 6.) For example, at an annual shareholder meeting held on April 29, 2016, the Republic voted to approve an increase in the amount of YPF's Global Medium-Term Notes Program from $2.0 billion to $10.0 billion.

---

[17] As disclosed in YPF's Form 20-F for the year ended December 31, 2013: "The Argentine federal government controls the Company, and consequently, the federal government is able to determine substantially all matters requiring approval by a majority of our shareholders, including the election of a majority of our directors, and is able to direct our operations." (Mastro Decl. 1 Ex. 6 at 10.) As disclosed in YPF's Form 20-F for the year ended December 31, 2022: "The Argentine Republic owns 51% of the shares of YPF S.A. and, consequently, the Argentine government is able to decide all matters requiring approval by a majority of shareholders[.] . . . We cannot assure you that decisions taken by our controlling shareholder would not differ from your interests as a shareholder." (Id. Ex. 1 at 6.)

[18] The Court does not address whether all of YPF's commercial activity in the United States is attributable to the Republic merely because the Republic holds a majority share in YPF; instead, the Court focuses on the commercial activity in the United States that the parties agree requires the Republic's direct approval.

(Coffee 4 ¶ 29; Mastro Decl. 1 Ex. 1 at 74.)    Similarly, at a
meeting held on April 28, 2023, the Republic granted the Board of
Directors the authority "to create Global Programs for the issuance
of negotiable obligations."    (Mastro Decl. 1 Ex. 7 at 26-27.)
Since April 2012, YPF has sold more than $2.4 billion in debt just
to United States investors.    (Coffee 4 ¶ 14.)    Accordingly, the
Republic's use of its controlling shares to direct YPF's commercial
activity in the United States is sufficient to establish that the
Shares are "used for a commercial activity in the United States."

   ii. **Whether the Shares Are or Were "Used for the
       Commercial Activity Upon Which the Claim is Based"**

   For purposes of § 1610(a)(2) of the FSIA, a claim is "'based
upon' the 'particular conduct' that constitutes the 'gravamen' of
the suit."    Petersen I, 895 F.3d at 204 (citation omitted); De
Letelier v. Republic of Chile, 748 F.2d 790, 796 (2d Cir. 1984)
("Congress specifically designed the execution immunity rules to
'conform' to the jurisdictional immunity provisions of § 1605."
(citation omitted)).    In cases "involving breach of contract or
related equitable claims, courts routinely identify the breach (or
formation plus breach) as the gravamen."    Friedman v. Gov't of Abu
Dhabi, United Arab Emirates, 464 F. Supp. 3d 52, 68 (D.D.C. 2020)
(collecting cases and citing Petersen I, 895 F.3d at 207).    When
there is "nothing [inherently] wrongful" about the formation of
the contract, the "commercial activity" analysis for FSIA purposes

20

turns on the "gravamen" of the "alleged breach" serving as the "foundation" of the suit, not the act of formation. <u>MMA Consultants 1, Inc. v. Republic of Peru</u>, 719 F. App'x 47, 52 (2d Cir. 2017) (rejecting commercial activity analysis based on formation). Because Plaintiffs have identified "nothing inherently wrongful" about the formation of the YPF bylaws, the Court need not determine whether the Shares were used in the formation of the YPF bylaws at issue. <u>Id.</u>

The Court of Appeals held that "the gravamen of Petersen's claim is that Argentina denied Petersen the benefit of the bargain promised by YPF's bylaws when Argentina repudiated its obligation to tender for Petersen's [YPF] shares." <u>Petersen I</u>, 895 F.3d at 207. The Court of Appeals also held that the Republic's actions were commercial in nature. <u>Id.</u> ("Th[e tender-offer] obligation and Argentina's subsequent repudiation of it were indisputably commercial.").

Although "the tender obligation is not attached to the shares that the Republic acquired," the Republic used its control of Repsol's shares to effectuate the breach of the tender offer obligation because that control ensured that (1) the bylaws would never be enforced and (2) the Republic holds the Shares today. The fundamental promise of the tender offer provisions of the YPF bylaws was that investors would not be stranded as minority shareholders in a government-run enterprise without being offered

a compensated exit.  *See* *Petersen II*, 2023 WL 2746022, at *12
("[T]he Republic promised security holders that it would provide
them with a compensated exit if it reacquired control over the
requisite number of shares.").  The Republic used its control of
Repsol's shares to "displac[e]" the Repsol-elected Board and
render it "devoid of any powers, functions, or duties." *Petersen
III*, 2023 WL 5827596, at *1.  The Republic "appropriated the rights
of the Board to itself, and used those rights to cancel the
shareholder meeting" scheduled for April 25, 2012.  *Id.* at *2.
That cancellation "ensure[d] that Repsol would have no ability to
vote its shares," *id.* at *1, including to enforce the bylaws'
tender offer obligation, (*see* dkt. no. 45-2 at 30 § 28(C)
(requiring YPF to withhold the Republic's right to vote if it
acquired a controlling stake and declined to make a tender offer)).

Moreover, following the enactment of the YPF Expropriation
Laws, the Republic continued to use the Repsol shares to breach
its obligations—using the shares to vote at shareholder meetings,
appoint a new Board, run the company, and evade the tender offer
requirement.  *Petersen II*, 2023 WL 2746022, at *3.  As this Court
previously recognized, the YPF Expropriation Law "was intended to
escape the obligation to pay the tender offer." *Petersen III*,
2023 WL 5827596, at *4.  The Republic invoked its "political
rights" in the Repsol shares at the June 4, 2012 shareholders'
meeting for the express purpose of overruling minority

shareholders' objection that YPF failed to invoke Sections 7(h) and 28 of the bylaws. (Dkt. no. 112-4 at 7-8.) Thus, by controlling Repsol's shares, the Republic stranded minority shareholders in a government-run enterprise – the precise outcome against which the bylaws were designed to protect and therefore the crux of the Republic's breach. Accordingly, the facts – (1) that the Republic's breach of its tender offer obligation was indisputably part of the gravamen of Plaintiffs' claims and (2) that the Republic used the Shares to effectuate that breach - are sufficient to establish that the Shares were "used for the commercial activity upon which the claim is based."

### b. Whether the Shares are Immune from Turnover Under New York Law

Because the Shares are "used for a commercial activity in the United States" and "used for the commercial activity upon which the claim is based," and therefore are not otherwise subject to execution immunity, the Court now analyzes whether the Shares are subject to turnover under New York law. 28 U.S.C. § 1610(a)(2); Bainbridge, 690 F. Supp. 3d at 417.

### i. Whether the Shares Can be Transferred under NY CPLR § 5225

Under New York law, the Court must first determine if the property is subject to enforcement and who the proper garnishee is. N.Y. C.P.L.R. § 5201. Under NY CPLR § 5201(b), the Shares "could be assigned or transferred," regardless of Article 10 of

the YPF Expropriation Law's restriction, (see infra Section
III.c.). Since May 21, 2014, each "Constancia de Acciones" (Proof
of Shares) issued by CdV confirms that the Shares are fully
transferable, without any restriction. (Mastro Decl. 2 Ex. 1.)
Additionally, as recently as May 2024, the Milei administration
has reaffirmed its intention to reprivatize YPF, a process that
would necessarily involve the transfer of the Shares. (Mastro
Decl. 2 Ex. 4 at 4.)

NY CPLR § 5201(c) outlines who the proper garnishee is for
"particular property." Given the Shares are uncertificated
securities, they fall within the category of "particular property"
and thus lead the Court to the conclusion that

> the person holding [the Shares] shall be the garnishee; except
> that section 8—112 of the uniform commercial code shall govern
> the extent to which and the means by which any interest in a
> certificated security, uncertificated security or security
> entitlement (as defined in article eight of the uniform
> commercial code) may be reached by garnishment, attachment or
> other legal process.

N.Y. C.P.L.R. § 5201 (c)(4). Under NY UCC § 8-112, Plaintiffs may
reach the Shares by (1) legal process upon the issuer at its chief
executive office in the United States (§ 8-112 (b)); (2) legal
process upon the secured party (§ 8-112 (d)); or (3) "aid from a
court of competent jurisdiction, by injunction or otherwise, in
reaching the certificated security, uncertificated security, or
security entitlement or in satisfying the claim by means allowed
at law or in equity in regard to property that cannot readily be

reached by other legal process" (§ 8-112 (e)).  While control is not enough to prove "possession or custody" under federal common law, the statutes (NY CPLR § 5201(c) and NY UCC § 8-112(d)) aid the Court in identifying who is in "possession or custody" and therefore appropriate to bring the proceedings against under NY CPLR § 5225.  Commonwealth of N. Mariana Islands, 990 N.E.2d at 115.  Because NY UCC § 8-112(d) states that the Shares can be reached by legal process upon the secured party, here, the Republic, this aids the Court in concluding that the Republic "holds" or has "possession or custody" of the Shares for purposes of applying NY CPLR § 5225(a).  Accordingly, Plaintiffs appropriately moved for turnover under New York law.

### ii. Whether the Shares are Immune from Turnover by Being Outside the United States

Regarding whether the Shares are immune from turnover by virtue of being outside of the United States, the Court previously ruled on this exact issue in Bainbridge, 690 F. Supp. 3d at 416. Here, the Court similarly holds that the FSIA does not supersede NY CPLR § 5225 and prevent the Court from ordering the Republic, a judgment debtor over which it has personal jurisdiction, to bring the Shares from outside of New York into New York to pay Plaintiffs.

### c. Whether the Shares Qualify as "in the United States" under Section 1610(a) of the FSIA Once Transferred

The Court must determine whether the Shares would qualify as property of the Republic "in the United States" under Section 1610(a) of the FSIA after the Court orders the Republic to take the following two steps: (i) transfer forthwith the Shares to a global custody account at BNYM in New York for turnover to Plaintiffs; and (ii) instruct BNYM to transfer the Republic's ownership interests in the Shares to Plaintiffs or their designees.[19]

A global custody account is an account that indirectly holds foreign securities on behalf of an investor. More specifically, a global custody account (BNYM in New York) maintains a network of local sub-custodians in foreign markets, and each sub-custodian in turn is a member of the central securities depositary in its own market (Argentina). (Mastro Decl. 1 Ex. 15, ii-iv; Mastro Decl.

---

[19] The Republic asserts that there is "no evidence that such an account could be created by BNYM, which presumably would have to satisfy its own due diligence before doing so." (Def. Opp'n at 12.) BNYM historically had contractual relationships with both the Republic (for which it serves as trustee and paying agent on sovereign debt issuances) and YPF (for which it maintains the ADR program and serves as depositary). While the Republic may not have an existing global custody account with BNYM, NY CPLR § 5225(c) requires that the Republic will execute and deliver any documents necessary to set up such an account. Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., B.V., 814 N.Y.S.2d 4, 14 (2007) (ordering judgment-debtor under NY CPLR § 5225(c) to "execute appropriate documents" to transfer shares in foreign corporations to plaintiffs).

1 Ex. 16.)  Transferring the Shares to a global custody account at
BNYM in New York means that CdV would identify BNYM's sub-custodian
as the beneficial owner, but the Shares would remain in the
register maintained by CdV in Argentina. (Pl. Mem. at 17-18; Def.
Opp'n at 5-6, 12.)  Once the Shares are transferred into a global
custody account at BNYM in New York, the Republic's ownership
interest in the Shares will qualify as security entitlements. N.Y.
U.C.C. §§ 8-102(7), (17); N.Y. U.C.C. § 8-112, Official Cmts., ¶
3.  The Republic's security entitlements will have a New York
situs, because the global account will be held at the New York
office of BNYM.  JPMorgan Chase Bank, N.A. v. Herman, 168 A.3d
514, 521-22 (Conn. App. Ct. 2017) (judgment-debtor's security
entitlement had Connecticut situs under UCC § 8-112 because its
account was with Connecticut office of brokerage firm, even though
securities certificates were held by securities depositary in New
York); EM Ltd. v. Republic of Argentina, 389 F. App'x 38, 43-44
(2d Cir. 2010) (holding that Argentina's beneficial interests in
trust had New York situs and were attachable under FSIA, even
though corpus of trust consisted of ADSs that represented interests
in shares of Argentine corporation).  Accordingly, the Republic's
ownership interest in the Shares will qualify as property "in the
United States," as required by the FSIA after the Court orders the
Republic to take the two proposed steps.

### d. **Whether International Comity Counsels Against Granting the Proposed Order**[20]

The Republic argues that international comity counsels against granting the proposed order. The "fundamental principle of international comity" is that "a state may not require a person to do an act in another state that is prohibited by the law of that state or the law of the state of which he is a national." Motorola Credit Corp. v. Uzan, 388 F.3d 39, 60 (2d Cir. 2004) (citations omitted). Additionally, under the act-of-state doctrine, courts cannot "declar[e] invalid, and thus ineffective as a rule of decision, . . . the official act of a foreign sovereign." Celestin v. Caribbean Air Mail, Inc., 30 F.4th 133, 137 (2d Cir. 2022) (internal quotation marks and citation omitted). The Court previously recognized the expropriation of the Shares as "a valid act." Petersen Energia Inversora, S.A.U. v. Argentine Republic et al., No. 15 Civ. 2739 (LAP), 2016 WL 4735367, at *8 (S.D.N.Y. Sept. 9, 2016), aff'd in part, appeal dismissed in part

---

[20] Prescriptive comity refers to "the respect sovereign nations afford each other by limiting the reach of their laws." Hartford Fire Ins. Co. v. California, 509 U.S. 764, 817 (1993). Prescriptive comity is distinct from "adjudicative comity," which "asks whether, where a statute might otherwise apply, a court should nonetheless abstain from exercising jurisdiction in deference to a foreign nation's courts that might be a more appropriate forum for adjudicating the matter." In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 100-01 (2d Cir. 2019).

sub nom. Petersen I, 895 F.3d.  (See also Pl. Reply at 6; Def.
Opp'n at 9.)

The Republic argues that Plaintiffs' requested relief would
require the Republic either to change its laws or violate them.[21]
The Republic points to Article 10 of the YPF Expropriation Law,
which forbids any transfer of the Shares without permission of the
National Congress by two-thirds vote of its members, and the
Permanent Supplementary Budget Law, which provides for payments
only of final judgments.

International comity comes into play only when there is a
true conflict between the law of the United States and that of a

---

[21] The Court does not evaluate the parties' arguments regarding
international comity as it pertains to the analysis of NY CPLR
§ 5225 and the FSIA because the Court relies on its decision in
Bainbridge, 690 F. Supp. 3d at 411.  In addition, the FSIA already
reflects Congress's resolution of comity principles in execution
proceedings against a foreign state.  Republic of Austria v.
Altmann, 541 U.S. 677, 699 (2004) (Comity principles in the FSIA
provide a "comprehensive framework for resolving any claim of
sovereign immunity."); accord Dole Food Co. v. Patrickson, 538
U.S. 468, 479 (2003) (The FSIA already grants immunity to foreign
states and their property "as a gesture of comity."); see also
Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's
Democratic Republic, No. 10 Civ. 5256 (KMW) (DCF), 2013 WL 1703873,
at *7 (S.D.N.Y. Apr. 19, 2013).  But see Peterson v. Islamic
Republic of Iran, 876 F.3d 63, 94 & n.23 (2d Cir. 2017), vacated
on other grounds, Clearstream Banking S.A. v. Peterson, 140 S. Ct.
813 (2020) (Comity questions left open by the FSIA include whether
"a court order will infringe on sovereign interests of a foreign
state."); Republic of Argentina v. NML Cap., Ltd., 573 U.S. 134,
142-46 & nn.4 & 6 (2014) (holding that a comity analysis may be
appropriate when ordering discovery about a foreign state's
assets, because the FSIA has "nothing to say" about that
discovery); Aurelius Cap. Master, Ltd. v. Republic of Argentina,
589 F. App'x 16, 18 (2d Cir. 2014) (same).

foreign jurisdiction.  *In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1049 (2d Cir. 1996) ("International comity comes into play only when there is a 'true conflict' between American law and that of a foreign jurisdiction."); *Hartford Fire Ins. Co.*, 509 U.S. at 799 (A "true conflict" exists only if it would be "impossible" for a party to comply with the laws of both countries.).

There is no unavoidable conflict between Argentine law and Plaintiffs' requested relief.  The Republic has several choices it can legally pursue: (1) receive the permission of the National Congress by two-thirds vote, (2) take action to change the law, or (3) satisfy the judgment through a separate agreement with Plaintiffs.  Courts have enjoined sovereigns to act within their own territory where necessary.  *See, e.g.*, *NML Cap., Ltd. v. Republic of Argentina*, 699 F.3d 246, 254-55, 263 (2d Cir. 2012) (affirming injunction requiring Argentina to specifically perform its obligations under equal treatment provision in bonds).

Assuming arguendo, that there is a true conflict between Plaintiffs' requested relief and Argentine laws, comity considerations counsel in favor of granting Plaintiffs' requested relief.  The United States has a strong interest in enforcing its judgments, and that interest outweighs any putative Argentine interest in avoiding execution on assets that are fully subject to

execution under the FSIA.[22]  <u>JW Oilfield Equip., LLC v. Commerzbank
AG</u>, 764 F. Supp. 2d 587, 596-98 (S.D.N.Y. 2011) (requiring German
bank to turn over funds in judgment-debtor's account in violation
of German law, based on the United States' "strong interest in
enforcing its judgments").

Foreign governments cannot simply override the exceptions to
the FSIA by invoking its own law to shield its assets from
execution in the United States.  If comity could supersede the
FSIA and allow foreign law to control which sovereign assets are
subject to execution, every foreign state could render itself
judgment-proof in United States courts just by passing a law
requiring its own approval for any transfer of its property.  <u>Simon
v. Republic of Hungary</u>, 911 F.3d 1172, 1180 (D.C. Cir. 2018)

_____

[22] Defendants argue that this will put the United States at jeopardy
"given the possibility of reciprocal adverse treatment of the
United States in foreign courts." (Def. Opp'n at 9.)  <u>See</u> <u>Fed.
Republic of Germany v. Philipp</u>, 592 U.S. 169, 184 (2021) ("We
interpret the FSIA as we do other statutes affecting international
relations: to avoid, where possible, producing friction in our
relations with [other] nations and leading some to reciprocate by
granting their courts permission to embroil the United States in
expensive and difficult litigation.") (internal quotation marks
and citations omitted).  While it is the Court's view that this
concern is addressed in the FSIA requirements, this
"apprehension[] [is] better directed to that branch of government
with authority to amend. . ."  <u>Republic of Argentina</u>, 573 U.S. at
146; <u>see also</u> <u>Turkiye Halk Bankasi A.S. v. United States</u>, 598 U.S.
264, 280 (2023) ("In the context of a civil proceeding, this Court
has recognized that a suit not governed by the FSIA 'may still be
barred by foreign sovereign immunity under the common law.'"
(citations omitted)).

(rejecting Hungary's comity-based argument that "would in actuality amount to a judicial grant of immunity"), <u>vacated on other grounds</u>, 141 S. Ct. 691 (2021); <u>De Csepel v. Republic of Hungary</u>, 27 F.4th 736, 753 (D.C. Cir. 2022) (reaffirming <u>Simon's</u> rejection of Hungary's comity-based argument on same ground).

While the Republic demands that this Court extend comity, it simultaneously refuses to make any effort to honor the Court's unstayed judgment. <u>NML Cap., Ltd. v. Republic of Argentina</u>, 2015 WL 1087488, at *7 (S.D.N.Y. Mar. 12, 2015) ("[I]f Citibank's predicament is a matter of comity, it is only because the Republic has refused to observe the judgments of the court to whose jurisdiction it acceded. Comity does not suggest abrogating those judgments, or creating exceptions to the Injunction designed to enforce them."); <u>see also Motorola Credit Corp.</u>, 388 F.3d at 60 (declining to grant comity to Turkish injunction prohibiting turnover of shares because "orders of foreign courts are not entitled to comity if the litigants who procure them have deliberately courted legal impediments to the enforcement of a federal court's orders" (internal quotation marks and citations omitted)). Comity is not a one-way street.

Accordingly, while the Court need not engage in a comity analysis, those comity considerations counsel in favor of granting the proposed order.

IV.   **Conclusion**

For the reasons set out above, Plaintiffs' motion is GRANTED. The Republic shall (i) transfer its Class D shares of YPF to a global custody account at BNYM in New York within 14 days from the date of this order; and (ii) instruct BNYM to initiate a transfer of the Republic's ownership interests in its Class D shares of YPF to Plaintiffs or their designees within one business day of the date on which the Shares are deposited into the account.

Satisfied that oral argument is not needed in addition to the papers submitted by the parties, the Republic's request for oral argument, (dkt. no. 582), is DENIED. Doctor's Assoc., Inc. v. Distajo, 66 F.3d 438, 448 (2d Cir. 1995); see also SecurityNational Mortg. Co. v. Lehman Bros. Holdings Inc., No. 20 MC 00027 (LAK) (DF), 2020 WL 9815257, at *1 (S.D.N.Y. July 10, 2020).

The Clerk of the Court is respectfully directed to close dkt. no. 555 in 15 Civ. 02739 and dkt. no. 481 in 16 Civ. 08569.

**SO ORDERED.**

Dated:     June 30, 2025
           New York, New York

_Loretta A. Preska_
_____
LORETTA A. PRESKA
Senior United States District Judge