# 25-1689

# In the United States Court of Appeals for the Second Circuit

———————————

ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P.,

*Plaintiffs-Appellees*,

v.

ARGENTINE REPUBLIC,

*Defendant-Appellant*.

———————————

On Appeal from the United States District Court
for the Southern District of New York
(No. 1:16-cv-08569) (Hon. Loretta A. Preska)

———————————

## SPECIAL APPENDIX

———————————

Amanda F. Davidoff
Thomas C. White
Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
davidoffa@sullcrom.com

Robert J. Giuffra, Jr.
Sergio J. Galvis
Adam R. Brebner
Pedro José Izquierdo
Arturo Carlos Schultz
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
giuffrar@sullcrom.com

*Attorneys for the Argentine Republic*

# TABLE OF CONTENTS

Page

## Orders, Opinions, and Judgments

Memorandum & Order,
    No. 1:16-cv-8569 (S.D.N.Y. June 30, 2025), Dkt. 662 ...............................S.A. 1

## U.S. Statutes

28 U.S.C. § 1605 ................................................................................. S.A. 34

28 U.S.C. § 1609 .................................................................................S.A. 39

28 U.S.C. § 1610 ................................................................................. S.A. 40

28 U.S.C. § 1611 ................................................................................. S.A. 44

N.Y. C.P.L.R. § 5225 .......................................................................... S.A. 45

## Argentine Laws and Statutes

YPF Expropriation Law (Law No. 26,741) ...................................... S.A. 46

## Excerpts of Restatements of Foreign Relations Law

Restatement (Third) of Foreign Relations Law § 403 .................................... S.A. 51

Restatement (Third) of Foreign Relations Law § 441 .................................... S.A. 58

Restatement (Fourth) of Foreign Relations Law § 432 .................................. S.A. 63

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETERSEN ENERGIA INVERSORA, S.A.U. ET AL., | |
| Plaintiff, | No. 15 Civ. 02739 (LAP) |
| -against- | |
| ARGENTINE REPUBLIC ET AL., | |
| Defendants. | |
| ETON PARK CAPITAL MANAGEMENT L.P. ET AL., | |
| Plaintiff, | No. 16 Civ. 08569 (LAP) |
| -against- | MEMORANDUM & ORDER |
| ARGENTINE REPUBLIC ET AL., | |
| Defendants. | |

LORETTA A. PRESKA, Senior United States District Judge:[1]

 Plaintiffs Petersen Energia Inversora S.A.U., Petersen
Energia, S.A.U., Eton Park Capital Management, L.P., Eton Park
Master Fund, Ltd., and Eton Park Fund, L.P., (together
"Plaintiffs") seek turnover of Defendant the Argentine Republic's
("Defendant" or "the Republic" or "Argentina") 51% of YPF S.A.'s
("YPF") Class D shares (the "Shares") in partial satisfaction of
the Court's judgment in the aggregate amount of approximately $16.1
billion, which remains unpaid, pursuant to Federal Rule of Civil

---

[1] References to the docket refer to the lead case, Petersen Energia
Inversora, S.A.U. et al. v. Argentine Republic et al., No. 15 Civ.
02739.

S.A. 1

Procedure 69(a)(1), New York Civil Practice Law and Rules ("NY CPLR") § 5225(c), and New York Uniform Commercial Code ("NY UCC") § 8-112(e).[2]  Plaintiffs request that the Court order the Republic to (i) transfer the Shares to a global custody account at the Bank of New York Mellon ("BNYM") in New York within 14 days from the date of this order; and (ii) instruct BNYM to initiate a transfer of the Republic's ownership interests in its YPF shares to Plaintiffs or their designees within one business day of the date on which the shares are deposited into the account.  (Pl. Mot.) Defendant opposes the motion.[3]  The United States of America filed

---

[2] (Pl. Mot. for Injunction and Turnover ("Pl. Mot."), dated Apr. 22, 2024 [dkt. no. 555]; Pl. Mem. in Support of Mot. ("Pl. Mem."), dated Apr. 22, 2024 [dkt. no. 556]; Fourth Expert Report of John C. Coffee, Jr. ("Coffee 4"), dated Apr. 22, 2024 [dkt. no. 557]; Second Expert Report of Nancy C. Lissemore ("Lissemore 2"), dated Apr. 22, 2024 [dkt. no. 558]; Decl. of Randy M. Mastro ("Mastro Decl. 1"), dated Apr. 22, 2024 [dkt. no. 559]; Pl. Reply, dated May 30, 2024 [dkt. no. 587]; Decl. of Alberto B. Bianchi, dated May 30, 2024 [dkt. no. 588]; Decl. of Dr. Alfredo L. Rovira, dated May 30, 2024 [dkt. no. 589]; Fifth Expert Report of John C. Coffee, Jr., dated May 30, 2024 [dkt. no. 590]; Decl. of Randy M. Mastro ("Mastro Decl. 2"), dated May 30, 2024 [dkt. no. 591]; Pl. Sur-Reply, dated July 8, 2024 [dkt. no. 598]; Pl. Letter, dated Aug. 27, 2024 [dkt. no. 647].)

[3] (Def. Opp'n to Pl. Mot. ("Def. Opp'n"), dated May 16, 2024 [dkt. no. 577]; Decl. of Robert J. Giuffra Jr. ("Giuffra Decl."), dated May 16, 2024 [dkt. no. 578]; Expert Decl. of Rafael M. Manovil, dated May 16, 2024 [dkt. no. 579]; Expert Report of Alfonso Santiago ("Santiago"), dated May 16, 2024 [dkt. no. 580]; Third Report of Professor Steven Davidoff Solomon, dated May 16, 2024 [dkt. no. 581]; Def. Sur-Reply, dated June 27, 2024 [dkt. no. 597]; Def. Letter, dated Aug. 26, 2024 [dkt. no. 639].)

**S.A. 2**

a statement of interest.[45]  For the reasons set forth below, Plaintiffs' motion is GRANTED.

I.  **Background**

The Court assumes familiarity with the factual background and procedural history of the case, which have been set out at length in prior opinions of this Court and the Court of Appeals.  The Court recounts only the facts necessary to determine the instant motion.

### a. Factual Background

Prior to 1993, YPF, a petroleum company, was wholly owned and operated by the Republic.  Petersen Energia Inversora, S.A.U v. Argentine Republic et al. ("Petersen II"), 15 Civ. 2739 (LAP), 16 Civ. 8569 (LAP), 2023 WL 2746022, at *2 (S.D.N.Y. Mar. 31, 2023).

In 1993, the Republic decided to privatize YPF through a worldwide IPO of its shares.  Id.  The Republic acted "in its capacity as shareholder of [YPF]" to amend YPF's bylaws to include protections for investors.  Petersen Energia Inversora S.A.U. v. Argentine Republic et al. ("Petersen I"), 895 F.3d 194, 199 (2d

---

4 (U.S. Statement of Interest, dated Nov. 6, 2024 [dkt. no. 679]; Pl. Response to U.S. St., dated Nov. 14, 2024 [dkt. no. 684].)
5 The parties and the United States filed supplemental briefs regarding the impact of the Court of Appeals' decision in Peterson v. Bank Markazi, 121 F.4th 983 (2d Cir. 2024) on this motion.  (See dkt. nos. 695-96, 698, 702, 708, 710.)  The parties and the United States agree that the decision has no impact on the Court's determination of this motion.

**S.A. 3**

Cir. 2018).   Notably, the amended bylaws included, <u>inter alia</u>,
Section 7, the tender offer provisions.  <u>Id.</u> at 199-200.

    In the Republic's efforts to privatize YPF, the Republic
specifically targeted its IPO at United States investors.   The
Republic sponsored an ADR program listed on the New York Stock
Exchange ("NYSE") for YPF's Class D shares with BNYM as the
depository bank, and it registered both YPF's Class D shares and
its ADRs representing interests in those shares with the United
States Securities and Exchange Commission ("SEC").  (Lissemore 2
¶¶ 23-25.)  <u>See also</u> <u>Petersen I</u>, 895 F.3d at 199.   The Republic
"raised billions of dollars in investment capital with the largest
share (more than $1.1 billion in total) coming from the sale of
ADRs [American Depositary Receipt ("ADR")] in the United States on
the NYSE." <u>Id.</u> at 200.  Repsol S.A. ("Repsol") emerged from the
IPO as YPF's majority shareholder.  <u>Id.</u>  The Republic remained a
holder of YPF's Class A shares.  <u>Id.</u>  After the IPO, YPF's shares,
via the ADRs, were traded publicly on the NYSE and other exchanges.
<u>Id.</u>

    On April 16, 2012, the Republic "exercised indirect control"
of Repsol's 51% of YPF's Class D shares, specifically the right to
"use its shares to govern the company," "direct corporate policy,"
or "otherwise exercise all the considerable power of a majority
shareholder." <u>Petersen Energía Inversora, S.A.U. v. Argentine</u>

**S.A. 4**

Republic et al. ("Petersen III"), 15 Civ. 2739 (LAP), 16 Civ. 8569 (LAP), 2023 WL 5827596, at *1 (S.D.N.Y. Sept. 8, 2023).

On May 3, 2012, the Republic enacted Law 26,741 (the "YPF Expropriation Law"), which became effective on May 7, 2012, id. at *3, and "was intended to escape the obligation to pay the tender offer," id. at *4.  Article 15 of the YPF Expropriation Law states that YPF "shall continue to operate as [a] publicly traded corporation[]." (Giuffra Decl. Ex. 1.)  Article 16 requires the Republic to execute the Shares pursuant to various principles, including in a manner "safeguarding shareholder interest and generating value on their behalf." (Id.)  Additionally, Article 10 states that the Republic's expropriation of the Shares from Repsol is conducted for the "public interest" and prohibits "any future transfer of the shares without permission of the National Congress by a two-thirds vote of its members."[6] (Id.; dkt. no. 470-7 Articles 4-5 (Expropriation must include a declaration of public utility.).)

By expropriating Repsol's 51% of YPF's Class D shares, the Republic breached Sections 7 and 28 of YPF's bylaws because it never made a tender offer for Plaintiffs' shares.  Petersen II, 2023 WL 2746022, at *8-11.

---

[6] The Court does not opine on whether this law applies (a) to voluntary transfers only or (b) to voluntary transfers and transfers made necessary by a court order. (Pl. Reply at 2; Def. Sur-Reply at 4.)

**S.A. 5**

As a result of the expropriation, the Republic holds 51% of YPF's Class D shares,[7] which are uncertificated securities held in book-entry form[8] in an account at Caja de Valores, S.A. ("CdV"), the central securities depository of Argentina.  (Mastro Decl. 1 Ex. 1 at 101.)  The Republic holds the shares at CdV directly, rather than in "street name" through a broker or other intermediary.  (Dkt. no. 45-2 at ECF 4; see also Pl. Mem. at 17.) When book-entry shares are transferred from one owner to another, no physical transfer occurs; instead, the transfer is noted in the registry.  (Mastro Decl. 1 Ex. 14 at 32 ("If securities are dematerialized: May dematerialized security positions be re-certificated and held outside the CSD? No.").)

---

[7] The Republic argues that the Court cannot transfer 49% of the Shares because the YPF Expropriation Law "designates 49% of the [shares] to Argentine Provinces that are part of OFEPHI."  (Def. Opp'n at 7.)  The provinces' contingent interest in the Republic's shares, which will ripen into an actual interest only if the Republic decides to transfer the Shares, is not itself subject to attachment and cannot prevent transfer of the Republic's interest. See, e.g., Matter of Supreme Merch. Co. v. Chem. Bank, 70 N.Y.2d 344, 350 (1987) (CPLR § 5201 "preclude[s] a levy against contingent obligations not certain to ripen into something real."). Additionally, YPF's Form 20-F for the year ended December 31, 2023 confirms that the "Argentine National State" owns 200.6 million Class D shares of YPF (51% of the total), while the "Argentine provincial governments" own 7,624 Class B shares (which Plaintiffs do not seek to execute upon).  (Mastro Decl. 2 Ex. 3 at 90.)
[8] Section 7(a) of YPF's bylaws states that its shares "shall not be represented by certificates.  Instead, they shall be book-entry shares and shall be recorded in accounts kept under their holder's names in the Corporation, commercial banks, investment banks or securities clearing houses as authorized by the Board of Directors."  (Dkt. no. 45-2 at ECF 4.)

**S.A. 6**

Since April 2012, the Republic has controlled YPF's major business and financial decisions through its majority share of the company. The parties agree that the Republic votes to elect the Board and to approve initiatives generally proposed by the Board, including those that require shareholder approval under the Republic's laws. (Pl. Mem. at 3, 12-13; Def. Opp'n at 6.)

Additionally, as disclosed in YPF's Form 20-F for the year ended December 31, 2013: "The Argentine federal government controls the Company, and consequently, the federal government is able to determine substantially all matters requiring approval by a majority of our shareholders, including the election of a majority of our directors, and is able to direct our operations." (Mastro Decl. 1 Ex. 6 at 10.) As disclosed in YPF's Form 20-F for the year ended December 31, 2022:

> The Argentine Republic owns 51% of the shares of YPF S.A. and, consequently, the Argentine government is able to decide all matters requiring approval by a majority of shareholders[.] . . . We cannot assure you that decisions taken by our controlling shareholder would not differ from your interests as a shareholder.

(Id. Ex. 1 at 6.)

More recently, YPF continues to tap into the United States' markets by: (i) sponsoring the ADR program for its Class D shares with BNYM and listing the shares on the NYSE, which requires maintaining the registration of its Class D shares and ADSs with the SEC; and (ii) offering bonds on the debt capital markets.

**S.A. 7**

(Lissemore 2 ¶¶ 27-29; Coffee 4 ¶¶ 11-18; Mastro Decl. 1 Exs. 11-12.)

## II.  **Applicable Law**

Federal Rule of Civil Procedure 69(a)(1) provides that the "procedure on execution" and "proceedings supplementary to and in aid of judgment or execution" enforcing a money judgment "must accord with the procedure of the state where the court is located." See, e.g., All. Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A., 190 F.3d 16, 20 (2d Cir. 1999).  In New York, NY CPLR § 5201 establishes what property is subject to enforcement and who the proper garnishee is.[9]  NY CPLR § 5225 provides the mechanism for courts to order the payment or delivery of the property.  In addition, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1610(a), addresses enforcement against a foreign sovereign.

### a. **NY CPLR § 5201**

NY CPLR § 5201(b) states that judgments are only enforceable "against any property which could be assigned or transferred."  New York law controls whether shares in a foreign corporation "could be assigned or transferred" under NY CPLR § 5201(b).  See, e.g., 245 Park Member LLC v. HNA Grp. (Int'l) Co. Ltd., No. 23-842-CV, 2024 WL 1506798, at *3 (2d Cir. Apr. 8, 2024) (New York

---

[9] A "garnishee" is a person who owes a debt to a judgment debtor, or a person other than the judgment debtor who has property in his possession or custody in which a judgment debtor has an interest. N.Y. C.P.L.R. § 105(i).

law controls whether membership interest in Delaware LLC is assignable and transferable); Hotel 71 Mezz Lender LLC v. Falor, 14 N.Y.3d 303, 314 (2010) (same). And, under New York law, shares in a company are freely transferable and assignable. See, e.g., Koehler v. Bank of Berm. Ltd., 12 N.Y.3d 533, 541 (2009).

NY CPLR § 5201(c), titled "proper garnishee for particular property or debt," outlines who the proper garnishee is for certain property. NY CPLR § 5201(c)(4) states that

> where property . . . is evidenced by a . . . negotiable document of title or a certificate of stock of an association or corporation, the . . . document or certificate shall be treated as property capable of delivery and the person holding it shall be the garnishee.

It further states,

> except that section 8—112 of the uniform commercial code shall govern the extent to which and the means by which any interest in a certificated security, uncertificated security or security entitlement (as defined in article eight of the uniform commercial code) may be reached by garnishment, attachment or other legal process.[10]

---

[10] Defendant argues that NY UCC § 8-110(a)(5) provides that the "local law of the issuer's jurisdiction," here Argentine law, "governs . . . whether an adverse claim can be asserted against a person to whom transfer of a[n] . . . uncertificated security is registered or a person who obtains control of the uncertificated security." (Def. Opp'n at 26 (emphasis added).) The Court is unpersuaded because Plaintiffs do not assert an "adverse claim" to the Shares; on the contrary, Plaintiffs acknowledge that the Republic validly owns the Shares, which is why Plaintiffs argue that they should be subject to execution governed by New York law and the FSIA. F.R.C.P. 69(a)(1) (New York law governs execution procedure here).

The Republic's Shares qualify as "uncertificated securit[ies]" under the UCC because they exist only in book-entry form.[11] Under NY UCC § 8-112, Plaintiffs may reach Defendant's uncertificated securities by (1) legal process upon the issuer at its chief executive office in the United States, (§ 8-112(b)); (2) legal process upon the secured party, (§ 8-112(d));[12] or (3) "aid from a court of competent jurisdiction, by injunction or otherwise, in reaching the certificated security, uncertificated security, or security entitlement or in satisfying the claim by means allowed at law or in equity in regard to property that cannot readily be reached by other legal process," (§ 8-112(e)).

---

[11] NY UCC § 8-102(18) defines "uncertificated security" as "a security that is not represented by a certificate." The term "security entitlement" refers to the rights and property interest of a person who holds securities indirectly through a broker or other securities intermediary. See N.Y. U.C.C. § 8-102(7), (17). The Shares are not "security entitlement[s]" because they are registered to the Republic and not held in street name. N.Y. U.C.C. § 8-102(7), (17); see also N.Y. U.C.C. § 8-501(d) ("If a securities intermediary holds a financial asset for another person, and the financial asset is registered in the name of . . . the other person, and has not been indorsed to the securities intermediary or in blank, the other person is treated as holding the financial asset directly rather than as having a security entitlement with respect to the financial asset.").

[12] Because the Republic holds the Shares directly through CdV, as opposed to in street name through a broker or other intermediary, they are "uncertificated securit[ies] registered in the name of a secured party." N.Y. U.C.C. § 8-112(d).

**S.A. 10**

### b. NY CPLR § 5225[13]

NY CPLR § 5225(a) sets forth New York's procedure for enforcement of money judgments against property in the possession or custody of the judgment debtor. <u>See, e.g.</u>, <u>Koehler</u>, 12 N.Y.3d at 537-38.  It provides that

> where it is shown that the judgment debtor is in possession or custody of money or other personal property in which he has an interest, the court shall order that the judgment debtor pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor. . . .

N.Y. C.P.L.R. § 5225(a).  NY CPLR § 5225(b) applies when the property is not in the judgment debtor's possession.  <u>Koehler</u>, 12 N.Y.3d at 541.  It provides that the Court may order a third-party garnishee to turn over the property – but only "upon a special proceeding" commenced against that garnishee.  N.Y. C.P.L.R. § 5225(b).

Under either NY CPLR §§ 5225(a) or (b), control is not enough: the judgment debtor (§ 5225(a)) or a third-party garnishee (§ 5225(b)) must have "possession or custody."  <u>Commonwealth of N. Mariana Islands v. Canadian Imperial Bank of Com.</u>, 990 N.E.2d 114, 115 (N.Y. 2013) (under NY CPLR § 5225(b) third-party garnishee

---

[13] The Republic argues that NY CPLR § 5225 applies only to a "person," which does not include sovereigns. (Def. Opp'n at 28 n. 15.)  However, the Court finds that § 5225 must apply to sovereigns, at least where the sovereign owes a commercial debt and is being asked to pay that debt with commercial assets.

**S.A. 11**

"must have actual, not merely constructive, possession or custody
of the assets").

Additionally, NY CPLR § 5225(c) provides that "[t]he court
may order any person to execute and deliver any documents necessary
to effect payment or delivery."

Turnover orders pursuant to NY CPLR § 5225 are effective
against assets regardless of their location if the Court has
personal jurisdiction over the judgment debtor or the third-party
garnishee.  In Koehler, the New York Court of Appeals expressly
addressed funds held outside of New York, holding that "CPLR
article 52 contains no express territorial limitation barring the
entry of a turnover order that requires . . . [the transfer of]
money or property into New York from another state or country."
12 N.Y.3d at 539, 541 ("[A] New York court with personal
jurisdiction over a defendant may order him to turn over out-of-
state property. . . ."); see also Motorola Credit Corp. v. Uzan,
739 F. Supp. 2d 636, 641 (S.D.N.Y. 2010) (same); In re Gaming
Lottery Sec. Litig., No. 96 Civ. 5567 (RPP), 2001 WL 123807, at *3
(S.D.N.Y. Feb. 13, 2001) (noting that the Court "has the power
under CPLR § 5225(a) to order a turnover of funds held in another
jurisdiction" and ordering the turnover of funds "in an account at
the Royal Bank of Scotland"); In re Feit & Drexler, Inc. v.
Drexler, 760 F.2d 406, 414 (2d Cir. 1985) (holding that the
district court, sitting in bankruptcy, had the power to compel the

**S.A. 12**

defendant to deliver property from outside the court's territorial jurisdiction because the court had personal jurisdiction over the defendant); Miller v. Doniger, 814 N.Y.S.2d 141 (2006) (affirming order directing the judgment debtor to "turn over his out-of-State Wachovia account"); Starbare II Partners L.P. v. Sloan, 629 N.Y.S.2d 23 (1995) (directing the defendant to turn over artwork located outside the state pursuant to NY CPLR 5225(a)).

In Bainbridge Fund Ltd. v. Republic of Argentina, this Court found that it has the power to order a sovereign to bring assets held in that sovereign country's central bank and deliver them to New York. 690 F. Supp. 3d 411, 421-22 (S.D.N.Y. 2023). "The FSIA . . . does not supersede CPLR 5225 and prevent the Court from ordering the Republic, a judgment debtor over which it has personal jurisdiction, to bring assets from outside of New York into New York to pay [Plaintiff]." Id. at 416. The Court further stated that "[t]he execution immunity provision of the FSIA is no bar because by its plain terms it 'immunizes only foreign-state property 'in the United States.''" Id. (citation omitted). Additionally, the Court determined that the "more prudent course" is to evaluate whether the assets are subject to execution immunity before ordering that they be brought to the United States. Id. at 417.

**S.A. 13**

**c. Foreign Sovereign Immunities Act, 28 U.S.C. § 1610(a)**

Under the FSIA,

> [t]he property in the United States of a foreign state . . .
> used for a commercial activity in the United States, shall
> not be immune from attachment in aid of execution, or from
> execution, upon a judgment entered by a court the United
> States or of a State after the effective date of this Act, if
> . . . the property is or was used for the commercial activity
> upon which the claim is based. . . .

28 U.S.C. § 1610(a)(2).  Accordingly, to be amenable to execution

under this section, property of a foreign state must satisfy three

requirements: (1) it must be "in the United States;" (2) it must

be "used for a commercial activity in the United States;" and (3)

it must be (or have been) "used for the commercial activity upon

which the claim is based."  <u>Id.</u>  In other words, the sovereign

**S.A. 14**

must use the property but may do so anywhere,[14] and the activity must occur in the United States but may be conducted by anyone.[15]

Plaintiffs have the initial burden of production to show that an exception to foreign sovereign immunity under the FSIA applies. Beierwaltes v. L'Office Federale de la Culture de la Confederation Suisse (Fed. Office of Culture of the Swiss Confederation), 999 F.3d 808, 816-17 (2d Cir. 2021); see also Bainbridge Fund Ltd., 690 F. Supp. 3d at 419. Defendant then bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply. Id.

### III. Discussion

The Republic opposes the entry of the proposed order by arguing, inter alia, that (1) the Shares are immune from turnover

---

[14] The Republic argues that the statute requires that the "use" occur in the United States, as opposed to requiring that the commercial activity occur in the United States. (Def. Opp'n at 13-17.) The Court disagrees. What matters is not where the Shares were used, but where the resulting commercial activity takes place. Exp.-Imp. Bank of the Republic of China v. Grenada, 768 F.3d 75, 89-91 (2d Cir. 2014) (declining to attach funds "because they are not used by the Statutory Corporations for commercial activity that takes place in the United States" (emphasis added)); Attestor Master Value Fund LP v. Argentina, 113 F.4th 220, 233 (2d Cir. 2024) (the FSIA required that "the commercial activity in which Argentina used [the property] took place at least in part in the United States." (emphasis added)); But see Aurelius Cap. Partners, LP v. Republic of Argentina, No. 07 Civ. 11327 (TPG), 2010 WL 768874, at *4 (S.D.N.Y. Mar. 5, 2010) ("even if the property is being used for commercial activity, this use is not occurring in the United States").

[15] The Republic argues that the commercial activity must be carried out by the foreign state. (Def. Opp'n at 17.) However, that requirement is not found in the statute. (Pl. Reply at 10.)

**S.A. 15**

under the FSIA, (see infra Sections III.a. and III.c.); (2)
Plaintiffs have not shown that the assets are subject to turnover
under New York law, (see infra Section III.b.); and (3)
international comity counsels against turnover, (see infra Section
III.d.). The Court addresses each argument in turn.

### a. Whether the Shares are Immune from Execution under the FSIA

Because the Court determined in Bainbridge that the "more
prudent course" is to "evaluate whether the assets are otherwise
subject to execution immunity before ordering that they be brought
to the United States," 690 F. Supp. 3d at 417, the Court first
turns to whether two elements of an exception under the FSIA are
met: (i) the Shares must be "used for a commercial activity in the
United States;" and (ii) it must be (or have been) "used for the
commercial activity upon which the claim is based." 28 U.S.C.
§ 1610(a)(2).

### i. Whether the Shares are "Used for a Commercial Activity in the United States"

To satisfy this element, the Republic must "actively utilize
[the Shares] in service of that commercial activity [in the United
States]." Exp.-Imp. Bank of the Republic of China v. Grenada, 768
F.3d 75, 90 (2d Cir. 2014); see also id. at 89 (". . . when the
property in question is put into action, put into service, availed
or employed for a commercial activity . . .").

**S.A. 16**

The Republic does not dispute that YPF sponsoring an ADR program for its Class D shares with BNYM in New York, listing its shares on the NYSE, registering its shares with the SEC, and selling its debt to United States institutional investors under SEC Rule 144A, all constitute "commercial activity in the United States." (Def. Opp'n at 24.)  See, e.g., EM Ltd. v. Republic of Argentina, 389 F. App'x 38, 44 (2d Cir. 2010) (facilitating investment and sale of securities is "commercial activity" under the FSIA); Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 615-17 (1992) (issuing bonds is commercial activity).  The question for the Court's consideration is whether the Republic used its Shares "for [the] commercial activity in the United States." 28 U.S.C. § 1610 (a).

In Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela, 932 F.3d 126, 152 (3d Cir. 2019), the Third Circuit affirmed attachment of Petróleos de Venezuela, S.A.'s ("PDVSA") (Venezuela's state oil company and its alter ego) controlling shares in PDV Holding, Inc. ("PDVH") (a separate entity whose corporate veil was not pierced).  The Court observed that PDVSA used its shares in PDVH "to run its business as an owner, to appoint directors, approve contracts, and to pledge PDVH's debts for its own short-term debt." Id. at 151.  Accordingly, the Court held that PDVSA used its shares in PDVH for a commercial activity in the United States by directing the activities of PDVH in the

**S.A. 17**

United States and thus the PDVH shares were subject to execution under § 1610(a). Id. at 151-52; see also Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 450 (D.C. Cir. 1990) (holding that Iran engaged in commercial activity when it "used its majority position" in a dairy company "to lock Foremost out of the management of the company and deny Foremost its share of the company's earnings."). Similarly, in In re 650 Fifth Ave. Co., No. 08 Civ. 10934 (KBF), 2014 WL 1284494 (S.D.N.Y. Mar. 28, 2014), vacated and remanded sub nom. Kirschenbaum v. 650 Fifth Ave. & Related Props., 830 F.3d 107 (2d Cir. 2016), and vacated and remanded, 830 F.3d 66 (2d Cir. 2016), the Court held that Iranian front companies "used" partnership shares in a real estate company for commercial activity in the United States, because: (i) the company owned a building in New York that generated revenue; and (ii) the shares "were the mechanism through which the partners owned the Building and determined the distribution of revenue that it produced." Id. at *17.[16] Accordingly, a foreign sovereign's use of its controlling shares to direct a company's commercial activity in the United States satisfies the FSIA requirement that the shares be "used for a commercial activity in the United States."

---

[16] On appeal, the Court of Appeals vacated the district court's prior alter ego finding and therefore the Court of Appeals did not address the district court's FSIA analysis. Kirschenbaum v. 650 Fifth Ave. Co., 830 F.3d 107 (2d Cir. 2016).

**S.A. 18**

Each year YPF advises United States investors that the Republic exercises a high degree of control over YPF.[17]  Since April 2012, the Republic has controlled YPF's major business and financial decisions through its majority share ownership and generated value for the company through use of the United States' markets.  The parties agree that the Republic votes to elect the Board and to approve initiatives generally proposed by the Board, including those that require shareholder approval under the Republic's laws like international debt issuances and the delisting of its shares from the NYSE.[18]  (Dkt. no. 45-2 at 21-24 §§ 17(vi); Pl. Mem. at 3, 11-13; Def. Opp'n at 6.)  For example, at an annual shareholder meeting held on April 29, 2016, the Republic voted to approve an increase in the amount of YPF's Global Medium-Term Notes Program from $2.0 billion to $10.0 billion.

---

[17] As disclosed in YPF's Form 20-F for the year ended December 31, 2013: "The Argentine federal government controls the Company, and consequently, the federal government is able to determine substantially all matters requiring approval by a majority of our shareholders, including the election of a majority of our directors, and is able to direct our operations." (Mastro Decl. 1 Ex. 6 at 10.)  As disclosed in YPF's Form 20-F for the year ended December 31, 2022: "The Argentine Republic owns 51% of the shares of YPF S.A. and, consequently, the Argentine government is able to decide all matters requiring approval by a majority of shareholders[.] . . . We cannot assure you that decisions taken by our controlling shareholder would not differ from your interests as a shareholder."  (Id. Ex. 1 at 6.)

[18] The Court does not address whether all of YPF's commercial activity in the United States is attributable to the Republic merely because the Republic holds a majority share in YPF; instead, the Court focuses on the commercial activity in the United States that the parties agree requires the Republic's direct approval.

**S.A. 19**

(Coffee 4 ¶ 29; Mastro Decl. 1 Ex. 1 at 74.)  Similarly, at a meeting held on April 28, 2023, the Republic granted the Board of Directors the authority "to create Global Programs for the issuance of negotiable obligations."  (Mastro Decl. 1 Ex. 7 at 26-27.) Since April 2012, YPF has sold more than $2.4 billion in debt just to United States investors.  (Coffee 4 ¶ 14.)  Accordingly, the Republic's use of its controlling shares to direct YPF's commercial activity in the United States is sufficient to establish that the Shares are "used for a commercial activity in the United States."

### ii. Whether the Shares Are or Were "Used for the Commercial Activity Upon Which the Claim is Based"

For purposes of § 1610(a)(2) of the FSIA, a claim is "'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit."  Petersen I, 895 F.3d at 204 (citation omitted); De Letelier v. Republic of Chile, 748 F.2d 790, 796 (2d Cir. 1984) ("Congress specifically designed the execution immunity rules to 'conform' to the jurisdictional immunity provisions of § 1605." (citation omitted)).  In cases "involving breach of contract or related equitable claims, courts routinely identify the breach (or formation plus breach) as the gravamen."  Friedman v. Gov't of Abu Dhabi, United Arab Emirates, 464 F. Supp. 3d 52, 68 (D.D.C. 2020) (collecting cases and citing Petersen I, 895 F.3d at 207).  When there is "nothing [inherently] wrongful" about the formation of the contract, the "commercial activity" analysis for FSIA purposes

**S.A. 20**

turns on the "gravamen" of the "alleged breach" serving as the "foundation" of the suit, not the act of formation.  MMA Consultants 1, Inc. v. Republic of Peru, 719 F. App'x 47, 52 (2d Cir. 2017) (rejecting commercial activity analysis based on formation).  Because Plaintiffs have identified "nothing inherently wrongful" about the formation of the YPF bylaws, the Court need not determine whether the Shares were used in the formation of the YPF bylaws at issue.  Id.

The Court of Appeals held that "the gravamen of Petersen's claim is that Argentina denied Petersen the benefit of the bargain promised by YPF's bylaws when Argentina repudiated its obligation to tender for Petersen's [YPF] shares."  Petersen I, 895 F.3d at 207.  The Court of Appeals also held that the Republic's actions were commercial in nature.  Id. ("Th[e tender-offer] obligation and Argentina's subsequent repudiation of it were indisputably commercial.").

Although "the tender obligation is not attached to the shares that the Republic acquired," the Republic used its control of Repsol's shares to effectuate the breach of the tender offer obligation because that control ensured that (1) the bylaws would never be enforced and (2) the Republic holds the Shares today.  The fundamental promise of the tender offer provisions of the YPF bylaws was that investors would not be stranded as minority shareholders in a government-run enterprise without being offered

**S.A. 21**

a compensated exit.  <u>See</u> <u>Petersen II</u>, 2023 WL 2746022, at *12
("[T]he Republic promised security holders that it would provide
them with a compensated exit if it reacquired control over the
requisite number of shares.").  The Republic used its control of
Repsol's shares to "displac[e]" the Repsol-elected Board and
render it "devoid of any powers, functions, or duties." <u>Petersen
III</u>, 2023 WL 5827596, at *1.  The Republic "appropriated the rights
of the Board to itself, and used those rights to cancel the
shareholder meeting" scheduled for April 25, 2012.  <u>Id.</u> at *2.
That cancellation "ensure[d] that Repsol would have no ability to
vote its shares," <u>id.</u> at *1, including to enforce the bylaws'
tender offer obligation, (<u>see</u> dkt. no. 45-2 at 30 § 28(C)
(requiring YPF to withhold the Republic's right to vote if it
acquired a controlling stake and declined to make a tender offer)).

Moreover, following the enactment of the YPF Expropriation
Laws, the Republic continued to use the Repsol shares to breach
its obligations—using the shares to vote at shareholder meetings,
appoint a new Board, run the company, and evade the tender offer
requirement.  <u>Petersen II</u>, 2023 WL 2746022, at *3.  As this Court
previously recognized, the YPF Expropriation Law "was intended to
escape the obligation to pay the tender offer." <u>Petersen III</u>,
2023 WL 5827596, at *4.  The Republic invoked its "political
rights" in the Repsol shares at the June 4, 2012 shareholders'
meeting for the express purpose of overruling minority

**S.A. 22**

shareholders' objection that YPF failed to invoke Sections 7(h) and 28 of the bylaws.  (Dkt. no. 112-4 at 7-8.)  Thus, by controlling Repsol's shares, the Republic stranded minority shareholders in a government-run enterprise – the precise outcome against which the bylaws were designed to protect and therefore the crux of the Republic's breach.  Accordingly, the facts – (1) that the Republic's breach of its tender offer obligation was indisputably part of the gravamen of Plaintiffs' claims and (2) that the Republic used the Shares to effectuate that breach - are sufficient to establish that the Shares were "used for the commercial activity upon which the claim is based."

### b. Whether the Shares are Immune from Turnover Under New York Law

Because the Shares are "used for a commercial activity in the United States" and "used for the commercial activity upon which the claim is based," and therefore are not otherwise subject to execution immunity, the Court now analyzes whether the Shares are subject to turnover under New York law.  28 U.S.C. § 1610(a)(2); Bainbridge, 690 F. Supp. 3d at 417.

### i. Whether the Shares Can be Transferred under NY CPLR § 5225

Under New York law, the Court must first determine if the property is subject to enforcement and who the proper garnishee is.  N.Y. C.P.L.R. § 5201.  Under NY CPLR § 5201(b), the Shares "could be assigned or transferred," regardless of Article 10 of

**S.A. 23**

the YPF Expropriation Law's restriction, (see infra Section
III.c.). Since May 21, 2014, each "Constancia de Acciones" (Proof
of Shares) issued by CdV confirms that the Shares are fully
transferable, without any restriction. (Mastro Decl. 2 Ex. 1.)
Additionally, as recently as May 2024, the Milei administration
has reaffirmed its intention to reprivatize YPF, a process that
would necessarily involve the transfer of the Shares. (Mastro
Decl. 2 Ex. 4 at 4.)

NY CPLR § 5201(c) outlines who the proper garnishee is for
"particular property."   Given the Shares are uncertificated
securities, they fall within the category of "particular property"
and thus lead the Court to the conclusion that

> the person holding [the Shares] shall be the garnishee; except
> that section 8—112 of the uniform commercial code shall govern
> the extent to which and the means by which any interest in a
> certificated security, uncertificated security or security
> entitlement (as defined in article eight of the uniform
> commercial code) may be reached by garnishment, attachment or
> other legal process.

N.Y. C.P.L.R. § 5201 (c)(4).   Under NY UCC § 8-112, Plaintiffs may
reach the Shares by (1) legal process upon the issuer at its chief
executive office in the United States (§ 8-112 (b)); (2) legal
process upon the secured party (§ 8-112 (d)); or (3) "aid from a
court of competent jurisdiction, by injunction or otherwise, in
reaching the certificated security, uncertificated security, or
security entitlement or in satisfying the claim by means allowed
at law or in equity in regard to property that cannot readily be

24

**S.A. 24**

reached by other legal process" (§ 8-112 (e)).  While control is not enough to prove "possession or custody" under federal common law, the statutes (NY CPLR § 5201(c) and NY UCC § 8-112(d)) aid the Court in identifying who is in "possession or custody" and therefore appropriate to bring the proceedings against under NY CPLR § 5225.  Commonwealth of N. Mariana Islands, 990 N.E.2d at 115.  Because NY UCC § 8-112(d) states that the Shares can be reached by legal process upon the secured party, here, the Republic, this aids the Court in concluding that the Republic "holds" or has "possession or custody" of the Shares for purposes of applying NY CPLR § 5225(a).  Accordingly, Plaintiffs appropriately moved for turnover under New York law.

### ii. Whether the Shares are Immune from Turnover by Being Outside the United States

Regarding whether the Shares are immune from turnover by virtue of being outside of the United States, the Court previously ruled on this exact issue in Bainbridge, 690 F. Supp. 3d at 416. Here, the Court similarly holds that the FSIA does not supersede NY CPLR § 5225 and prevent the Court from ordering the Republic, a judgment debtor over which it has personal jurisdiction, to bring the Shares from outside of New York into New York to pay Plaintiffs.

**S.A. 25**

### c. Whether the Shares Qualify as "in the United States" under Section 1610(a) of the FSIA Once Transferred

The Court must determine whether the Shares would qualify as property of the Republic "in the United States" under Section 1610(a) of the FSIA after the Court orders the Republic to take the following two steps: (i) transfer forthwith the Shares to a global custody account at BNYM in New York for turnover to Plaintiffs; and (ii) instruct BNYM to transfer the Republic's ownership interests in the Shares to Plaintiffs or their designees.[19]

A global custody account is an account that indirectly holds foreign securities on behalf of an investor. More specifically, a global custody account (BNYM in New York) maintains a network of local sub-custodians in foreign markets, and each sub-custodian in turn is a member of the central securities depositary in its own market (Argentina). (Mastro Decl. 1 Ex. 15, ii-iv; Mastro Decl.

---

[19] The Republic asserts that there is "no evidence that such an account could be created by BNYM, which presumably would have to satisfy its own due diligence before doing so." (Def. Opp'n at 12.) BNYM historically had contractual relationships with both the Republic (for which it serves as trustee and paying agent on sovereign debt issuances) and YPF (for which it maintains the ADR program and serves as depositary). While the Republic may not have an existing global custody account with BNYM, NY CPLR § 5225(c) requires that the Republic will execute and deliver any documents necessary to set up such an account. Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., B.V., 814 N.Y.S.2d 4, 14 (2007) (ordering judgment-debtor under NY CPLR § 5225(c) to "execute appropriate documents" to transfer shares in foreign corporations to plaintiffs).

**S.A. 26**

1 Ex. 16.)  Transferring the Shares to a global custody account at
BNYM in New York means that CdV would identify BNYM's sub-custodian
as the beneficial owner, but the Shares would remain in the
register maintained by CdV in Argentina. (Pl. Mem. at 17-18; Def.
Opp'n at 5-6, 12.)  Once the Shares are transferred into a global
custody account at BNYM in New York, the Republic's ownership
interest in the Shares will qualify as security entitlements.  N.Y.
U.C.C. §§ 8-102(7), (17); N.Y. U.C.C. § 8-112, Official Cmts., ¶
3.  The Republic's security entitlements will have a New York
situs, because the global account will be held at the New York
office of BNYM.  JPMorgan Chase Bank, N.A. v. Herman, 168 A.3d
514, 521-22 (Conn. App. Ct. 2017) (judgment-debtor's security
entitlement had Connecticut situs under UCC § 8-112 because its
account was with Connecticut office of brokerage firm, even though
securities certificates were held by securities depositary in New
York); EM Ltd. v. Republic of Argentina, 389 F. App'x 38, 43-44
(2d Cir. 2010) (holding that Argentina's beneficial interests in
trust had New York situs and were attachable under FSIA, even
though corpus of trust consisted of ADSs that represented interests
in shares of Argentine corporation).  Accordingly, the Republic's
ownership interest in the Shares will qualify as property "in the
United States," as required by the FSIA after the Court orders the
Republic to take the two proposed steps.

**S.A. 27**

### d. Whether International Comity Counsels Against Granting the Proposed Order[20]

The Republic argues that international comity counsels against granting the proposed order. The "fundamental principle of international comity" is that "a state may not require a person to do an act in another state that is prohibited by the law of that state or the law of the state of which he is a national." Motorola Credit Corp. v. Uzan, 388 F.3d 39, 60 (2d Cir. 2004) (citations omitted). Additionally, under the act-of-state doctrine, courts cannot "declar[e] invalid, and thus ineffective as a rule of decision, . . . the official act of a foreign sovereign." Celestin v. Caribbean Air Mail, Inc., 30 F.4th 133, 137 (2d Cir. 2022) (internal quotation marks and citation omitted). The Court previously recognized the expropriation of the Shares as "a valid act." Petersen Energia Inversora, S.A.U. v. Argentine Republic et al., No. 15 Civ. 2739 (LAP), 2016 WL 4735367, at *8 (S.D.N.Y. Sept. 9, 2016), aff'd in part, appeal dismissed in part

---

[20] Prescriptive comity refers to "the respect sovereign nations afford each other by limiting the reach of their laws." Hartford Fire Ins. Co. v. California, 509 U.S. 764, 817 (1993). Prescriptive comity is distinct from "adjudicative comity," which "asks whether, where a statute might otherwise apply, a court should nonetheless abstain from exercising jurisdiction in deference to a foreign nation's courts that might be a more appropriate forum for adjudicating the matter." In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC, 917 F.3d 85, 100-01 (2d Cir. 2019).

28

**S.A. 28**

sub nom. Petersen I, 895 F.3d.   (See also Pl. Reply at 6; Def.

Opp'n at 9.)

The Republic argues that Plaintiffs' requested relief would

require the Republic either to change its laws or violate them.[21]

The Republic points to Article 10 of the YPF Expropriation Law,

which forbids any transfer of the Shares without permission of the

National Congress by two-thirds vote of its members, and the

Permanent Supplementary Budget Law, which provides for payments

only of final judgments.

International comity comes into play only when there is a

true conflict between the law of the United States and that of a

---

[21] The Court does not evaluate the parties' arguments regarding
international comity as it pertains to the analysis of NY CPLR
§ 5225 and the FSIA because the Court relies on its decision in
Bainbridge, 690 F. Supp. 3d at 411.  In addition, the FSIA already
reflects Congress's resolution of comity principles in execution
proceedings against a foreign state.  Republic of Austria v.
Altmann, 541 U.S. 677, 699 (2004) (Comity principles in the FSIA
provide a "comprehensive framework for resolving any claim of
sovereign immunity."); accord Dole Food Co. v. Patrickson, 538
U.S. 468, 479 (2003) (The FSIA already grants immunity to foreign
states and their property "as a gesture of comity."); see also
Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's
Democratic Republic, No. 10 Civ. 5256 (KMW) (DCF), 2013 WL 1703873,
at *7 (S.D.N.Y. Apr. 19, 2013).  But see Peterson v. Islamic
Republic of Iran, 876 F.3d 63, 94 & n.23 (2d Cir. 2017), vacated
on other grounds, Clearstream Banking S.A. v. Peterson, 140 S. Ct.
813 (2020) (Comity questions left open by the FSIA include whether
"a court order will infringe on sovereign interests of a foreign
state."); Republic of Argentina v. NML Cap., Ltd., 573 U.S. 134,
142-46 & nn.4 & 6 (2014) (holding that a comity analysis may be
appropriate when ordering discovery about a foreign state's
assets, because the FSIA has "nothing to say" about that
discovery); Aurelius Cap. Master, Ltd. v. Republic of Argentina,
589 F. App'x 16, 18 (2d Cir. 2014) (same).

**S.A. 29**

foreign jurisdiction.  In re Maxwell Commc'n Corp., 93 F.3d 1036,
1049 (2d Cir. 1996) ("International comity comes into play only
when there is a 'true conflict' between American law and that of
a foreign jurisdiction."); Hartford Fire Ins. Co., 509 U.S. at 799
(A "true conflict" exists only if it would be "impossible" for a
party to comply with the laws of both countries.).

There is no unavoidable conflict between Argentine law and
Plaintiffs' requested relief.  The Republic has several choices it
can legally pursue: (1) receive the permission of the National
Congress by two-thirds vote, (2) take action to change the law, or
(3) satisfy the judgment through a separate agreement with
Plaintiffs.  Courts have enjoined sovereigns to act within their
own territory where necessary.  See, e.g., NML Cap., Ltd. v.
Republic of Argentina, 699 F.3d 246, 254-55, 263 (2d Cir. 2012)
(affirming injunction requiring Argentina to specifically perform
its obligations under equal treatment provision in bonds).

Assuming arguendo, that there is a true conflict between
Plaintiffs' requested relief and Argentine laws, comity
considerations counsel in favor of granting Plaintiffs' requested
relief.  The United States has a strong interest in enforcing its
judgments, and that interest outweighs any putative Argentine
interest in avoiding execution on assets that are fully subject to

**S.A. 30**

execution under the FSIA.[22]  JW Oilfield Equip., LLC v. Commerzbank AG, 764 F. Supp. 2d 587, 596-98 (S.D.N.Y. 2011) (requiring German bank to turn over funds in judgment-debtor's account in violation of German law, based on the United States' "strong interest in enforcing its judgments").

Foreign governments cannot simply override the exceptions to the FSIA by invoking its own law to shield its assets from execution in the United States.  If comity could supersede the FSIA and allow foreign law to control which sovereign assets are subject to execution, every foreign state could render itself judgment-proof in United States courts just by passing a law requiring its own approval for any transfer of its property.  Simon v. Republic of Hungary, 911 F.3d 1172, 1180 (D.C. Cir. 2018)

---

[22] Defendants argue that this will put the United States at jeopardy "given the possibility of reciprocal adverse treatment of the United States in foreign courts." (Def. Opp'n at 9.)  See Fed. Republic of Germany v. Philipp, 592 U.S. 169, 184 (2021) ("We interpret the FSIA as we do other statutes affecting international relations: to avoid, where possible, producing friction in our relations with [other] nations and leading some to reciprocate by granting their courts permission to embroil the United States in expensive and difficult litigation.") (internal quotation marks and citations omitted).  While it is the Court's view that this concern is addressed in the FSIA requirements, this "apprehension[] [is] better directed to that branch of government with authority to amend. . ." Republic of Argentina, 573 U.S. at 146; see also Turkiye Halk Bankasi A.S. v. United States, 598 U.S. 264, 280 (2023) ("In the context of a civil proceeding, this Court has recognized that a suit not governed by the FSIA 'may still be barred by foreign sovereign immunity under the common law.'" (citations omitted)).

**S.A. 31**

(rejecting Hungary's comity-based argument that "would in actuality amount to a judicial grant of immunity"), <u>vacated on other grounds</u>, 141 S. Ct. 691 (2021); <u>De Csepel v. Republic of Hungary</u>, 27 F.4th 736, 753 (D.C. Cir. 2022) (reaffirming <u>Simon's</u> rejection of Hungary's comity-based argument on same ground).

While the Republic demands that this Court extend comity, it simultaneously refuses to make any effort to honor the Court's unstayed judgment. <u>NML Cap., Ltd. v. Republic of Argentina</u>, 2015 WL 1087488, at *7 (S.D.N.Y. Mar. 12, 2015) ("[I]f Citibank's predicament is a matter of comity, it is only because the Republic has refused to observe the judgments of the court to whose jurisdiction it acceded. Comity does not suggest abrogating those judgments, or creating exceptions to the Injunction designed to enforce them."); <u>see also</u> <u>Motorola Credit Corp.</u>, 388 F.3d at 60 (declining to grant comity to Turkish injunction prohibiting turnover of shares because "orders of foreign courts are not entitled to comity if the litigants who procure them have deliberately courted legal impediments to the enforcement of a federal court's orders" (internal quotation marks and citations omitted)). Comity is not a one-way street.

Accordingly, while the Court need not engage in a comity analysis, those comity considerations counsel in favor of granting the proposed order.

**S.A. 32**

## IV.  Conclusion

For the reasons set out above, Plaintiffs' motion is GRANTED. The Republic shall (i) transfer its Class D shares of YPF to a global custody account at BNYM in New York within 14 days from the date of this order; and (ii) instruct BNYM to initiate a transfer of the Republic's ownership interests in its Class D shares of YPF to Plaintiffs or their designees within one business day of the date on which the Shares are deposited into the account.

Satisfied that oral argument is not needed in addition to the papers submitted by the parties, the Republic's request for oral argument, (dkt. no. 582), is DENIED.  Doctor's Assoc., Inc. v. Distajo, 66 F.3d 438, 448 (2d Cir. 1995); see also SecurityNational Mortg. Co. v. Lehman Bros. Holdings Inc., No. 20 MC 00027 (LAK) (DF), 2020 WL 9815257, at *1 (S.D.N.Y. July 10, 2020).

The Clerk of the Court is respectfully directed to close dkt. no. 555 in 15 Civ. 02739 and dkt. no. 481 in 16 Civ. 08569.

**SO ORDERED.**

Dated:     June 30, 2025
           New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge

**S.A. 33**

28 U.S.C. § 1605 provides:

**General exceptions to the jurisdictional immunity of a foreign state**

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case-

(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue;

(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to-

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights; or

(6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an

**S.A. 34**

award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

(b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided*, That-

(1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; and if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a result of the arrest if the party bringing the suit had actual or constructive knowledge that the vessel or cargo of a foreign state was involved; and

(2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in paragraph (1) of this subsection or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

(c) Whenever notice is delivered under subsection (b)(1), the suit to enforce a maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits in rem whenever it appears that, had the vessel been privately owned and possessed, a suit in rem might have been maintained. A decree against the foreign state may include costs of the suit and, if the decree is for a money judgment, interest as ordered by the court, except that the court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose. Such value shall be determined as of the time notice is served under subsection (b)(1). Decrees shall be subject to appeal and revision as provided in other cases of admiralty and maritime jurisdiction. Nothing shall preclude the plaintiff in any proper case from seeking relief in personam in the same action brought to enforce a maritime lien as provided in this section.

(d) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action brought to foreclose a preferred mortgage, as defined in section 31301 of title 46. Such action shall be brought, heard, and determined in accordance with the provisions of chapter 313 of title 46 and in accordance with the principles of law and rules of practice of suits in rem, whenever it appears that had the vessel been privately owned and possessed a suit in rem might have been maintained.

[(e), (f) Repealed. Pub. L. 110–181, div. A, title X, §1083(b)(1)(B), Jan. 28, 2008, 122 Stat. 341.]

(g) Limitation on Discovery.-

　　(1) In general.-(A) Subject to paragraph (2), if an action is filed that would otherwise be barred by section 1604, but for section 1605A or section 1605B, the court, upon request of the Attorney General, shall stay any request, demand, or order for discovery on the United States that the Attorney General certifies would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action, until such time as the Attorney General advises the court that such request, demand, or order will no longer so interfere.

　　(B) A stay under this paragraph shall be in effect during the 12-month period beginning on the date on which the court issues the order to stay discovery. The court shall renew the order to stay discovery for additional 12-month periods upon motion by the United States if the Attorney General certifies that discovery would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action.

　　(2) Sunset.-(A) Subject to subparagraph (B), no stay shall be granted or continued in effect under paragraph (1) after the date that is 10 years after the date on which the incident that gave rise to the cause of action occurred.

　　(B) After the period referred to in subparagraph (A), the court, upon request of the Attorney General, may stay any request, demand, or order for discovery on the United States that the court finds a substantial likelihood would-

　　　　(i) create a serious threat of death or serious bodily injury to any person;

　　　　(ii) adversely affect the ability of the United States to work in cooperation with foreign and international law enforcement agencies in investigating violations of United States law; or

　　　　(iii) obstruct the criminal case related to the incident that gave rise to the cause of action or undermine the potential for a conviction in such case.

(3) Evaluation of evidence.-The court's evaluation of any request for a stay under this subsection filed by the Attorney General shall be conducted ex parte and in camera.

(4) Bar on motions to dismiss.-A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

(5) Construction.-Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States.

(h) Jurisdictional Immunity for Certain Art Exhibition Activities.-

(1) In general.-If-

(A) a work is imported into the United States from any foreign state pursuant to an agreement that provides for the temporary exhibition or display of such work entered into between a foreign state that is the owner or custodian of such work and the United States or one or more cultural or educational institutions within the United States;

(B) the President, or the President's designee, has determined, in accordance with subsection (a) of Public Law 89–259 (22 U.S.C. 2459(a)), that such work is of cultural significance and the temporary exhibition or display of such work is in the national interest; and

(C) the notice thereof has been published in accordance with subsection (a) of Public Law 89–259 (22 U.S.C. 2459(a)), any activity in the United States of such foreign state, or of any carrier, that is associated with the temporary exhibition or display of such work shall not be considered to be commercial activity by such foreign state for purposes of subsection (a)(3).

(2) Exceptions.-

(A) Nazi-era claims.-Paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and-

(i) the property at issue is the work described in paragraph (1);

(ii) the action is based upon a claim that such work was taken in connection with the acts of a covered government during the covered period;

**S.A. 37**

(iii) the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

(iv) a determination under clause (iii) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

(B) Other culturally significant works.-In addition to cases exempted under subparagraph (A), paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and-

(i) the property at issue is the work described in paragraph (1);

(ii) the action is based upon a claim that such work was taken in connection with the acts of a foreign government as part of a systematic campaign of coercive confiscation or misappropriation of works from members of a targeted and vulnerable group;

(iii) the taking occurred after 1900;

(iv) the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

(v) a determination under clause (iv) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

(3) Definitions.-For purposes of this subsection-

(A) the term "work" means a work of art or other object of cultural significance;

(B) the term "covered government" means-

(i) the Government of Germany during the covered period;

(ii) any government in any area in Europe that was occupied by the military forces of the Government of Germany during the covered period;

(iii) any government in Europe that was established with the assistance or cooperation of the Government of Germany during the covered period; and

(iv) any government in Europe that was an ally of the Government of Germany during the covered period; and

(C) the term "covered period" means the period beginning on January 30, 1933, and ending on May 8, 1945.

**S.A. 38**

28 U.S.C. § 1609 provides:

**Immunity from attachment and execution of property of a foreign state**

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

28 U.S.C. § 1610 provides:

**Exceptions to the immunity from attachment or execution**

(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if-

> (1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

> (2) the property is or was used for the commercial activity upon which the claim is based, or

> (3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

> (4) the execution relates to a judgment establishing rights in property-

>> (A) which is acquired by succession or gift, or

>> (B) which is immovable and situated in the United States: *Provided*, That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

> (5) the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment, or

> (6) the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement, or

> (7) the judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7) (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved with the act upon which the claim is based.

(b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be

**S.A. 40**

immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

> (1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

> (2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2), (3), or (5) or 1605(b) of this chapter, regardless of whether the property is or was involved in the act upon which the claim is based, or

> (3) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605A of this chapter or section 1605(a)(7) of this chapter (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved in the act upon which the claim is based.

(c) No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

(d) The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if—

> (1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

> (2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

(e) The vessels of a foreign state shall not be immune from arrest in rem, interlocutory sale, and execution in actions brought to foreclose a preferred mortgage as provided in section 1605(d).

(f)(1)(A) Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701–1702), or any other proclamation, order,

**S.A. 41**

regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A.

(B) Subparagraph (A) shall not apply if, at the time the property is expropriated or seized by the foreign state, the property has been held in title by a natural person or, if held in trust, has been held for the benefit of a natural person or persons.

(2)(A) At the request of any party in whose favor a judgment has been issued with respect to a claim for which the foreign state is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A, the Secretary of the Treasury and the Secretary of State should make every effort to fully, promptly, and effectively assist any judgment creditor or any court that has issued any such judgment in identifying, locating, and executing against the property of that foreign state or any agency or instrumentality of such state.

(B) In providing such assistance, the Secretaries-

(i) may provide such information to the court under seal; and

(ii) should make every effort to provide the information in a manner sufficient to allow the court to direct the United States Marshall's office to promptly and effectively execute against that property.

(3) Waiver.-The President may waive any provision of paragraph (1) in the interest of national security.

(g) Property in Certain Actions.-

(1) In general.-Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of-

(A) the level of economic control over the property by the government of the foreign state;

(B) whether the profits of the property go to that government;

(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

(D) whether that government is the sole beneficiary in interest of the property; or

(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

(2) United states sovereign immunity inapplicable.-Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.

(3) Third-party joint property holders.-Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

28 U.S.C. § 1611 provides:

**Certain types of property immune from execution**

(a) Notwithstanding the provisions of section 1610 of this chapter, the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

(b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if-

(1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver; or

(2) the property is, or is intended to be, used in connection with a military activity and

(A) is of a military character, or

(B) is under the control of a military authority or defense agency.

(c) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution in an action brought under section 302 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 to the extent that the property is a facility or installation used by an accredited diplomatic mission for official purposes.

New York C.P.L.R. § 5225 provides:

**Payment or delivery of property of judgment debtor**

(a) Property in the possession of judgment debtor.  Upon motion of the judgment creditor, upon notice to the judgment debtor, where it is shown that the judgment debtor is in possession or custody of money or other personal property in which he has an interest, the court shall order that the judgment debtor pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff.  Notice of the motion shall be served on the judgment debtor in the same manner as a summons or by registered or certified mail, return receipt requested.

(b) Property not in the possession of judgment debtor.  Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff. Costs of the proceeding shall not be awarded against a person who did not dispute the judgment debtor's interest or right to possession.  Notice of the proceeding shall also be served upon the judgment debtor in the same manner as a summons or by registered or certified mail, return receipt requested.  The court may permit the judgment debtor to intervene in the proceeding. The court may permit any adverse claimant to intervene in the proceeding and may determine his rights in accordance with section 5239.

(c) Documents to effect payment or delivery.  The court may order any person to execute and deliver any document necessary to effect payment or delivery.

**TRANSLATION**

LAW 26,741

THE SENATE AND HOUSE OF DELEGATES OF THE ARGENTINE
NATION, CONVENED IN LEGISLATURE, ETC.
ISSUES BY LAW:

TITLE I

SOLE CHAPTER

ARGENTINA'S HYDROCARBON SOVEREIGNTY

Article 1. - Achieving self-sufficiency in the supply of hydrocarbons as well as in the exploration, exploitation, industrialization, transportation and sale of hydrocarbons, is hereby declared a national public interest and a priority for the Republic of Argentina, with the goal of guaranteeing socially equitable economic development, the creation of jobs, the increase of the competitiveness of various economic sectors and the equitable and sustainable growth of the provinces and regions.

Article 2.- The National Executive Office, as the authority in charge of setting policy on this subject, shall introduce the measures necessary to accomplish the purpose of the present law with the participation of the provinces and public and private capital, national and international.

Article 3.- The principles of the hydrocarbon policy of the Republic of Argentina are hereby established as the following:

a. Promote the use of hydrocarbons and their derivatives to promote development and as a mechanism to increase the competitiveness of the various economic sectors and that of the provinces and regions;

b. Convert hydrocarbon resources to proved reserves and their exploitation and the restoration of reserves;

c. Integrate public and private capital, national and international, into strategic alliances dedicated to the exploration and exploitation of conventional and nonconventional hydrocarbons;

d. Maximize the investments and the resources employed for the achievement of self-sufficiency in hydrocarbons in the short, medium and long term;

e. Incorporate new technologies and categories of management that contribute to the improvement of hydrocarbon exploration and exploitation activities and the advancement of technological development in the Republic of Argentina in this regard;

1

**S.A. 46**

f.    Promote the industrialization and sale of hydrocarbons with a high added-value;

g.    Protect the interests of consumers with respect to the price, quality and availability of hydrocarbon derivatives;

h.    Collect outstanding balances relating to exportable hydrocarbons in order to improve the trade balance, ensuring a rational exploitation of the resources and the sustainability of its exploitation for use by future generations.

TITLE II

SOLE CHAPTER
FEDERAL COUNCIL OF HYDROCARBONS

Article 4.- A Federal Council of Hydrocarbons is hereby created which shall include the participation of the following:

a.    The Ministry of Economy and Public Finances, the Ministry of Federal Planning, Public Investment and Services, the Ministry of Labor, Employment and Social Security and the Ministry of Industry, through their respective representatives.

b.    The provinces and the Autonomous City of Buenos Aires, through the representatives that each may appoint.

Article 5.- The duties of the Federal Council of Hydrocarbons shall be the following:

a.    Promote the coordinated action of the National and Provincial Governments, with the purpose of ensuring the fulfillment of the objectives of the present law.

b.    Adopt decisions regarding all questions related to the accomplishment of the objectives of this law and the establishment of the hydrocarbons policy of the Republic of Argentina that the National Executive Office may submit for consideration.

Article 6.- The Council shall convene a meeting with the absolute majority of its members an shall be presided and represented by the representative of the National Government that the National Executive Office designates to such end.  It shall establish its own internal regulations.

2

**S.A. 47**

10/16/2020          Case 1:15-cv-02739-LAP Document 3649-43251 Filed 05/14/2028 Page 4 of 66

TITLE III
RECUPERATION OF CONTROL OF YPF

CHAPTER I
EXPROPRIATION

Article 7.- For purposes of ensuring the fulfillment of the objectives of this law, fifty-one percent (51%) of the equity of YPF Sociedad Anónima, represented by an identical stake of Class D shares held by Repsol YPF S.A., its controlled or controlling entities, directly or indirectly, is hereby declared a public interest and subject to expropriation. In addition, fifty-one percent (51%) of the equity of Repsol YPF GAS S.A, represented by sixty percent (60%) of the Class A shares of such company, held by Repsol Butano S.A., its controlled or controlling entities, is hereby declared a public interest and subject to expropriation.

Article 8.- The YPF Sociedad Anónima and Repsol YPF Gas S.A. shares subject to expropriation in accordance with the preceding article shall be distributed in the following manner: fifty-one percent (51%) shall belong to the National Government and the remaining forty-nine percent (49%) shall be distributed among the provinces that compose the National Organization of Hydrocarbon Producing States.

Regulations shall take into consideration the conditions relating to the transfer, ensuring that the distribution of the shares among the provinces that accept their transfer is conducted in an equitable manner, considering each of their levels of hydrocarbon production and proved reserves.

Article 9.- To ensure compliance with the objectives of this law, the National Executive Office, by itself or through an appointed public entity, shall exercise all the political rights associated with the shares subject to expropriation until the transfer of political and economic rights is completed, in accordance with the preceding article.

The transfer of the political and economic rights of the shares subject to expropriation conducted by the National Government in favor of the provincial governments members of the National Organization of Hydrocarbon Producing States, shall provide for the exercise of shareholder rights in a unified manner for the minimum term of fifty (50) years by means of a shareholders' agreement.

The appointment of YPF S.A. Directors corresponding to the expropriated shares shall be completed proportionately considering the holdings of the National Government, Provincial Governments and one Director shall represent the employees of the company.

Article 10.- For purposes of implementing this law and the registration of the ownership rights connected to the shares subject to expropriation, it is hereby recorded that the expropriation of such shares is conducted for the public interest

3

S.A. 48

and that any future transfer of the shares is prohibited without the permission of the National Congress by a two-thirds vote of its members.

Article 11.- The expropriation processes shall be governed by the provisions of Law No. 21,499 and the expropriator shall be the National Executive Office.

Article 12.- The price of the property subject to expropriation shall be determined in accordance with the provisions of Law No. 21,499, Article 10 and the corresponding provisions.  The appraisal shall be conducted by the National Court of Appraisal.

CHAPTER II

OPERATIONAL CONTINUITY

Article 13.- To ensure the continuity of the activities associated with the exploration, production, processing and refining of hydrocarbons by YPF Sociedad Anónima and Repsol YPF Gas S.A., as well as their transport, distribution and sale, and the increasing investment flows, and adequately supplying the fuel required for the function of the national economy pursuant to the provisions of this law, the National Executive Office, through the persons or organizations it appoints, shall exercise all of the rights conferred upon the shares subject to expropriation in accordance with articles 57 and 59 of such act.

The National Securities Commission, on the day of enactment of this law, shall convene a shareholders meeting in order to discuss, among other matters deemed necessary and relevant for the purposes of the foregoing, the dismissal of all the directors and alternate members, trustees and their alternates, and appoint replacements for the applicable term.

Article 14.- The National Executive Office and Intervenor designated by YPF Sociedad Anónima and Repsol YPF Gas S.A. are empowered to adopt all actions and precautions as necessary, until control of YPF Sociedad Anónima and Repsol YPF Gas S.A. is assumed, in order to ensure the operation of the company, the preservation of its assets, and the supply of hydrocarbons.

CHAPTER III

THE LEGAL CONTINUITY AND MANAGEMENT OF YPF S.A.

Article 15.-  In the execution of its activities, YPF Sociedad Anónima and Repsol YPF Gas S.A. shall continue to operate as publicly traded corporations pursuant to Chapter II, Section V of Law Nº 19,550 and its corresponding regulations, and shall not be subject to any legislation or regulation applicable to the management or control of Companies or entities owned by the National Government or provincial governments.

4

S.A. 49

Article 16.-  The administration of shareholder rights corresponding to the shares subject to expropriation by the National Government and its provinces shall be executed pursuant to the following principles:

a.   The strategic contribution of YPF Sociedad Anónima in compliance with the objectives set forth herein;

b.   The administration of YPF Sociedad Anónima pursuant to the industry's best practices and corporate governance, safeguarding shareholder interest and generating value on their behalf;

c.    The professional management of YPF S.A.

Article 17.- For purposes of complying with the present law, with respect to sources of finance, YPF Sociedad Anónima shall resort to internal and external, strategic alliances, joint ventures, transitory business unions, and all cooperation partnerships whether public, private or mixed companies, domestic and foreign.

Article 18.- This law is a public order law and shall enter into force upon its publication in the Official Gazette.

Article 19.- It shall be communicated to the National Executive Office.

GIVEN IN THE SESSIONS ROOM OF THE ARGENTINE CONGRESS, IN BUENOS AIRES, THE THIRD DAY OF MAY OF THE YEAR TWO THOUSAND AND TWELVE.

-REGISTERED UNDER NO. 26,741-

AMADO BOUDOU. – JULIAN A. DOMINGUEZ. – Juan H. Estrada. – Gervasio Bozzano.

5

---

**S.A. 50**

# Restat 3d of the Foreign Relations Law of the U.S., § 403

*Restatement of the*
*Law, Foreign Relations Law 3d - Official Text*     >
*Part 4- Jurisdiction and Judgments*          >
*Chapter 1- Jurisdiction to Prescribe*

## § 403 Limitations on Jurisdiction to Prescribe

(1) Even when one of the bases for jurisdiction under § 402 is present, a state may not exercise jurisdiction to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable.

(2) Whether exercise of jurisdiction over a person or activity is unreasonable is determined by evaluating all relevant factors, including, where appropriate:

(a) the link of the activity to the territory of the regulating state, *i.e.*, the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

(b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;

(c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

(d) the existence of justified expectations that might be protected or hurt by the regulation;

(e) the importance of the regulation to the international political, legal, or economic system;

(f) the extent to which the regulation is consistent with the traditions of the international system;

(g) the extent to which another state may have an interest in regulating the activity; and

(h) the likelihood of conflict with regulation by another state.

(3) When it would not be unreasonable for each of two states to exercise jurisdiction over a person or activity, but the prescriptions by the two states are in conflict, each state has an obligation to evaluate its own as well as the other state's interest in exercising jurisdiction, in light of all the relevant factors, Subsection (2); a state should defer to the other state if that state's interest is clearly greater.

### COMMENTS & ILLUSTRATIONS

**Comment:**

*a. Reasonableness in international law and practice.* The principle that an exercise of jurisdiction on one of the bases indicated in § 402 is nonetheless unlawful if it is unreasonable is established in United States law, and has emerged as a principle of international law as well. There is wide international consensus that the links of territoriality or nationality, § 402, while generally necessary, are not in all instances sufficient conditions for the exercise of such jurisdiction. Legislatures and administrative agencies, in the United States and in other states, have generally refrained from exercising jurisdiction where it would be unreasonable to do so, and courts have

usually interpreted general language in a statute as not intended to exercise or authorize the exercise of jurisdiction in circumstances where application of the statute would be unreasonable. See Comment *g*.

Some United States courts have applied the principle of reasonableness as a requirement of comity, that term being understood not merely as an act of discretion and courtesy but as reflecting a sense of obligation among states. This section states the principle of reasonableness as a rule of international law. The principle applies regardless of the status of relations between the state exercising jurisdiction and another state whose interests may be affected. While the term "comity" is sometimes understood to include a requirement of reciprocity, the rule of this section is not conditional on a finding that the state affected by a regulation would exercise or limit its jurisdiction in the same circumstances to the same extent. Some elements of reciprocity may be relevant in considering the factors listed in Subsection (2). See Reporters' Note 5.

*b. Considerations not exhaustive.* The list of considerations in Subsection (2) is not exhaustive. No priority or other significance is implied in the order in which the factors are listed. Not all considerations have the same importance in all situations; the weight to be given to any particular factor or group of factors depends on the circumstances.

*c. Regulation of different subjects and by different organs of state.* Criteria such as those in Subsection (2) may lead to different conclusions according to the subject of the regulation. For instance, regulation by the United States of the labor relations of a foreign vessel that regularly calls on the United States may be unreasonable; regulation of the vessel's safety standards may not be unreasonable. Compare § 512, Reporters' Note 3. A state may exercise jurisdiction to prescribe through a variety of law-making or regulatory organs; the reasonableness of the exercise of jurisdiction may differ with the level at which the decision is taken. For example, a directive by Congress to an agency such as the Securities and Exchange Commission to investigate payments by United States corporations in foreign countries may be a reasonable exercise of jurisdiction to prescribe (see § 414, Reporters' Note 5); a decision to initiate such an investigation taken by the Commission, or by an official of the Commission, under a general mandate might not be justified.

*d. Reasonable exercise of jurisdiction by more than one state.* Exercise of jurisdiction by more than one state may be reasonable -- for example, when one state exercises jurisdiction on the basis of territoriality and the other on the basis of nationality; or when one state exercises jurisdiction over activity in its territory and the other on the basis of the effect of that activity in its territory; or when a given activity or transaction, such as international trade or transport, takes place in or affects more than one state. In such situations, the factors in Subsection (2) apply to both states. The fact that one state has exercised jurisdiction with respect to a given person or activity is relevant in applying Subsections (2)(g) and (h), but is not conclusive that it is unreasonable for the other state to do so. Nor is it conclusive that one state has a strong policy to permit or encourage an activity which the other state wishes to prohibit. For the case of conflicting regulations, Subsection (3), see Comment *e*.

*e. Conflicting exercises of jurisdiction.* Subsection (3) applies when an exercise of jurisdiction by each of two states is not unreasonable, but their regulations conflict. In that case, each state is required to evaluate both its interests in exercising jurisdiction and those of the other state. When possible, the two states should consult with each other. If one state has a clearly greater interest, the other should defer, by abandoning its regulation or interpreting or modifying it so as to eliminate the conflict. When neither state has a clearly stronger interest, states often attempt to eliminate the conflict so as to reduce international friction and avoid putting those who are the object of the regulations in a difficult situation. Subsection (3) is addressed primarily to the political departments of government, but it may be relevant also in judicial proceedings. See Reporters' Notes 6 and 7.

Subsection (3) applies only when one state requires what another prohibits, or where compliance with the regulations of two states exercising jurisdiction consistently with this section is otherwise impossible. It does not apply where a person subject to regulation by two states can comply with the laws of both; for example, where one state requires keeping accounts on a cash basis, the other on an accrual basis. It does not apply merely because one state has a strong policy to permit or encourage an activity which another state prohibits, or one state exempts from regulation an activity which another regulates. Those situations are governed by Subsection (2), but do not constitute conflict within Subsection (3).

Ordinarily, a state may not require a person to do something in another state that is prohibited by that state. See §§ 441 and 442.

*f. Criminal and civil jurisdiction.* The principles governing jurisdiction to prescribe set forth in § 402 and in this section apply to criminal as well as to civil regulation. However, in the case of regulatory statutes that may give rise to both civil and criminal liability, such as United States antitrust and securities laws, the presence of substantial foreign elements will ordinarily weigh against application of criminal law. In such cases, legislative intent to subject conduct outside the state's territory to its criminal law should be found only on the basis of express statement or clear implication.

*g. Interpreting United States law to avoid unreasonableness or conflict.* A United States statute is to be construed to apply to a person or activity only to the extent consistent with § 402 and this section, unless such construction is not fairly possible. See § 114, and Reporters' Note 2 to that section. Similarly, if one construction of a United States statute would bring it in conflict with the law of another state that has a clearly greater interest, Comment *e*, or would subject a person to conflicting commands, § 441, while another construction would avoid such a conflict, the latter construction is clearly preferred, if fairly possible. This rule of construction applies not only to courts, but also to Executive Branch officials and regulatory bodies in interpreting the authority granted to them in legislation, and the President may rely on it in considering a bill submitted to him for approval. If construction of a statute that accommodates the intent of Congress within the limits of international law is not fairly possible, the statute is nevertheless valid, but its application may give rise to international responsibility for the United States. See § 115 and Comments *a* and *b* to that section.

*h. Principles applied.* The principles set forth in § 402 and in this section are illustrated in succeeding sections of this chapter in selected contexts: jurisdiction to tax, §§ 411-13; jurisdiction over foreign subsidiaries, § 414; antitrust, § 415; securities regulation, § 416; the effect of foreign government compulsion, § 441; and the reach and limits of transnational discovery of evidence, § 442. The same principles are applicable also to areas not here illustrated, such as regulation of food and drugs, communications, commodities trading, or any other activity in which more than one state has a legitimate interest.

## REPORTER'S NOTES

1. *Invocations of principle of reasonableness.* Some states, particularly the United Kingdom, have questioned various applications of United States law as "exorbitant." See, *e.g.*, Debates on the British Shipping Contracts and Commercial Documents Bill, 1964, 698 Parl.Deb. H.C. (5th Ser.) 1215 (1961); Debates on the British Protection of Trading Interests Act, 1980, 973 Parl.Deb. H.C. (5th Ser.) 1535 (1979); In re Uranium Antitrust Litigation, 617 F.2d 1248 (7th Cir.1980). See also the prolonged controversy surrounding the efforts of the United States to prescribe conduct for the watch industry of Switzerland, described in detail in Rahl, ed., Common Market and American Antitrust, ch. 6 (1970); Kahn-Freund, "English Contracts and American Anti-Trust Law -- the Nylon Patent Case," 18 Mod.L.Rev. 65 (1955); Lowe, "Blocking Extraterritorial Jurisdiction: The British Protection of Trading Interests Act, 1980," 75 Am.J.Int'l L. 257 (1981). In particular, some states have questioned the lawfulness of applying the "effects doctrine," § 402(1)(c), to economic effects. See § 415, Reporters' Note 3. They have also questioned applications of the nationality principle to support directives to foreign subsidiaries of United States companies. See § 414, Reporters' Note 3. These objections have usually been articulated in terms that sought to limit the scope of a particular basis of jurisdiction, § 402, but they reflect the view that the bases of jurisdiction must be interpreted and applied reasonably, and indicate a perception as to what is reasonable in particular circumstances.

The European Economic Community and some of its member states have emulated the United States in regulating anticompetitive conduct and other activity, and non-member states (including the United States) have sometimes questioned these exercises of jurisdiction on grounds corresponding to those set forth in this section.

The proper limits of jurisdiction over transnational activity have been analyzed by European courts and other authorities in much the same way as by those in the United States, both in regarding effect in the state (or in the Community) as a proper basis for jurisdiction, and in limiting the exercise of jurisdiction so as to avoid undue infringement of the concerns of other states. Reporters' Note 3. While, as of 1987, no detailed agreement had been reached on the limits of national (or Community) law as applied to transnational activity, efforts to develop guidelines have sought reasonable accommodation of the interests of the states concerned. For instance, in 1984 the member states of the OECD adopted a statement on Conflicting Requirements Imposed on Multinational Enterprises, which recognizes "relevant principles of international law," calls for "cooperation as an alternative to unilateral action," and urges member states to "take fully into account the

sovereignty and legitimate economic, law enforcement and other interests of other Member countries." OECD, Comm. on Int'l Investment and Multinat'l Enterprises, "The 1984 Review of 1976 OECD Declaration and Decisions on International Investment and Multinational Enterprises," approved by the Council of Ministers, May 18, 1984, OECD Doc. Press/A(84) 28.

2. *Limiting exercise of United States jurisdiction pursuant to principle of reasonableness.* The courts of the United States have used different formulations in approaching challenges to the reach of United States jurisdiction to prescribe. Some courts have addressed the issue from the point of view of "comity," but seen as a matter of obligation among states. See, *e.g.*, Timberlane Lumber Co. v. Bank of America N.T. & S.A., 549 F.2d 597, 614 (9th Cir.1976). Other courts have spoken of "due recognition of our self-regarding respect for the relevant interests of foreign nations," Romero v. International Terminal Operating Co., 358 U.S. 354, 382-83, 79 S.Ct. 468, 486, 3 L.Ed.2d 368 (1959). Courts have invoked the presumption that Congress does not intend to violate international law (see § 114), and have interpreted general words in United States statutes in the light of "the limitations customarily observed by nations upon the exercise of their powers." United States v. Aluminum Co. of America, 148 F.2d 416, 443 (2d Cir.1945). See also Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). Taken together, these formulations and variations on them support the principle of reasonableness as well as the factors set forth in Subsection (2). Congress will not, in Learned Hand's phrase, be presumed to intend to "punish all whom [our] courts can catch" (see § 415, Reporters' Note 3). Accordingly, phrases such as "any seaman . . ." in the Jones Act, 46 U.S.C. § 688, or "a question . . . affecting commerce" in the National Labor Relations Act, 29 U.S.C. § 159(c)(1), or "property, wherever located" in the Bankruptcy Code, 11 U.S.C. § 541(a), will not be interpreted to include everything that would literally come within their scope. It is more plausible to interpret a statute of the United States as having extraterritorial reach when the act is international in focus, for example the Trading with the Enemy Act, 50 U.S.C.App. § 1 *et seq.*, than when it has a primarily domestic focus, such as the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* Legislation dating from an earlier day, when economic regulation was less ambitious, is unlikely to reflect an intention to reach beyond the nation's frontier.

3. *Effects doctrine and principle of reasonableness.* Where regulation of transnational activity is based on its effects in the territory of the regulating state, the principle of reasonableness calls for limiting the exercise of jurisdiction so as to minimize conflict with the jurisdiction of other states, particularly with the state where the act takes place. For example, when two multinational tobacco companies based in the United States and South Africa, respectively, announced that they would merge, the West German Cartel Office issued an order to prevent the merged enterprise from achieving a dominant market share in the Federal Republic of Germany. On appeal, the German court upheld so much of the order as related to significant effect on the German market and the activities of the German subsidiaries, but set aside as contrary to international law that part prohibiting the merger of the parent companies. Dec. of Kammergericht of July 1, 1983 (Philip Morris/Rothmans), Kart 16/82, summarized in English in 4 CCH Comm.Mkt.Rptr. para. 40,571 (Doing Bus. in Europe). The result was similar to the outcome of a case in the United States, United States v. Ciba Corp., 1970, CCH Trade Cas. para. 73,269 (S.D.N.Y.1960), but the German decision was based expressly on international law as incorporated into domestic law by Article 25 of the Constitution of the Federal Republic. After the decision the merger arrangements were revised, and the Federal Supreme Court declared the decision of the Kammergericht moot and did not address the international issues. Most other states of Western Europe, including Austria, Denmark, Finland, France, Greece, Norway, Portugal, Spain, Sweden, and Switzerland, as well as Canada and Japan (but not the United Kingdom or the Netherlands) have accepted the effects doctrine as applied to economic effects, either in their legislation or in political decisions, though with varying interpretations of the doctrine. See OECD, Restrictive Business Practices of Multinational Enterprises § 120 and sources there cited (1977).

4. *Regulation of different subjects illustrated.* The following example illustrates Comment *c.* Suppose the United States government were considering regulation of a foreign-flag charter air carrier that takes passengers to and from the United States. Assuming no governing international agreement, the factors listed in Subsection (2) would indicate low justification for regulating the wages of the crew; greater justification for regulating the fares charged to United States passengers; and relatively high justification for requiring safety inspection of the carrier's aircraft used to provide the transportation. As the foreign carrier becomes more extensively or permanently linked to the United States -- for instance, if the carrier maintains a permanent booking office in the United States or operates regularly scheduled flights rather than intermittent charter service -- it might become

Restat 3d of the Foreign Relations Law of the U.S., § 403

reasonable to subject additional aspects of its activity, including economic aspects, to the jurisdiction of the United States.

5. *Reciprocity*. A condition of reciprocity is not among the criteria set forth in this section, since a determination as to whether an exercise of jurisdiction is reasonable must take account of the interests of the persons affected as well as the interests or practices of other states. However, in making the evaluation called for by this section, it is useful to consider whether the regulating state would regard it as reasonable were the other state to exercise regulatory jurisdiction if the circumstances were reversed.

6. *Determination of competing state interests*. For purposes of Subsections § (2)(g) and (h) and in particular of Subsection (3), it may be necessary to identify and weigh the respective interests of the concerned states in regulating (or refraining from regulating) a given activity or transaction. In weighing the interests of a foreign state, a court in the United States may take into account indications of national interest by the foreign government, whether made through a diplomatic note, a brief amicus curiae, or a declaration by government officials in parliamentary debates, press conferences, or communiques. Correspondingly, a court may take into account declarations of United States interest in official statements or records of the Executive Branch. For instance, in a private antitrust suit, a court may give weight to a decision by the Department of Justice that the United States interest in having its antitrust laws applied to a given transaction or activity was not sufficiently strong to outweigh the possible adverse effects on the foreign relations of the United States. Some courts have deemed such balancing to be beyond their competence, and have considered only whether application of the law of the forum would be reasonable. See, *e.g.*, In re Uranium Antitrust Litigation, 480 F.Supp. 1138, 1148 (N.D.Ill.1979); Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 945-52 (D.C.Cir. 1984), see Reporters' Note 7. Other courts have undertaken balancing of competing state interests, or have remanded to lower courts for purposes of establishing a record on the basis of which balancing could proceed. See, *e.g.*, Timberlane Lumber Co. v. Bank of America N.T. & S.A., 549 F.2d 597, 614 (9th Cir.1976); Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1297-99 (3d Cir.1979). Compare Asahi Metal Industry Co. v. Superior Court, U.S. , 107 S.Ct. 1026, 1034-35, 94 L.Ed.2d 92 (1987), calling for "careful inquiry into the reasonableness of the assertion" of jurisdiction to adjudicate. See § 421, Reporters' Note 1.

Conflicts of jurisdiction are sometimes avoided by applying the act of state doctrine or a similar policy of nonintervention by national courts, § 443, and as to specific matters or in particular fields, by international agreements, such as those on double taxation or on cooperation in controlling narcotics or organized crime, or agreements to pursue an investigation of common interest. See also § 441, concerning foreign government compulsion, and Comments *a* and *e* thereto.

7. *Enjoining exercise of jurisdiction in other states: the* Laker *litigation*. In a series of cases arising from an effort of Laker Airways, a British airline in liquidation, to bring an action under United States antitrust laws in a UnitedStates court against British, United States, and other companies, the English Court of Appeal enjoined Laker from pursuing the action against British companies. British Airways Board v. Laker Airways, Ltd., [1983] 3 W.L.R. 544 (C.A.). United States courts enjoined United States and third country airlines from joining the British proceeding, on the ground that it was designed to frustrate the action in the United States. Laker Airways, Ltd. v. Pan American World Airways, 559 F.Supp. 1124, (D.D.C.1983), *affirmed sub nom*. Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909 (D.C.Cir.1984). The English Court of Appeal appears to have acted in large part in response to orders of the British government under the Protection of Trading Interests Act, 1980 (see § 442, Reporters' Note 4), which prohibited the production of certain documents in the United States action, and thus in the Court of Appeal's view had rendered the action untriable in the United States. The United States courts, accepting that Laker was required to obey the injunction of the British court (see § 481, Comment *b*), sought to forestall extension of that injunction to parties as to which British interest was smaller. Later, the House of Lords reversed and lifted the injunction, on the grounds that no forum was available to Laker other than the United States court, and that a British court, unable to accord plaintiff a forum itself, should not in effect decide the case against him by preventing him from suing in an appropriate forum, notwithstanding the desires of the British government. British Airways Board v. Laker Airways, Ltd., [1985] A.C. 58. (H.L. (E.)). All the courts agreed that antisuit injunctions are exceptional remedies inconsistent with normal relations between states, and that challenges to the application of a state's law to a transnational controversy should ordinarily be raised before the courts of that state.

8. *Criminal and civil jurisdiction.* In applying the principle of reasonableness, the exercise of criminal (as distinguished from civil) jurisdiction in relation to acts committed in another state may be perceived as particularly intrusive. See, *e.g.*, the reaction of the House of Lords to participation by the United States government in the effort by the Westinghouse Corporation to take the testimony of British witnesses to an alleged conspiracy to fix the price of uranium. Rio Tinto Zinc Corp. v. Westinghouse Electric Corp., [1978] A.C. 547, esp. at 630 (Viscount Dilhorne) (H.L. (E.)), discussed in § 473, Reporters' Note 7. It is generally accepted by enforcement agencies of the United States government that criminal jurisdiction over activity with substantial foreign elements should be exercised more sparingly than civil jurisdiction over the same activity, and only upon strong justification. No case is known of criminal prosecution in the United States for an economic offense (not involving fraud) carried out by an alien wholly outside the United States.

Apart from exercises of jurisdiction under the special "protective principle," § 402(3), for example to punish fraud on immigration authorities, the exercise of criminal jurisdiction with respect to conduct outside the state's territory has been infrequent. See § 402, Reporters' Note 1. Prosecutions for activities committed in a foreign state have generally been limited to serious and universally condemned offenses, such as treason or traffic in narcotics, and to offenses by or against military forces. In such cases the state in whose territory the act occurs is not likely to object to regulation by the state concerned. See, *e.g.*, Rivard v. United States, 375 F.2d 882 (5th Cir.1967), *certiorari denied*, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967) (conspiracy to smuggle heroin into the United States); Rocha v. United States, 288 F.2d 545 (9th Cir.1961), *certiorari denied*, 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241 (1961) (sham marriage ceremonies to secure preferential immigration visas); United States v. Pizzarusso, 388 F.2d 8 (2d Cir.1968), *certiorari denied*, 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968) (false statement by prospective immigrant to United States consul in Canada); United States v. King, 552 F.2d 833, 850 (9th Cir.1976), *certiorari denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977) (unlawful distribution in Japan of heroin intended for importation into the United States); United States v. Wright-Barker, 784 F.2d 161, 168 (3d Cir. 1986) (possession of narcotics on high seas with intent to import into United States). For a discussion in light of the previous Restatement, see United States v. Columba-Collella, 604 F.2d 356, 358-59 (5th Cir. 1979). For exercise of investigative jurisdiction beyond national frontiers, see § 432(2), and § 433 and Reporters' Note 1 thereto.

9. "*Special maritime" and "special aircraft" jurisdiction of the United States.* Criminal jurisdiction is asserted by the United States under 18 U.S.C. § 7 ("special maritime and territorial jurisdiction") and 49 U.S.C. § 1301(38) and § 1472(i) ("special aircraft jurisdiction") in relation to acts "in the commerce of the United States." Such jurisdiction could reach offenses that do not involve acts in United States territory or air space, acts by United States nationals, or acts aboard a United States registered vessel or aircraft -- for instance, a hijacking over the high seas by a national of State *X* of an aircraft of State *Y* bound for the United States. Whether such jurisdiction is based on the effects principle, § 402(1)(c), or on a kind of universal jurisdiction, § 404, exercise of criminal jurisdiction in these circumstances would not seem unreasonable under Subsection (2), especially in the case of a serious offense, for example one involving the use of force. On the other hand, prosecution of an alien under the special maritime or aircraft jurisdiction for offenses such as gambling or similar nonviolent crime committed on a foreign vessel engaged in "the commerce of the United States" might raise serious questions under this section. Compare 21 U.S.C. § 955a, applying provisions of the United States criminal code relating to controlled substances to persons aboard United States flag vessels or stateless vessels on the high seas. See also § 433, Comment *d* and Reporters' Note 4, concerning law enforcement on the high seas.

10. *Previous Restatement.* This section draws on portions of §§ 7, 17, 18, and 40 of the previous Restatement, and follows § 40 in setting forth considerations to be evaluated in cases of conflict of jurisdiction. The factors set forth in the present section, however, are not identical with those in previous § 40. They adopt the factors listed in § 6 of the Restatement, Second, of Conflict of Laws, and take account of developments in the practice of other states. In contrast to prior § 40, reasonableness is understood here not as a basis for requiring states to consider moderating their enforcement of laws that they are authorized to prescribe, but as an essential element in determining whether, as a matter of international law, the state may exercise jurisdiction to prescribe.

# Cross Reference

Restat 3d of the Foreign Relations Law of the U.S., § 403

A.L.R. Annotations:

Actionability, under federal and state antidiscrimination legislation, of foreign employer's discriminating in favor of foreign workers in hiring and other employment matters.  84 ALR Fed 114.

Applicability of Jones Act (46 USC sec. 688) to foreign seamen, foreign ships, or other foreign circumstances. 68 ALR Fed 360.

Digest System Key Numbers:

International Law 7

Restatement of the Law, Third, Foreign Relations Law of the United States
Copyright (c) 1987, The American Law Institute

**End of Document**

## Restat 3d of the Foreign Relations Law of the U.S., § 441

*Restatement of the*

*Law, Foreign Relations Law 3d - Official Text*       >
*Part 4- Jurisdiction and Judgments*       >
*Chapter 4- Jurisdiction and the Law of Other States*

# § 441 Foreign State Compulsion

**(1) In general, a state may not require a person**

    **(a) to do an act in another state that is prohibited by the law of that state or by the law of the state of which he is a national; or**

    **(b) to refrain from doing an act in another state that is required by the law of that state or by the law of the state of which he is a national.**

**(2) In general, a state may require a person of foreign nationality**

    **(a) to do an act in that state even if it is prohibited by the law of the state of which he is a national; or**

    **(b) to refrain from doing an act in that state even if it is required by the law of the state of which he is a national.**

**COMMENTS & ILLUSTRATIONS**

**Comment:**

*a. Contradictory commands and jurisdiction to prescribe.* Under § 403(3), when two states having jurisdiction to prescribe issue contradictory commands, certain principles of preference generally prevail. This section applies those principles to protect persons caught between conflicting commands. In determining preference between conflicting exercises of jurisdiction to prescribe, this section generally accords preference to the state in which the act is to be done (or is not to be done). Under Subsection (1), a state may not, absent unusual circumstances, require a person, even one of its nationals, to do abroad what the territorial state prohibits. Under Subsection (2), the territorial state may in principle exercise its authority over any person, including a foreign national, even in the face of the defense of foreign compulsion; however, the defense is recognized in instances in which exercise of jurisdiction by the territorial state would be unreasonable under § 403. The situations most likely to call for deviation from the preference for territoriality are those covered by Subsection (2)(a), for instance an order by a United States court or agency to a foreign national doing business in the United States to make a disclosure prohibited by the law of his state. See § 442. The state of nationality may reasonably regulate conduct of its nationals abroad more broadly when the conduct or activity has not yet begun, since compliance is likely to be less burdensome than would be the case if conflicting commands concerned activity already undertaken.

*b. Territorial preference.* Under this section, prohibitions by the state in whose territory the act is to be carried out ordinarily prevail over orders of other states. For instance, an order of state *X* to its nationals to discriminate on the basis of race, sex, or religion in hiring personnel in the United States, or in entering into commercial arrangements in the United States, would not be a good defense to a charge of unlawful discrimination under United States law. Correspondingly, a showing that, under the law of *X*, it would be a crime for United States nationals to conform to American standards in hiring practices would generally be a good defense to a charge of unlawful discrimination in employment in the United States. There may, however, be cases where conduct abroad is so egregious that it is not unreasonable for the state of nationality to insist

Restat 3d of the Foreign Relations Law of the U.S., § 441

that the person desist from such conduct, even at the cost of leaving the state where the conduct has taken place. The territorial preference is not as strong in situations where the activity being regulated has direct effects in both the territorial state and the state of nationality. For instance, it has been suggested that foreign banks dealing on United States stock exchanges through United States brokers be required to disclose the names of the clients (or at least the United States clients) on whose behalf they are acting. A prohibition on such disclosure by the state where the bank is organized might well not be a defense, unless there were substantial links between the bank in question and the state imposing the prohibition, the depositors had relied on assurance of confidentiality, and the prohibition reflected important interests of the state that imposed it. See § 442.

*c. Risk of severe sanction required.* This section applies whether the requirement or prohibition by the first state is backed by criminal or civil liability or both. The defense of foreign government compulsion is in general available only when the other state's requirements are embodied in binding laws or regulations subject to penal or other severe sanction; it is not available when the second state's orders are given in the form of "guidance," informal communications, or the like. The threat of termination of valuable business arrangements may give rise to the foreign compulsion defense, but denial of opportunity for new arrangements would probably not do so. See Reporters' Note 3.

*d. Participation by foreign governments in essentially private arrangements.* Numerous arrangements characterized by plaintiffs in United States antitrust cases as anticompetitive combinations have been characterized by defendants (and sometimes by foreign governments as well) as arrangements required or directed by foreign states and therefore immune from antitrust liability in the United States. For the foreign compulsion defense to succeed, however, it is not enough that the government of a foreign state tolerated or licensed the activity at issue, that it gave an exclusive franchise to a participant in a combination, or even that a foreign state-owned entity itself participated in the activity. To prevail under the government compulsion defense, defendants must establish that the activity on which liability is sought to be based was required by the foreign state, as set forth in Comment *c.* See Reporters' Note 4.

*e. Relation of government compulsion to principles of jurisdiction to prescribe.* If the exercise by a state of jurisdiction to prescribe is unreasonable under the criteria set forth in § 403, obedience to that state's command will not ordinarily support the foreign government compulsion defense against the reasonable exercise of jurisdiction to prescribe by another state. For instance, in the *Fruehauf* case, § 414, Reporters' Note 3, when, in 1965, the United States government ordered the French subsidiary of a United States corporation to terminate a contract to supply truck trailers to Communist China, if Fruehauf/France had complied with that order and had been sued in France for breach of contract, a French court need not have upheld a government compulsion defense. If, on the other hand, after the French court had ordered Fruehauf/France to go through with the contract, a prosecution had been brought against the parent firm under United States law, the defense of foreign compulsion should have prevailed, because the order of the French court would have been binding and not unreasonable.

*f. Relation of residence to nationality.* In recognizing that the law of the state of a person's nationality may provide the defense of foreign compulsion, Subsection (1) assumes that by virtue of that link the person in question (natural or juridical) would be subject to genuine risk of sanction. If the person in question is a permanent resident of the state whose command is at issue, his foreign nationality would carry less weight than if the individual were also resident (or the company also established) in the state of nationality.

*g. Subdivisions of federal states.* The principles of this section apply to compulsion by a subdivision of a state having authority to compel or prohibit conduct. For constraints on the actions of States of the United States that impinge on matters committed to the authority of the federal government, see § 1, Reporters' Note 5.

### REPORTER'S NOTES

1. *Protection against conflicting commands by states.* As stated in the judgment on relief in the *Incandescent Lamp* case, United States v. General Electric Co., § 415, Reporters' Note 5, it is reasonable to provide a party, and particularly a foreign party, with "protection from being caught between the jaws of this judgment and the operation of laws in foreign countries where it does its business." See also, *e.g.*, United States v. Imperial Chemical Industries, Ltd., § 415, Reporters' Note 6. For similar statements in consent judgments to which the United States Department of Justice was a party, see cases cited in Fugate, Foreign Commerce and the Antitrust Laws, § 3.19 notes 11-14 (3d ed.1982). In practice, cases do not always fit into either Subsection (1)

Restat 3d of the Foreign Relations Law of the U.S., § 441

or Subsection (2) exclusively. The conduct in question may take place and have effect in more than one state; government mandates may not be expressed in statutes, or formal decrees, or regulations; and it is sometimes difficult to distinguish the authentic commands of a foreign government in pursuit of national policy from a command responding to solicitation by a private party. In borderline cases it may be reasonable to enjoin future conduct but not to award damages for past conduct committed in the reasonable belief that it was protected by the defense of foreign government compulsion. This has special significance in the antitrust context in the United States, where if damages are awarded to a private plaintiff, they are trebled. 15 U.S.C. § 15. See 1 Areeda and Turner, Antitrust Law § 2176 (1978); 2 Atwood and Brewster, Antitrust and American Business Abroad 340-41 (2d ed. 1981).

2. *Localizing an act or activity*. Whether a given act or activity comes under Subsection (1) or (2) depends on the center of gravity of the activity, *i.e.*, on the place with which the act or activity has the most significant connection. For instance, an agreement to divide up a market in state *A* would be centered in *A*, even if negotiated or signed in *B* or *C*. Conflicting requirements of disclosure or confidentiality, which may involve close questions of localization, are discussed in § 442.

3. *Forms of compulsion*. In United States v. First National City Bank, 396 F.2d 897 (2d Cir.1968), a case involving an order to a United States bank to produce documents located at its branch in Germany, see § 442, Reporters' Note 7, the court said: "We would be reluctant to hold . . . that the mere absence of criminal sanctions abroad necessarily mandates obedience to a subpoena. . . . The vital national interests of a foreign nation, especially in matters relating to economic affairs, can be expressed in ways other than through the criminal law." 396 F.2d at 902. The threat to revoke a license required to stay in business, the court said, might be as severe as the threat of a criminal sanction. But the possibility that the bank might be exposed to civil liability or lose customers in the financial community in Germany was held insufficient to support the government compulsion defense.

Even where the requirements of the foreign government compulsion have not been met, a United States court might still decide that exercise of United States jurisdiction was unreasonable in the circumstances, § 403, or that as a matter of conflict of laws the law of another state was more appropriately applied to the activity in question.

4. *Foreign government involvement and compulsion distinguished*. In American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), § 415, Reporters' Note 2, the Supreme Court seemed to approve defendant's argument that it could not be held answerable under United States law for an act depending on the cooperation of the government of a foreign state in the territory of that state. Subsequent cases have made clear that this aspect of *American Banana* is no longer good law. In United States v. Sisal Sales Corporation, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927), the Supreme Court held that a combination to monopolize the United States market, entered into in the United States and having effect in this country, did not gain immunity from United States antitrust law by virtue of being carried out pursuant to legislation and licenses of the government of Mexico. Similarly, in Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), the Court permitted plaintiffs to show that they had been excluded from exports to Canada as a result of defendant's conspiracy. "[Defendants] are afforded no defense from the fact that [the Canadian franchisee] . . . was acting in a manner permitted by Canadian law." 370 U.S. at 706-707, 82 S.Ct. at 1414.

In United States v. Watchmakers of Switzerland Information Center, Inc., 1963 CCH Trade Cas. para. 70,600 (S.D.N.Y.1962), four United States watchmakers and five Swiss watch manufacturers and associations of parts-makers were charged under United States antitrust laws with having participated in agreements to prevent development of competitive watch industries in countries other than Switzerland. Among the defenses was the assertion that the agreements were in accordance with Swiss law and were in effect the orders of the Swiss government. Judge Cashin rejected the defense:

> In the present case . . . the defendants' activities were not required by the laws of Switzerland. They were agreements formulated privately without compulsion on the part of the Swiss Government. It is clear that these private agreements were then recognized as facts of economic and industrial life by that nation's government. Nonetheless, the fact that the Swiss Government may, as a practical matter, approve of the

effects of this private activity cannot convert what is essentially a vulnerable private conspiracy into an unassailable system resulting from foreign governmental mandate.

1963 CCH Trade Cas. para. 70,600 at 77,456-57.

Subsequently, a modification of the original judgment was negotiated through intercession of the Swiss government and the United States Department of State. In the interim, the Swiss government had issued binding export regulations in place of the private regulatory scheme that had given rise to the suit. The judgment was revised to eliminate requirements inconsistent with the Swiss regulations. The revised judgment reiterated that no defendant was prohibited from performing any act in Switzerland required under that country's laws, or refraining from any act in Switzerland that was illegal under that country's laws. 1965 CCH Trade Cas. para. 71,352 (S.D.N.Y.1965).

In a series of lawsuits growing out of the establishment of an international uranium cartel in the 1970's, several parties raised the defense that participation of Canadian uranium producers in the cartel was required as national policy by the government of Canada. No definitive ruling was rendered on the defense, in part because it became intertwined with controversies about discovery of information located outside the United States. See § 442, Reporters' Note 4. Assuming United States law was applicable to the cartel on the basis of the criteria set forth in §§ 402, 403 and 415, the defense of government compulsion would have prevailed only on a showing that the government of Canada required local producers to join the cartel on threat of criminal penalties, risk of losing their mining rights, or similar sanctions. A showing that the government of Canada had (i) known about and acquiesced in the cartel; (ii) favored and supported the cartel as a matter of policy; and (iii) itself owned one or more participants in the cartel (crown corporations) would not have been sufficient to establish the defense of government compulsion in the United States. See In re Uranium Antitrust Litigation, 480 F.Supp. 1138 (N.D.Ill. 1979); United Nuclear Corp. v. General Atomic Co., 96 N.M. 155, 629 P.2d 231 (1980), *appeal dismissed, certiorari denied*, 451 U.S. 901, 101 S.Ct. 1966, 68 L.Ed.2d 289 (1981). Such circumstances might, however, be relevant under § 403 on the issue of the reasonableness of the application of United States law, as well as on the appropriateness of any remedy or sanction.

5. *Territorial preference applied.* Though the priority for territoriality often resolves conflicts of jurisdiction, Comment *b* and § 403(3), the territorial preference is not applied mechanically. For instance, in Interamerican Refining Corporation v. Texaco Maracaibo, Inc., 307 F.Supp. 1291 (D.Del.1970), a United States importer and refiner of petroleum brought an antitrust action against several exporters from Venezuela, alleging that defendants had unlawfully refused to sell oil to plaintiff. The defendants admitted their refusal to deal with plaintiff, but said they acted at the orders of the government of Venezuela. The court granted summary judgment for defendants, saying that the effective demonstration of foreign government compulsion precluded an inference of illegal conduct. If actual activity in the United States had been involved -- for instance, retail price maintenance by United States distributors -- the command of the foreign government would probably not provide a good defense. *Cf.* Department of Justice, Antitrust Guide forInternational Operations, § 415, Reporters' Note 7, Case K, at 50-52 (1977).

An instructive example of competing state commands involved the campaign of the League of Arab States against persons doing business with Israel. The Arab League had published blacklists of firms suspected of doing business with Israel, and each member state required companies with which it made contracts to certify that they would not make subcontracts with or purchase supplies from firms on the blacklist. In January 1976 (before amendment of the Export Administration Act made compliance in the United States with the boycott illegal, 50 U.S.C.App. §§ 2402(5)(A) and (B) and 2407), the Department of Justice brought a civil antitrust action against the Bechtel Corporation, a leading international construction firm based in the United States, alleging that Bechtel and coconspirators had refused to deal with blacklisted persons in connection with projects in Arab countries, and had required its subcontractors to refuse to deal with such persons in connection with such projects. Bechtel defended on the ground, *inter alia*, that it was complying with the requirements of Arab states for contracts to be performed in those states. The Department of Justice sought to exclude that defense in relation to work done, subcontracts made, or employees hired in the United States. Eventually, a consent decree approved by the court drew a distinction along territorial lines. Defendants were enjoined from taking steps in the United States, such as entering into or implementing a provision in a contract providing for a boycott of any United States person as subcontractor, or requiring boycott of any United States person by a subcontractor. Compare Subsection (2)(b). The defendants were permitted, however, to enter into

Restat 3d of the Foreign Relations Law of the U.S., § 441

agreements outside the United States providing that they or any subcontractors were to comply with the laws of the country in which a construction project is located with regard to work in that country, and to make purchases outside the United States for such project on any basis required by the foreign government client. Compare Subsection (2)(a). See United States v. Bechtel Corp., 1979-1 CCH Trade Cas. para. 62,429, para. 62,430 (N.D.Cal. 1979), *affirmed*, 648 F.2d 660 (9th Cir.), *certiorari denied*, 454 U.S. 1083, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981). Whether in the absence of settlement the case would have turned on the defense of foreign government compulsion is uncertain. For discussion of this and other problems arising out of the Arab League boycott, see Lowenfeld, Trade Controls for Political Ends Ch. III (2d ed. 1983).

Where the prohibited activity cannot be easily localized -- for instance, an agreement not to ship certain commodities into the United States -- an order from the government of the state of the defendant's nationality may not suffice to establish a defense of foreign government compulsion, but will be accorded substantial weight in making the evaluation called for by § 403(3).

## Cross Reference

A.L.R. Annotations:

Propriety of federal court injunction against suit in foreign country. 78 ALR Fed 831.

Digest System Key Numbers:

International Law 7

Restatement of the Law, Third, Foreign Relations Law of the United States
Copyright (c) 1987, The American Law Institute

## Restat 4th of the Foreign Relations Law of the U.S. 432

*Restatement of the*
**Law Fourth: The Foreign Relations Law of the United States** >
**Part IV- Jurisdiction, State Immunity, and Judgments** >
**Chapter 3- Enforcement**

## § 432 International Law Governing Jurisdiction to Enforce

**Under customary international law**:

    **(a) a state may exercise jurisdiction to enforce in its own territory; and**

    **(b) a state may not exercise jurisdiction to enforce in the territory of another state without the consent of the other state**.

### COMMENTS & ILLUSTRATIONS

**Comment:**

*a. Definition.* Jurisdiction to enforce concerns the authority of a state to exercise its power to compel compliance with law. This Restatement distinguishes it from jurisdiction to prescribe, which concerns the authority of a state to make law applicable to persons, property, or conduct, and from jurisdiction to adjudicate, which concerns the authority of a state to apply law to persons or things, in particular through the processes of its courts or administrative tribunals. See § 401. A state typically exercises jurisdiction to enforce through its law-enforcement officers, often at the direction of its courts. Examples of jurisdiction to enforce include the search of a place, the arrest of a person, imprisonment after criminal conviction, and the seizure of property. This Section does not address the use of force for purposes other than the enforcement of law.

*b. Territoriality and jurisdiction to enforce.* Under customary international law, a state may not exercise jurisdiction to enforce in the territory of another state without the consent of that other state. A state may exercise jurisdiction to enforce both its own laws and the laws of other states within its own territory. In certain circumstances, a state may also exercise jurisdiction to enforce in areas beyond the jurisdiction of any state, such as on the high seas. A state is internationally responsible to other states for violations of customary international law governing jurisdiction to enforce.

*c. Relationship of jurisdiction to enforce to jurisdiction to prescribe and jurisdiction to adjudicate.* A state may exercise jurisdiction to enforce its own law only when it has jurisdiction to prescribe. A state may exercise jurisdiction to enforce its own law through its courts only when it has jurisdiction to prescribe and jurisdiction to adjudicate. A state may exercise jurisdiction to enforce the laws of other states even if it lacks jurisdiction to prescribe or jurisdiction to adjudicate. Examples include the arrest and extradition of a person for trial in another state, see § 428, and the execution of a foreign judgment, see §§ 481-490.

### REPORTER'S NOTES

1. *Acts constituting jurisdiction to enforce.* Enforcement jurisdiction includes compelling compliance with law through the use of force, as well as the performance of coercive governmental functions. Examples include arresting a person, detaining a person, serving compulsory process, conducting police or administrative investigations, taking depositions and witness statements, executing an order for the production of documents, seizing property, and enforcing judgments.

2. *Jurisdiction to enforce within a state's own territory.* The exercise of jurisdiction to enforce by a state within its own territory is unproblematic. See Vaughan Lowe & Christopher Staker, Jurisdiction, in International Law 313, 335 (Malcolm D. Evans ed., 3d ed. 2010). Courts and law-enforcement officials routinely exercise such jurisdiction when they search places, arrest persons, or seize assets located in the state's own territory. Within its own territory, a state's courts and law-enforcement officials may exercise jurisdiction to enforce not only that

Restat 4th of the Foreign Relations Law of the U.S. 432

state's laws but also the laws of other states. For example, law-enforcement officials from one state may arrest a person for extradition to another state even though the arresting state would not have jurisdiction to prescribe with respect to the offense. See § 428. Courts may also execute foreign judgments against assets located in their state even though that state would have had neither jurisdiction to prescribe the applicable law nor jurisdiction to adjudicate the rights of the parties. See §§ 481-490; see also Reporters' Note 6.

An order issued within a state's own territory may be consistent with customary international law even though it relates to persons or property located outside the territory of that state. For instance, when a court in one state orders the appearance of a witness who is, or the production of documents that are, located in another state, that will not constitute enforcement within another state's territory absent attempts by the first state to execute those orders in the territory of the other state. See James Crawford, Brownlie's Principles of Public International Law 479 (8th ed. 2012). Similarly, issuing an arrest warrant for someone who is located in another state does not amount to an exercise of extraterritorial enforcement jurisdiction absent an attempt to execute that arrest warrant in the territory of the other state. See Arrest Warrant of 11 April 2000 (Dem. Rep. Congo v. Belg.), 2002 I.C.J. Rep. 3, 63, P 54 (joint separate opinion by Higgins, Kooijmans, Buergenthal, JJ.) (Feb. 14). Although other states may object to such orders, they are not prohibited as a matter of international law.

Customary international law permits but does not require states to exercise enforcement jurisdiction within their own territories. Many states have entered into treaties that provide for jurisdiction over serious international crimes and impose an obligation on treaty parties to arrest individuals found within their territories who are suspected of having committed such crimes and to either extradite them or submit them to prosecution (this obligation is often referred to as "*aut dedere aut judicare*"). See, e.g., Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation arts. 5-6, Sept. 23, 1971, 24 U.S.T. 565, 974 U.N.T.S. 177; International Convention Against the Taking of Hostages arts. 5-6, Dec. 17, 1979, T.I.A.S. No. 11,081, 1316 U.N.T.S. 205; Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 7, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85; International Convention for the Suppression of Terrorist Bombings arts. 6-7, Jan. 12, 1998, S. Treaty Doc. 106-6, 2149 U.N.T.S. 256; International Convention for the Suppression of Acts of Nuclear Terrorism arts. 9 and 11, Apr. 13, 2005, 2445 U.N.T.S. 89; see also § 413, Reporters' Note 2 (listing additional conventions). These agreements create obligations on the treaty parties to undertake certain enforcement measures (e.g., arresting the individual and extraditing the individual or submitting him or her for prosecution), but do not reflect customary international law obligations to exercise enforcement jurisdiction. On the obligation to extradite or prosecute, see generally Int'l Law Comm'n, Final Report, Obligation to Extradite or Prosecute (*aut dedere aut judicare*), U.N. Doc. A/CN.4/L.844, [2014] 2 Y.B. Int'l L. Comm'n (forthcoming); Questions Relating to the Obligation to Prosecute or Extradite (Belg. v. Sen.), Judgment, 2012 I.C.J. Rep. 422 (July 20); see also § 413.

3. *Jurisdiction to enforce in the territory of other states.* A state may not exercise jurisdiction to enforce in the territory of another state without the latter state's consent. This rule was set forth by the Permanent Court of International Justice in the *Lotus* case:

> [T]he first and foremost restriction imposed by international law upon a State is that--failing the existence of a permissive rule to the contrary--it may not exercise its power in any form in the territory of another State. In this sense jurisdiction is certainly territorial; it cannot be exercised by a State outside its territory except by virtue of a permissive rule derived from international custom or from a convention.

> S.S. "Lotus" (Fr. v. Turk.), 1927 P.C.I.J. (ser. A) No. 10, (Sept. 7); see also Int'l Law Comm'n, Report to the General Assembly, Annex V, [2006] 2(2) Y.B. Int'l L. Comm'n 230, 235-236 PP 6, 32, U.N. Doc. A/61/10 (2006) (Report prepared by the ILC Secretariat); Lowe & Staker, supra, at 335; Menno T. Kamminga, Extraterritoriality P 22, in Max Planck Encyclopedia of Public International Law (Rüdiger Wolfrum ed., 2012). Consent to the commission of otherwise wrongful conduct may be given by a state in advance or even at the time it is occurring. Int'l Law Comm'n, Report to the General Assembly, Draft Articles on the Responsibility of States for Internationally Wrongful Acts, art. 20, [2001] 2(2) Y.B. Int'l L. Comm'n 72, U.N. Doc. A/56/10 (2001). Where consent is given after the conduct has occurred, it represents a form of waiver or acquiescence, leading to loss of the right to invoke responsibility. Id. art. 45; see Reporters' Note 5.

Consent by one state for another state to exercise enforcement jurisdiction within its territory may be given on an *ad hoc* basis. For instance, Indonesia gave police officers from certain states permission to enter to conduct

investigations following the Bali bombings in 2002, Germany gave U.K. police officers permission to enter to regulate football hooliganism during the World Cup in 2006, and Somalia gave French police officers permission to enter its territory to capture the pirates that were thought to be responsible for seizing the French yacht *Le Ponant*. See Crawford, supra, at 480 n.184.

Consent by one state for another state to exercise enforcement jurisdiction within its territory may also be given through a treaty. For example, in maritime law enforcement agreements, states agree that one treaty party may, in certain circumstances, enter the territorial sea of the other treaty party to pursue and arrest ships suspected of engaging in illicit drug trafficking. See, e.g., Agreement Concerning Cooperation in Maritime Law Enforcement, U.S.-Bah., art. VI, June 29, 2004, T.I.A.S. No. 04-629. Similarly, some members of the European Union have granted each other the right to undertake certain enforcement measures in each other's territory with respect to cross-border surveillance and actions in hot pursuit. See Convention Implementing the Schengen Agreement of 14 June 1985, Benelux Economic Union, Germ.-Fr. arts. 40-41, June 19, 1990, 2000 O.J. (L 239) 19.

A common example of one state exercising enforcement jurisdiction in the territory of another state with the latter state's consent can be found in Status of Mission or Status of Armed Forces Agreements. These agreements typically provide that the receiving state consents to the presence of armed forces from the sending state on its territory and permits the sending state to exercise jurisdiction with respect to the prescription, adjudication, and enforcement of criminal offenses committed by members of its armed forces on the receiving state's territory. See, e.g., Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces, art. VII, June 19, 1951, 199 U.N.T.S. 67. Another example of one state consenting to another state exercising plenary jurisdiction, including enforcement jurisdiction, within part of its territory are the treaties by which the United States leases Guantánamo Bay, Cuba, and recognizes Cuba's ultimate sovereignty over that territory, while Cuba gives the United States complete jurisdiction and control over that territory for so long as the United States does not abandon the leased areas. Lease of Lands for Coaling and Naval Stations, art. III, Feb. 16-23, 1903, T.S. No. 418; Treaty Defining Relations with Cuba, May 29, 1934, U.S.-Cuba, art. III, 48 Stat. 1683, T.S. No. 866.

It is rare for two states to agree that one state shall adjudicate a dispute on the territory of the other state. However, a well-known example of this happening occurred when Libya conditioned extradition of the alleged offenders thought responsible for the bombing of Pan Am Flight 103 over Lockerbie, Scotland, on trial in a neutral third country. The United Kingdom and the Netherlands then agreed with Libya that, in return for Libya handing over the suspects, the trial would be by a Scottish court applying Scottish law but located in Zeist, The Netherlands. See Agreement Concerning a Scottish Trial in The Netherlands, Neth.-U.K., Sept. 18, 1998, 2062 U.N.T.S. 81. For a more recent example, see Agreement Concerning Trials under Pitcairn Law in New Zealand and Related Matters, U.K.-N.Z., Oct. 11, 2002, NZTS 2003, No. 2.

A state may not send its agents to arrest an alleged offender in the territory of another state without the latter state's consent. Ordinarily, the state seeking to prosecute the individual will have to make an extradition request to the state in whose territory the alleged offender is located. See § 428. There have been cases where a state or individuals working with or acting on behalf of a state have seized an alleged offender from the territory of another state without the latter state's consent. For example, Adolf Eichmann was abducted from the Argentine Republic in 1960 and brought to trial in Israel; Israeli nuclear technician Mordechai Vanunu was abducted from the Italian Republic in 1986 and brought to trial in Israel; and Mexican doctor Humberto Alvarez-Machain was abducted from the United Mexican States in 1990 and brought to trial in the United States. In some cases, these abductions occurred despite the existence of an applicable extradition treaty. These abductions represent violations of the international law on jurisdiction to enforce and entail the international responsibility of the abducting state. See [2006] 2(2) Y.B. Int'l L. Comm'n, supra, at 235-236 P 32 (Report prepared by the ILC Secretariat); Reporters' Note 5.

4. *Enforcement jurisdiction and the law of the sea*. The customary-international-law rules governing the law of the sea, briefly introduced here, are *sui generis*. The United Nations Convention on the Law of the Sea, Dec. 10, 1982, 1833 U.N.T.S. 123 (UNCLOS), reflects many of the customary-international-law rules governing prescriptive jurisdiction under the law of the sea. See United States Oceans Policy, Statement by the President, 19 Weekly Comp. of Pres. Docs. 383 (Mar. 10, 1983), 83 Dep't State Bull., No. 2075, at 70-71, 22 I.L.M. 464 (recognizing that Convention "contains provisions with respect to traditional uses of the oceans which generally

confirm existing maritime law"); The Commander's Handbook on the Law of Naval Operations § 1.2 (2007) ("Although the United States is not a party to [UNCLOS], it considers the navigation and overflight provisions therein reflective of customary international law and thus acts in accordance with [the Convention], except for the deep seabed mining provisions."). Under customary international law, the sovereignty of a coastal state extends to its territorial sea and to the airspace above that sea. UNCLOS art. 2. This sovereignty must be exercised in accordance with other rules of international law, such as the right of foreign vessels to exercise innocent passage. See, e.g., id. arts. 17, 25-28, 211. In its contiguous zone, a coastal state may exercise enforcement jurisdiction in order to prevent or punish the infringement of its customs, fiscal, immigration, or sanitary laws within its territory or territorial sea. Id. art. 33. On the high seas, flag states have the exclusive right to exercise criminal enforcement jurisdiction over acts committed aboard their flag vessels, subject to certain exceptions. See, e.g., id. arts. 92, 94, 105, 109, 110. States may also seize pirate ships and vessels engaged in unauthorized broadcasts on the high seas. See id. arts. 105, 109(4).

5. *Violations of international law governing jurisdiction to enforce.* A state is responsible to other states for violations of the customary-international-law rules governing jurisdiction to enforce. Draft Articles on State Responsibility [2001] 2(2) Y.B. Int'l L. Comm'n, supra, at 32 art. 1. Violations may give rise to a variety of legal consequences, including the obligation to provide reparations. See id. at 87-91 arts. 28-31. In some cases, treaties will govern the consequences. For example, where a state has effected the seizure of a ship or aircraft on suspicion of piracy without adequate grounds, the state making the seizure shall be liable to the state the nationality of which is possessed by the ship or aircraft for any loss or damage caused by the seizure. Id. art. 116.

In those rare cases where a state violates international law by conducting enforcement actions on the territory of another state without its consent, its actions are often subject to protest. For instance, Argentina complained to the U.N. Security Council that Israel had seized Adolf Eichmann from its territory without its consent. In response, the Security Council requested that Israel make appropriate reparations in accordance with the Charter of the United Nations and the rules of international law. See S.C. Res. 138 (1960). However, a state may retroactively "consent" to an enforcement action on its territory, or declare that it does not intend to pursue the violation further, which represents a form of waiver or acquiescence, leading to loss of the right to invoke responsibility. Draft Articles on State Responsibility [2001] 2(2) Y.B. Int'l L. Comm'n, supra, at 121 art. 45. For instance, although it initially objected to Israel's seizure of Eichmann, Argentina subsequently agreed to abandon its claim for reparations for the violation of its territorial sovereignty. See Lowe & Staker, supra, at 336. On the potential consequences of a violation of jurisdiction to enforce for the exercise of jurisdiction to adjudicate, see § 427, Comment *d* and Reporters' Notes 5-7.

6. *Relationship of jurisdiction to enforce to jurisdiction to prescribe and jurisdiction to adjudicate.* Under customary international law, a state may exercise jurisdiction to enforce although it lacks jurisdiction to prescribe and to adjudicate, but this depends on which law is being enforced. See § 401, Comment *d*, and Reporters' Note 3. A state may not enforce its own law if it had no jurisdiction to prescribe that law, and may not enforce its own judgment if it had no jurisdiction to adjudicate that dispute. However, a state may exercise jurisdiction to enforce with respect to laws prescribed or judgments adjudicated by another state. For instance, a state may arrest and extradite a criminal accused under the substantive law of another state for trial in that state. It also may execute the judgment of another state's courts despite lacking the jurisdiction to adjudicate the dispute itself. See Bernard Oxman, Jurisdiction of States P 5, in Max Planck Encyclopedia of Public International Law (Rüdiger Wolfrum ed., 2013)

7. *Previous Restatement.* The Restatement Third, The Foreign Relations Law of the United States (Am. Law Inst. 1987), addressed customary international law governing jurisdiction to enforce in §§ 431-432 and U.S. practice with respect to external measures in aid of the enforcement of criminal law in § 433. This Section restates the customary-international-law rules governing jurisdiction to enforce in light of more recent practice, while § 431 of this Restatement addresses U.S. practice in relation to jurisdiction to enforce.

Restatement of the Law Fourth: The Foreign Relations Law of the United States
Copyright © 2019 By The American Law Institute

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2025, I filed the foregoing Special Appendix with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit through the ACMS system. I certify that all participants in these cases are registered ACMS users and that service will be accomplished by the ACMS system.

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.

September 25, 2025