# 25-1689

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD.,
ETON PARK FUND, L.P.,

*Plaintiffs-Appellees*,

v.

ARGENTINE REPUBLIC,

*Defendant-Appellee,*

YPF S.A.,

*Defendant.*

_____

On Appeal from the United States District Court for the
Southern District of New York, No. 16-cv-8569

_____

**PAGE-PROOF RESPONSE BRIEF FOR
PLAINTIFFS-APPELLEES**

_____

MARK C. HANSEN
DEREK T. HO
ANDREW E. GOLDSMITH
KELLOGG, HANSEN, TODD,
FIGEL, & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036

PAUL D. CLEMENT
C. HARKER RHODES IV
NICHOLAS A. AQUART
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

November 14, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Plaintiffs-Appellees state the following:

Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. (together "Eton Park") are non-governmental entities that have no parent corporations. No public corporation owns 10% or more of the stock of either Eton Park Capital Management, L.P. or Eton Park Fund, L.P. Eton Park Master Fund, Ltd. is in liquidation; Burford Capital Limited, a public corporation, indirectly acts as its liquidator and owns more than 10% of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES.................................................................... iv

INTRODUCTION ......................................................................... 1

STATEMENT OF THE ISSUES ........................................................ 4

STATEMENT OF THE CASE............................................................ 5

    A.    Argentina and YPF Amend YPF's Bylaws and Promise Investors Strong Tender-Offer Protections............................................ 5

    B.    Argentina and YPF Breach Their Obligations Under the Bylaws Tender-Offer Provisions ........................................... 7

    C.    Argentina's and YPF's Commercial Activity in the United States.................................................................... 9

    D.    The District Court Enters Judgment for Plaintiffs Against Argentina, and Argentina Declines to Obtain a Stay ........................ 10

    E.    The District Court Enforces Its Judgment........................................ 12

SUMMARY OF ARGUMENT.................................................... 15

STANDARD OF REVIEW ........................................................ 18

ARGUMENT ............................................................................. 19

I.    The District Court Properly Exercised Its Authority To Order Argentina To Bring Assets Into New York To Satisfy The Judgment.......... 19

    A.    Settled Law Authorizes Courts to Order Judgment Debtors to Bring Assets Into the Jurisdiction to Satisfy a Judgment................... 19

    B.    Nothing in Federal Common Law or the FSIA Abrogates That Settled Rule With Respect to Foreign Sovereigns ............................. 22

        1.    Federal common law has never prohibited ordering a foreign sovereign to bring property into the jurisdiction to satisfy a judgment ............................................................... 23

2. The FSIA confirms that a court can order a foreign sovereign to bring property into the jurisdiction to satisfy a judgment .................................................... 27

3. Argentina's remaining arguments are unpersuasive ............... 31

II. The District Court Correctly Held That New York Law Authorizes The Turnover Order ........................................................................ 38

III. The District Court Correctly Found That The FSIA's Requirements Are Satisfied Here.......................................................................... 43

A. The District Court Correctly Found That the YPF Shares Will Be "in the United States" ..................................................... 44

B. The District Court Correctly Found That the YPF Shares Are "Used for a Commercial Activity in the United States" ................... 46

C. The District Court Correctly Found That the YPF Shares Were "Used for the Commercial Activity Upon Which the Claim Is Based"................................................................. 49

IV. The District Court Correctly Held That Its Order Comports With International Comity And The Act-Of-State Doctrine ................................. 51

A. The District Court's Order Comports With International Comity ................................................................................ 51

1. The district court's order does not conflict with Argentine law ...................................................................... 51

2. The district court correctly found that the order comports with international comity principles regardless of any conflict with Argentine law ......................... 55

B. The District Court's Order Comports With the Act-of-State Doctrine .............................................................................. 58

CONCLUSION .................................................................................... 59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Argentina v. NML Cap., Ltd.*,
573 U.S. 134 (2014).................................................................. *passim*

*Attestor Master Value Fund LP v. Argentina*,
113 F.4th 220 (2d Cir. 2024).......................................................40

*Aurelius Cap. Partners, LP v. Argentina*,
584 F.3d 120 (2d Cir. 2009).................................................. 47, 48

*Bainbridge Fund Ltd. v. Argentina*,
690 F.Supp.3d 411 (S.D.N.Y. 2023) ..........................................13

*Beierwaltes*
*v. L'Office Federale de la Culture de la Confederation Suisse*,
999 F.3d 808 (2d Cir. 2021)........................................................43

*CC/Devas (Mauritius) Ltd. v. Antrix Corp.*,
605 U.S. 223 (2025)............................................................ 22, 34

*Citronelle-Mobile Gathering, Inc. v. Watkins*,
934 F.2d 1180 (11th Cir. 1991) ..................................................21

*City of Jamestown v. Pa. Gas Co.*,
1 F.2d 871 (2d Cir. 1924) ...........................................................19

*Clearstream Banking S.A. v. Peterson*,
589 U.S. 1127 (2020)...................................................................30

*Compañía de Inversiones Mercantiles S.A.*
*v. Grupo Cementos de Chihuahua S.A.B. de C.V.*,
58 F.4th 429 (10th Cir. 2023)......................................................20

*Conn. Bank of Com. v. Republic of Congo*,
309 F.3d 240 (5th Cir. 2002)......................................................33

*Corbett v. Nutt*,
77 U.S. (10 Wall.) 464 (1870)....................................................19

*Crystallex Int'l Corp. v. Venezuela*,
    932 F.3d 126 (3d Cir. 2019) .................................................................48

*de Csepel v. Republic of Hungary*,
    27 F.4th 736 (D.C. Cir. 2022) ..................................................... 57, 58

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003).............................................................................51

*Douglass v. Phenix Ins. Co. of Brooklyn*,
    33 N.E. 938 (N.Y. 1893) ....................................................................24

*EM Ltd. v. Argentina*,
    389 F.App'x 38 (2d Cir. 2010) ..........................................................45

*EM Ltd. v. Argentina*,
    695 F.3d 201 (2d Cir. 2012) ....................................................... 29, 36

*Exp.-Imp. Bank v. Grenada*,
    768 F.3d 75 (2d Cir. 2014)..................................................................47

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
    905 F.2d 438 (D.C. Cir. 1990) ...........................................................49

*Gagan v. Monroe*,
    269 F.3d 871 (7th Cir. 2001) ..............................................................21

*Gryphon Dom. VI, LLC v. APP Int'l Fin. Co.*,
    836 N.Y.S.2d 4 (N.Y. App. Div. 2007) ....................................... 25, 39

*Havlish v. Taliban*,
    152 F.4th 339 (2d Cir. 2025) ..............................................................18

*Hewlett-Packard Co. v. Quanta Storage, Inc.*,
    961 F.3d 731 (5th Cir. 2020)...............................................................21

*In re 650 Fifth Ave.*,
    2014 WL 1284494 (S.D.N.Y. Mar. 28, 2014)....................................49

*In re Feit & Drexler, Inc.*,
    760 F.2d 406 (2d Cir. 1985)...............................................................20

*In re Icenhower*,
  755 F.3d 1130 (9th Cir. 2014) ..............................................................21

*In re Picard*,
  917 F.3d 85 (2d Cir. 2019) ...................................................................52

*In re Vitamin C Antitrust Litig.*,
  8 F.4th 136 (2d Cir. 2021) ........................................................... 56, 57

*Inter-Reg'l Fin. Grp., Inc. v. Hashemi*,
  562 F.2d 152 (2d Cir. 1977) ........................................................ 20, 45

*Kim v. Kimm*,
  884 F.3d 98 (2d Cir. 2018) .......................................................... 42, 54

*Koehler v. Bank of Berm. Ltd.*,
  911 N.E.2d 825 (N.Y. 2009) ...................................................... *passim*

*Koehler v. Bank of Bermuda Ltd.*,
  544 F.3d 78 (2d Cir. 2008) ...................................................................20

*Massie v. Watts*,
  10 U.S. (6 Cranch) 148 (1810) ...........................................................19

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010) ..............................................................................6

*Motorola Credit Corp. v. Uzan*,
  388 F.3d 39 (2d Cir. 2004) .......................................................... 52, 56

*New York v. O'Neill*,
  359 U.S. 1 (1959) ................................................................................19

*NML Cap., Ltd. v. Argentina*,
  699 F.3d 246 (2d Cir. 2012) ...............................................................28

*NML Cap., Ltd. v. Argentina*,
  727 F.3d 230 (2d Cir. 2013) ...............................................................41

*Penn v. Lord Baltimore*
  [1750] 27 Eng. Rep. 1132 ...................................................................19

*Petersen Energia Inversora S.A.U. v. Argentine Republic*,
   895 F.3d 194 (2d Cir. 2018) ........................................................ *passim*

*Petersen Energia Inversora S.A.U. v. Argentine Republic*,
   588 U.S. 906 (2019) ................................................................... 10

*Peterson v. Bank Markazi*,
   121 F.4th 983 (2d Cir. 2024) ..................................................... *passim*

*Peterson v. Islamic Republic of Iran*,
   876 F.3d 63 (2d Cir. 2017) ........................................................ *passim*

*Republic of Austria v. Altmann*,
   541 U.S. 677 (2004) ................................................................... 26

*Republic of Mexico v. Hoffman*,
   324 U.S. 30 (1945) ........................................................... 24, 25, 26

*Richmark Corp. v. Timber Falling Consultants*,
   959 F.2d 1468 (9th Cir. 1992) ................................................... 55

*Samantar v. Yousuf*,
   560 U.S. 305 (2010) ......................................................... 28, 32, 38

*Schooner Exch. v. McFaddon*,
   11 U.S. (7 Cranch) 116 (1812) ................................................... 26

*Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.*,
   82 F.4th 144 (2d Cir. 2023) ....................................................... 40

*Simon v. Republic of Hungary*,
   911 F.3d 1172 (D.C. Cir. 2018) ................................................. 57

*SuVicMon Dev., Inc. v. Morrison*,
   991 F.3d 1213 (11th Cir. 2021) ................................................. 24

*Swarna v. Al-Awadi*,
   622 F.3d 123 (2d Cir. 2010) ....................................................... 43

*Turkiye Halk Bankasi A.S. v. United States*,
   598 U.S. 264 (2023) ............................................................. 32, 38

*United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*,
210 F.3d 1207 (10th Cir. 2000) .......................................................... 21

*United States v. First Nat'l City Bank*,
379 U.S. 378 (1965) ................................................................... 20, 22

*United States v. Ross*,
302 F.2d 831 (2d Cir. 1962) ....................................................... 20, 24

*Verlinden B.V. v. Cent. Bank of Nigeria*,
461 U.S. 480 (1983) .......................................................................... 26

*W.S. Kirkpatrick & Co. v. Env't Tectonics Corp. Int'l*,
493 U.S. 400 (1990) .......................................................................... 58

*Watkins v. Holman's Lessee*,
41 U.S. (16 Pet.) 25 (1842) ............................................................... 19

**Constitutional Provision**

Art.5, §78 Const. Nac. (Arg.) ............................................................. 54

**Statutes**

28 U.S.C. §1330(a)-(b) ...................................................................... 35

28 U.S.C. §1330(b) ............................................................................ 21

28 U.S.C. §1605 ................................................................................ 35

28 U.S.C. §1606 ................................................................................ 23

28 U.S.C. §1610 .......................................................................... 33, 35

28 U.S.C. §1610(a) ..................................................... 17, 46, 47, 58

28 U.S.C. §1610(a)(2) ............................................................... *passim*

28 U.S.C. §1611 ................................................................................ 35

N.Y. C.P.L.R. §5225 ......................................................................... 38

**Rule**

Fed.R.Civ.P. 69(a)(1) .................................................................. 13, 38

**Other Authorities**

Black's Law Dictionary (12th ed. 2024)....................................................25

C.J.S. *Executions* (2025)...............................................................24

David Siegel, N.Y. Prac. (6th ed. 2024)..................................................22

Restatement (Second) of Conflict of Laws (2025).....................................19

Restatement (Third) of Foreign Relations Law (1987) ..........................52

Wright & Miller, Fed. Prac. & Proc. Civ. (3d ed. 2025).........................25

## INTRODUCTION

In 2012, Defendant-Appellee Argentine Republic ("Argentina") breached its clear contractual obligations by refusing to make a tender offer to Plaintiffs for their shares in the energy company YPF S.A. ("YPF"), causing Plaintiffs what Argentina itself estimated to be billions of dollars in damages. After more than a decade of litigation, the district court below entered judgment against Argentina. Argentina did not satisfy the conditions imposed by the district court for a stay of that judgment, and did not seek a stay from this Court. As a result, the judgment has been fully enforceable—and unpaid—for almost two years. The district court has accordingly been overseeing a wide range of post-judgment enforcement proceedings, none of which have yet caused Argentina to make the slightest move towards satisfying the judgment against it.

As part of those post-judgment enforcement proceedings, the district court entered an order allowing Plaintiffs to obtain partial satisfaction of their unstayed judgment by requiring Argentina to move its Class D YPF shares into a global custody account in New York, after which those assets would be "in the United States" and subject to execution under the Foreign Sovereign Immunities Act ("FSIA"). That order was a fully justified exercise of the district court's well-settled authority to compel a defendant over which it has personal jurisdiction to transfer property into the forum to satisfy a valid and enforceable judgment, and fully

comported with the requirements of the FSIA.  It also fully accords with this Court's previous decision in this case—which recognized that Argentina's breach of its contractual obligations was commercial conduct, not sovereign conduct—by ordering Argentina to turn over commercial property that it used to effectuate its breach in partial satisfaction of the unstayed and enforceable judgment.

All of Argentina's various attacks on the district court's order are meritless, and come nowhere near showing any abuse of discretion by the experienced district-court judge who has now spent more than ten years presiding over this case. Argentina begins by asserting that federal common law prohibits execution on foreign-sovereign property abroad, and that the FSIA does not alter that federal common-law rule.  That argument misses the point entirely, as the district court has not ordered execution on foreign-sovereign property abroad.  Instead, the order simply applies the centuries-old rule that a court with personal jurisdiction over a party can order that party to bring property into the forum to satisfy a judgment, even if the court would have no authority to execute on that property outside the forum. Argentina advances no authority whatsoever disputing that settled rule, or suggesting that foreign sovereigns have any special immunity from that rule—and the plain text of the FSIA, Supreme Court precedent, and this Court's own decisions all make clear that no such special immunity exists.  Contrary to what Argentina suggests, that does not mean the FSIA affords foreign-sovereign property abroad any

less protection than foreign-sovereign property in the United States; it simply means that foreign-sovereign property abroad can be brought into the United States, where the court can then determine whether the FSIA permits execution.

Argentina next contends that the New York turnover statute does not extend to foreign-sovereign property abroad. But Argentina never made that state-law statutory interpretation argument below and so has forfeited it. In any event, there is a reason this argument did not occur to Argentina below, as controlling precedent forecloses it. The New York Court of Appeals has made clear that the turnover statute allows a court with personal jurisdiction over a judgment debtor to order him to bring out-of-state property into New York to satisfy the judgment, and there is no persuasive reason for atextually excluding foreign sovereigns from that generally applicable rule—which is why this Court has twice concluded that the New York turnover statute *does* reach foreign-sovereign property abroad.

Argentina turns to the FSIA, arguing that its YPF shares cannot be subject to execution because they are not "in the United States," "used for a commercial activity in the United States," and "used for the commercial activity upon which the claim is based." 28 U.S.C. §1610(a)(2). The district court carefully considered Argentina's arguments on each issue, and thoroughly and persuasively rejected them. The YPF shares will be in the United States once Argentina complies with the turnover order, which is when execution will occur; Argentina uses them for

3

commercial activity in the United States by using them to direct YPF's commercial activity here; and Argentina used them to effectuate its clear breach of its obligations under YPF's bylaws (the "Bylaws"). Argentina's contrary arguments simply ignore the district court's well-supported findings and this Court's prior ruling regarding the commercial nature of Argentina's ownership of its YPF shares.

Finally, Argentina asserts that the district court's order is barred by international comity principles and the act-of-state doctrine. But as Argentina's own description makes clear, nothing in the district court's order requires Argentina to violate Argentine law or invalidates any Argentine sovereign act. And even if there were some conflict between Argentine law and the district court's order, the district court did not remotely abuse its discretion in concluding that the United States' interests in enforcing a valid and unstayed judgment outweigh Argentina's interests in continuing to evade its legal obligations. This Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly held that nothing in federal common law or the FSIA prohibits a court from ordering a judgment debtor over which the court has personal jurisdiction to bring assets into the court's territorial jurisdiction to satisfy the judgment, whether or not the judgment debtor is a foreign sovereign.

2. Whether the district court correctly held that New York law authorizes it to order a judgment debtor over which it has personal jurisdiction to bring assets into

New York to satisfy the judgment, whether or not the judgment debtor is a foreign sovereign.

3. Whether the district court correctly held that the FSIA does not provide the YPF shares with execution immunity.

4. Whether the district court correctly held that its turnover order comports with international comity and the act-of-state doctrine.

## STATEMENT OF THE CASE

### A. Argentina and YPF Amend YPF's Bylaws and Promise Investors Strong Tender-Offer Protections.

YPF was founded in 1922 as a "politically managed, government-owned monopoly." JA__[Dist.Ct.Dkt.112-2.at.16, 42]. In the 1990s, however, a new regime in Argentina embarked upon an ambitious turn toward free-market principles, with the privatization of YPF through an IPO tapping into U.S. markets as its cornerstone. *See Petersen Energia Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 199 n.1 (2d Cir. 2018). Considering Argentina's "checkered economic past" and "persistent economic ills," however, foreign investors were "very skeptical" of whether Argentina's newfound commitment to privatization would last. JA__[Dist.Ct.Dkt.364-26¶19].

To overcome that skepticism, Argentina and YPF amended YPF's Bylaws "to incorporate protections for investors from (1) hostile takeovers and (2) attempts by Argentina to renationalize the company." *Petersen*, 895 F.3d at 199. Under §7 of

the amended Bylaws, shareholders wishing to acquire control of 15% or more of YPF were obligated to make a tender offer to all shareholders at a price calculated based on a formula set in the Bylaws. JA__[Dist.Ct.Dkt.363-1.at.7]; *see Petersen*, 895 F.3d at 199. Section 28 specifically extended similar requirements to the Argentine government, ensuring shareholders a compensated exit at a specified price in the event of re-nationalization. JA__[Dist.Ct.Dkt.363-1.at.29].

Argentina ultimately "raised billions of dollars in investment capital" through the privatization of YPF, with "the largest share (more than $1.1 billion in total) coming from the sale of ADRs in the United States on the NYSE [New York Stock Exchange]." *Petersen*, 895 F.3d at 200.[1] The protections afforded by the Bylaws were "critical" to the IPO's success, as Argentina "likely could not have achieved the valuation it did at the time of its IPO, or even completed the IPO itself, without providing prospective investors with protections" like those the amended Bylaws embodied. JA__[Dist.Ct.Dkt.364-26.¶¶11, 50].

Following the IPO, Petersen (plaintiffs in No. 25-1687) and Eton Park (plaintiffs in No. 25-1689) became significant shareholders in YPF by purchasing NYSE-listed ADRs. When Petersen crossed the 15% threshold set forth in §7 of the

---

[1] American depository receipts ("ADRs") are certificates that represent an ownership interest in foreign securities, allowing investors to acquire equity in foreign companies on U.S. stock exchanges via dollar-denominated transactions. *See, e.g.*, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 251 (2010).

Bylaws, it fully complied with that section's tender-offer requirements. By the spring of 2012, Petersen and Eton Park were the second- and third-largest investors in YPF, respectively. JA__[Dist.Ct.Dkt.364-49.¶¶16-17].

### B. Argentina and YPF Breach Their Obligations Under the Bylaws Tender-Offer Provisions.

In 2011, YPF announced the discovery of a major new oil field. Following that discovery, Argentina began a campaign to retake control of YPF by depressing YPF's share price and ultimately seizing a majority stake in the company. *See* JA__[Dist.Ct.Dkt.364-86.at.16307]; JA__[Dist.Ct.Dkt.364-53.at.13, Dkt.63.at.5].

On February 21, 2012, Argentine Secretary of Energy Daniel Cameron sent a memorandum to Roberto Baratta, the government's appointed YPF board member, recognizing that the Bylaws were "carefully intended at the outset to defend its future minority shareholders," and using Petersen's own tender offer as a benchmark, estimated that if Argentina complied with the Bylaws' tender-offer requirements, Argentina would have to pay "between 11 billion and 14.5 billion dollars." JA__[Dist.Ct.Dkt.364-81.at.69040-41]. In Cameron's view, "this is not the path that will allow us greater possibilities." JA__[Dist.Ct.Dkt.364-81.at.69041]. Instead, he stressed, "[t]he only way to go is expropriation." JA__[Dist.Ct.Dkt.364-81.at.69041] (emphasis omitted). That was so, he advised, even though the failure to make a tender offer would "probably involve lawsuits." JA__[Dist.Ct.Dkt.364-81.at.69042].

7

On April 16, 2012, Argentina executed its plan to seize control, issuing an executive decree appointing Julio De Vido, Argentina's then-Minister of Planning, Public Investment, and Services as "Intervenor" with the powers of YPF's Board of Directors and President, and another decree appointing Axel Kicillof, then-Secretary of Economic Policy and Development Planning, as "Vice-Intervenor." *See Petersen*, 895 F.3d at 202. The Intervenor "seized control of YPF's facilities, replaced top management with government officials, and escorted YPF's then-CEO off the premises." *Id.*

Argentine officials were "quick to declare that, despite having acquired control of the company, Argentina and YPF had no intention of complying with the tender offer provisions of YPF's bylaws." *Id.* On April 17, 2012—one day after the intervention—Kicillof, speaking as both Argentina's Secretary of Economic Policy and Development Planning and YPF's new Vice-Intervenor, told the Argentine Congress that Argentina and YPF would not honor the Bylaws. Kicillof described as "fools ... those who think that the State has to be stupid and buy everything according to the law of YPF itself, respecting its bylaws," and dismissed the tender-offer requirement as a "bear trap." JA__[Dist.Ct.Dkt.481-11.at.25]. Consistent with Kicillof's declaration, Argentina never made a tender offer, nor did it comply with the other requirements of §7 and §28. YPF likewise never enforced those

requirements, and violated the provisions of §7 and §28 concerning the counting of votes and payment of dividends.

On May 3, 2012, Argentina enacted legislation to expropriate 51% of YPF's shares, including NYSE-listed ADRs. *See Petersen*, 895 F.3d at 202-03. To prevent Argentina's Executive Branch from re-privatizing YPF at its own discretion, the Argentine Congress included a provision restricting the Executive Branch from voluntarily transferring Argentina's YPF shares without two-thirds majority approval from the Argentine Congress. JA__[Dist.Ct.Dkt.588¶¶4-5].

### C.    Argentina's and YPF's Commercial Activity in the United States.

Since 2012, Argentina has controlled YPF's business and financial decisions through its majority stake in the company. As YPF has publicly reported, "[t]he Argentine federal government controls [YPF], and consequently, the federal government is able to determine substantially all matters requiring approval by a majority of our shareholders, including the election of a majority of our directors, and is able to direct our operations." JA__[Dist.Ct.Dkt.559-6.Mastro.Ex.6.at.10]. For example, at YPF's annual shareholder meeting in 2023, Argentina used its controlling YPF shares to appoint all 12 members of YPF's Board of Directors. JA__[Dist.Ct.Dkt.557.Coffee.¶¶24-25, Dkt.559.Mastro.Ex.7]. Argentina has also hand-selected YPF's CEO and senior management. JA__[Dist.Ct.Dkt.556.Coffee.¶27, Dist.Ct.Dkt.559.Mastro.Ex.9].

Under Argentina's control, YPF has continued to sponsor ADRs with Bank of New York Mellon ("BNYM") in the United States, list those ADRs on the NYSE, maintain the registration of its Class D shares and ADRs with the SEC, and file forms with the SEC as required by federal law. *See* JA__[Dist.Ct.Dkt.558.Lissemore.¶¶27-29, Dist.Ct.Dkt.557.Coffee.¶11]. YPF continues to take advantage of debt and capital markets in the United States; in 2024, for example, YPF launched a successful global offering of $800 million in bonds, $220.5 million of which were sold to U.S. institutional investors. JA__[Dist.Ct.Dkt.557.Coffee¶¶12-13].

### D. The District Court Enters Judgment for Plaintiffs Against Argentina, and Argentina Declines to Obtain a Stay.

Petersen filed suit against Argentina and YPF in May 2015 for breaching their obligations under the Bylaws. JA__[Dist.Ct.Dkt.1.at.1-30]. Argentina and YPF moved to dismiss Petersen's complaint, but the district court denied their motions, holding *inter alia* that Argentina and YPF were not immune from suit under the FSIA because Petersen's claims were based on Argentina's and YPF's commercial activity. *See Petersen*, 895 F.3d at 204. This Court affirmed, *id.* at 204-11, and the Supreme Court denied certiorari, 588 U.S. 906 (2019). Meanwhile, Eton Park filed suit against Argentina and YPF in November 2016. JA__[Dist.Ct.Dkt.364-16]. The district court designated Petersen's and Eton Park's actions as related, and they have since proceeded in tandem.

10

The parties subsequently moved for summary judgment. The district court granted summary judgment for Plaintiffs against Argentina on liability, while granting summary judgment for YPF. As to Argentina, the court explained "that Sections 7 and 28 of YPF's Bylaws, on their face, required that [Argentina] make a tender offer upon acquisition of more than 49% of YPF's capital stock," that Argentina acquired control of 51% of YPF's capital stock, and that it "failed to make the tender offer called for by the Bylaws." JA__[Dist.Ct.Dkt.437.14-15]. Argentina therefore plainly breached its contractual obligations. *See* JA__[*Id.*at.34-36, 54-58, 62-63].

The district court proceeded to hold a three-day trial on damages in July 2023, where it heard live testimony from multiple expert witnesses on Argentine law and extensive arguments from counsel regarding the correct amount of damages under the Bylaws' specified formula. The court issued its judgment on September 15, 2023, awarding Plaintiffs approximately $16.1 billion in damages. JA__[Dist.Ct.Dkt.498].

Argentina filed a notice of appeal and a motion to stay the judgment pending appeal. JA__[Dist.Ct.Dkt.504, 513]. The district court granted the stay on two conditions: that Argentina "seek expedited review of its appeal," and provide "minimal security" by pledging certain assets to protect Plaintiffs' interest in collecting on their judgment. JA__[Dist.Ct.Dkt.527.6-10]. Rather than comply with

those conditions, Argentina asked for a month to "evaluate" them, JA__[Dist.Ct.Dkt.528]; it then notified the district court that it would neither comply with the conditions nor seek an expedited appeal. JA__[Dist.Ct.Dkt.531.at.1]. Instead, Argentina asked the court to reconsider its prior order and grant a stay with no conditions. JA__[Dist.Ct.Dkt.531.at.2]. The district court denied that motion, explaining that Argentina merely sought to continue its "strategy of procedural delay and obfuscation" by "mouthing an intent to cooperate but refusing to do so." JA__[Dist.Ct.Dkt.533.at.2-5]. Argentina did not seek a stay from this Court, and the judgment accordingly became effective and subject to execution and collection.

### E. The District Court Enforces Its Judgment.

In April 2024, three months after the district court's judgment became effective, Plaintiffs moved for an order requiring Argentina to (i) transfer its YPF shares to a global custody account at BNYM in New York, and (ii) instruct BNYM to transfer the ownership interests in those shares to Plaintiffs' designees in partial satisfaction of the judgment. JA__[Dist.Ct.Dkt.555, 556]. After extensive briefing, including a brief from the federal government making the same arguments that it repeats in this Court, the district court granted Plaintiffs' motion in June 2025 and issued a thorough 33-page opinion rejecting Argentina's (and the government's) arguments for opposing Plaintiffs' turnover motion. JA__[Dist.Ct.Dkt.742].

First, the court explained that nothing in the FSIA "prevent[s] the Court from ordering [Argentina], a judgment debtor over which it has personal jurisdiction, to bring assets from outside of New York into New York to pay [Plaintiffs]." SA.13 (quoting *Bainbridge Fund Ltd. v. Argentina*, 690 F.Supp.3d 411, 416 (S.D.N.Y. 2023)); *see* SA.25. On the contrary, it is well settled that a court generally has the authority to order a judgment debtor over which it has personal jurisdiction to bring assets into its territorial jurisdiction to satisfy a judgment, and nothing in federal common law or the FSIA alters that settled rule with respect to foreign sovereigns. *See Bainbridge*, 690 F.Supp.3d at 415-16.

Second, the district court held that federal and New York law authorized it to order Argentina to bring the YPF shares into New York to satisfy the judgment. SA.8-13, 23-25. Proceedings to enforce a judgment in federal court "must accord with the procedure of the state where the court is located." SA.8 (quoting Fed.R.Civ.P. 69(a)(1)). And under New York law, courts have authority to enter turnover orders under C.P.L.R. §5225 "against assets regardless of their location if the Court has personal jurisdiction over the judgment debtor or the third-party garnishee." SA.12; *see Koehler v. Bank of Berm. Ltd.*, 911 N.E.2d 825, 830-31 (N.Y. 2009). Because the district court had personal jurisdiction over Argentina, it had authority under C.P.L.R. §5225 to order Argentina to bring the YPF Shares to New York to partially satisfy the judgment. SA.12-13.

Third, the court explained that once Argentina brought the shares to New York, they would be subject to execution under the FSIA. SA.14-23. Under the FSIA, foreign-sovereign property in the United States is subject to execution if it is "used for a commercial activity in the United States" and "is or was used for the commercial activity upon which the claim is based." SA.14 (quoting 28 U.S.C. §1610(a)(2)). As the court explained, Argentina used its YPF shares "for a commercial activity in the United States" by directing YPF's commercial activity in this country, and had used the shares "for the commercial activity upon which Plaintiffs' claims are based by using its control of the shares to effectuate its breach of its tender-offer obligation under the Bylaws. SA.16-23.

Finally, the district court rejected Argentina's argument that ordering turnover of its YPF shares would violate principles of international comity. First, "the FSIA already reflects Congress's resolution of comity principles in execution proceedings against a foreign state," making any separate comity analysis unnecessary. SA.29 n.21. In any event, nothing in the turnover order would require Argentina to violate its own law or to invalidate any prior sovereign act. SA.29-30. And even if some true conflict between the turnover order and Argentine law existed, "comity considerations counsel in favor of granting Plaintiffs' requested relief" as "[t]he United States has a strong interest in enforcing its judgments," and "[f]oreign governments cannot simply override the exceptions to the FSIA by invoking [their]

14

own law to shield [their] assets from execution in the United States." SA.30-31. The court also noted the obvious irony in Argentina's "demand[] that this Court extend comity" when Argentina "simultaneously refuses to make any effort to honor the Court's unstayed judgment." SA32.

Argentina moved for a stay of the turnover order pending appeal, which the district court denied. JA__[Dist.Ct.Dkt.753.at.3]. Argentina then moved this Court for a stay pending appeal, which this Court granted. Dkts.15, 50.

## SUMMARY OF ARGUMENT

Argentina made clear promises to investors and just as clearly broke those promises. The district court correctly entered judgment holding Argentina liable for that breach, and its order enforcing that unstayed judgment is equally correct. This Court should affirm.

Argentina's lead argument—that federal common law precludes a district court from ordering execution on foreign-sovereign property abroad—misses the point entirely. The district court's order here did not order execution, in the sense of forcible judicial seizure, on any foreign-sovereign property abroad, any more than New York law authorizes execution directly on out-of-state property. Instead, consistent with well-settled law, the turnover order simply exercised jurisdiction over a defendant over which the court has personal jurisdiction and ordered that defendant to bring property into the forum to satisfy a judgment. Argentina never

disputes the existence of that centuries-old authority, and cites no federal common law exempting foreign sovereigns from that well-established judicial power. Argentina thus comes nowhere near showing that pre-FSIA federal common law created any special immunity for foreign sovereigns from the settled rule that a court with personal jurisdiction over a judgment debtor can order it to bring property into the forum to satisfy the judgment.

Even if Argentina could somehow make that showing under pre-FSIA federal common law, it would be to no avail. As the Supreme Court has made abundantly clear, Congress enacted the FSIA's comprehensive statutory framework to displace the muddled common-law approach that previously governed immunity questions in civil suits against foreign sovereigns. Accordingly, only the text of the FSIA can afford sovereign immunity, and federal common law has no role to play. This Court has already held that the FSIA provides no immunity for Argentina vis-à-vis this suit, and as such, Argentina is subject to the ordinary rules which do not allow parties to frustrate justice or make valid unstayed judgments effectively uncollectible.

Argentina next attempts to narrow the New York turnover statute, arguing that it tacitly exempts foreign-sovereign property abroad. This Court should not consider that argument, because Argentina never raised it below. But this forfeiture was no great tactical error; nothing in the statutory text remotely suggests that it excludes foreign-sovereign property, and the New York Court of Appeals has already rejected

a similar attempt to atextually limit the statute by excluding property located outside New York, which is why this Court has already twice recognized that courts can use the New York turnover statute to reach foreign-sovereign property abroad.

Argentina's arguments that its YPF shares are entitled to execution immunity under the FSIA are equally meritless. First, as the district court explained, once Argentina complies with its turnover, those shares will be "in the United States." 28 U.S.C. §1610(a). That does not make the district court's order an improper end-run around the "in the United States" requirement, any more than a turnover order against a private party with respect to out-of-state property is an improper end-run around the general rule that a district court can only execute on property in the forum. Second, the district court also correctly found that Argentina has "used [its YPF shares] for a commercial activity in the United States" by directing YPF to engage in commercial activity here, *id.*; as the district court explained, what matters is not where Argentina voted its shares, but where the resulting commercial activity took place. Third, the district court was correct to find that the shares were "used for the commercial activity upon which the claim is based," as Argentina used the shares to effectuate its breach of the Bylaws by (among other things) preventing YPF from enforcing the Bylaws requirements. *Id.* Argentina makes no attempt to respond to the district court's analysis, and its assertion that Plaintiffs and the district court have adopted inconsistent positions is plainly incorrect.

17

Finally, Argentina argues that the district court's order contravenes international comity and the act-of-state doctrine. But Congress has already weighed the relevant international comity considerations in enacting the FSIA, and it is neither necessary nor appropriate for a court to weigh those considerations again here. In any event, contrary to what Argentina suggests, nothing in the district court's order requires it to violate Argentine law, even on Argentina's own description of what that law requires. And as the district court found, even if some conflict existed between the court's order and Argentine law, the relevant comity considerations weigh strongly in favor of the court's order, given the United States' strong interest in enforcing its judgments and given Argentina's continued refusal to make any effort to satisfy the unstayed judgment here.

It is no surprise that Argentina (and a number of other foreign-sovereign amici) would prefer not to be obligated to satisfy judgments by the United States courts against them. That self-serving preference, however, is no basis for changing either long-settled principles of judicial enforcement of unstayed judgments or the plain text of the FSIA. The district court did not abuse its discretion in entering its well-reasoned and well-supported order, and this Court should affirm.

## STANDARD OF REVIEW

This Court reviews a turnover order "for abuse of discretion." *Havlish v. Taliban*, 152 F.4th 339, 349 (2d Cir. 2025).

## ARGUMENT

I.    **The District Court Properly Exercised Its Authority To Order Argentina To Bring Assets Into New York To Satisfy The Judgment.**

A.    **Settled Law Authorizes Courts to Order Judgment Debtors to Bring Assets Into the Jurisdiction to Satisfy a Judgment.**

Since before this Nation was founded, it has been black-letter law that a court has the authority to order a defendant over which it has personal jurisdiction to turn over property to satisfy its judgment, even when that property is located outside the court's territorial jurisdiction. *See, e.g.*, *Massie v. Watts*, 10 U.S. (6 Cranch) 148, 158-60 (1810) (Marshall, C.J.) (courts of equity may exercise authority "wherever the person be found, although lands not within the jurisdiction of that court may be affected by the decree" (citing cases including *Penn v. Lord Baltimore* [1750] 27 Eng. Rep. 1132)); *see also, e.g.*, *Corbett v. Nutt*, 77 U.S. (10 Wall.) 464, 475 (1870); *Watkins v. Holman's Lessee*, 41 U.S. (16 Pet.) 25, 39 (1842); *City of Jamestown v. Pa. Gas Co.*, 1 F.2d 871, 878 (2d Cir. 1924) (recognizing that *Massie* "has never been overruled," and "is always referred to with respect"). In fact, it is literally hornbook law that a court has the authority "to order a person, who is subject to its judicial jurisdiction, to do an act, or to refrain from doing an act, in another state," such as by turning over property to satisfy a judgment. Restatement (Second) of Conflict of Laws §53 (2025); *see, e.g.*, *New York v. O'Neill*, 359 U.S. 1, 9 (1959) (courts have "jurisdiction to order an act even though that act is to be performed outside of the State").

The Supreme Court and this Court have thus repeatedly recognized that "[o]nce personal jurisdiction of a party is obtained," a court has authority to order that party to turn over property under its control, "whether the property be within or without the United States." *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965); *see, e.g.*, *Koehler v. Bank of Bermuda Ltd.*, 544 F.3d 78, 85 (2d Cir. 2008) ("[A] court sitting in New York, that has personal jurisdiction over a judgment debtor, may order the judgment debtor himself to deliver property into New York."); *In re Feit & Drexler, Inc.*, 760 F.2d 406, 414 (2d Cir. 1985) ("Violet's contention that the district court lacked the power to compel her to deliver her property from outside the court's territorial jurisdiction must be rejected because the court had personal jurisdiction over Violet herself[.]"); *Inter-Reg'l Fin. Grp., Inc. v. Hashemi*, 562 F.2d 152, 154-55 (2d Cir. 1977) (affirming order requiring the defendant "to bring [stock] certificates into the State of Connecticut from their locations in other states, and indeed, even in other countries"); *United States v. Ross*, 302 F.2d 831, 834 (2d Cir. 1962) ("Personal jurisdiction gave the court power to order Ross to transfer property whether that property was within or without the limits of the court's territorial jurisdiction.").

Other federal courts of appeals have likewise routinely applied the same settled principle. *See, e.g.*, *Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 58 F.4th 429, 469-72 (10th Cir. 2023)

(affirming order to turn over foreign stock certificates, and explaining that "when the district court had personal jurisdiction over the judgment debtor, the location of the debtor's assets was irrelevant"); *Hewlett-Packard Co. v. Quanta Storage, Inc.*, 961 F.3d 731, 743 (5th Cir. 2020) (district court "may require parties subject to its jurisdiction to turn over property, even if that property is located abroad"); *In re Icenhower*, 755 F.3d 1130, 1140 (9th Cir. 2014) ("[T]he bankruptcy court's *in personam* jurisdiction over the Diazes empowered it to issue an order, enforceable in the United States, requiring the Diazes to take action abroad."); *Gagan v. Monroe*, 269 F.3d 871, 877 (7th Cir. 2001); *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1236 (10th Cir. 2000), *aff'd*, 532 U.S. 588 (2001); *Citronelle-Mobile Gathering, Inc. v. Watkins*, 934 F.2d 1180, 1188 (11th Cir. 1991).[2]

The district court's turnover order fully comports with that settled law. As this Court correctly held in its prior decision in this case, the district court had jurisdiction over Plaintiffs' claims against Argentina under the FSIA. *Petersen*, 895 F.3d at 204-09. It therefore had personal jurisdiction over Argentina as well. 28 U.S.C. §1330(b) (providing "[p]ersonal jurisdiction over a foreign state … as to every claim for relief

---

[2] Numerous state supreme courts have reached the same conclusion—including, as most relevant here, the New York Court of Appeals, which has squarely held its turnover statute authorizes courts "to issue a turnover order pertaining to extraterritorial property, if it has personal jurisdiction over a judgment debtor in possession of the property." *Koehler*, 911 N.E.2d at 830; *see infra* pp.38-40.

over which the district courts have jurisdiction under [the FSIA]"); *see CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 605 U.S. 223, 225-26 (2025). Because the district court had personal jurisdiction over Argentina, the court also had the authority to order Argentina to bring property into the court's territorial jurisdiction to satisfy the judgment against it, regardless of whether that property was previously located "within or without the United States." *First Nat'l*, 379 U.S. at 384; *see Feit & Drexler*, 760 F.2d at 414; David Siegel, N.Y. Prac. §510 (6th ed. 2024) ("As long as the debtor is subject to the court's personal jurisdiction, a delivery order can be effective even when the property sought is outside the state.").

### B. Nothing in Federal Common Law or the FSIA Abrogates That Settled Rule With Respect to Foreign Sovereigns.

Argentina does not dispute—or even mention—the settled general principle that a district court has authority to order a judgment debtor over which it has personal jurisdiction to bring assets into its territorial jurisdiction to satisfy the judgment. On the contrary, Argentina implicitly concedes the existence of that background rule—but argues the district court could not exercise that authority in this case, because Argentina is a foreign sovereign. But nothing in federal common law or the FSIA prevents a district court from exercising its longstanding authority to enforce a judgment by ordering a foreign-sovereign judgment debtor to bring property into the court's territorial jurisdiction. To the contrary, once a court exercises personal jurisdiction over a foreign sovereign in conformity with the FSIA

(which is law of the case here, *see supra* pp.21-22), then that foreign sovereign "shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. §1606, and so may be ordered to bring property into the jurisdiction to satisfy the judgment subject only to the FSIA's requirements for execution on property within the United States (which are satisfied here, *see infra* pp.43-50). The district court's order should therefore be affirmed.

> **1. Federal common law has never prohibited ordering a foreign sovereign to bring property into the jurisdiction to satisfy a judgment.**

Argentina's lead argument on appeal is that pre-FSIA federal common law "forbids … execution on foreign-sovereign property located outside the United States." Arg.Br.21 (capitalization altered); *see* U.S.Br.9-21. That argument is both irrelevant and wrong.

a. First and foremost, Argentina's argument is irrelevant because the district court did not order "execution" on any "extraterritorial assets" here. *Contra* Arg.Br.21. Instead, in accordance with centuries of settled law, the district court simply ordered Argentina—a judgment debtor over which the court had personal jurisdiction—to bring assets *into* New York to satisfy the judgment against it. Argentina cites not one case, from before or after enactment of the FSIA, holding that a district court lacks the authority to issue such an order.

23

Argentina relies instead on conflating the district court's authority to order a judgment debtor to bring assets into its territorial jurisdiction with the court's distinct (and more limited) authority to order execution on those assets. But as centuries of precedent demonstrate, those concepts are entirely distinct. A court's authority to order a judgment debtor to bring assets into its territorial jurisdiction is an exercise of *in personam* jurisdiction; it flows from the court's personal jurisdiction over the judgment debtor, and extends to property in the judgment debtor's control "whether that property [is] within or without the limits of the court's territorial jurisdiction." *Ross*, 302 F.2d at 834; *see, e.g.*, *Koehler*, 911 N.E.2d at 829 (turnover order allows a court to "compel observance of its decrees by proceedings *in personam* against the owner"). A court's authority to order *execution*, by contrast—in the sense of forcible "judicial seizure of the property," *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945)—is a power that "partake[s] of the nature of suits *in rem*," and so is generally limited to property within the court's territorial jurisdiction. *Douglass v. Phenix Ins. Co. of Brooklyn*, 33 N.E. 938, 939-42 (N.Y. 1893); *see, e.g.*, *SuVicMon Dev., Inc. v. Morrison*, 991 F.3d 1213, 1221 (11th Cir. 2021) (execution is "generally *in rem*"); *see also Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 144 (2014) (courts "generally lack authority in the first place to execute against property in other countries"); 33 C.J.S. *Executions* §61 (2025) (courts "lack[] authority to issue a writ of execution on a judgment debtor's property located in another state"); 12 Wright & Miller, Fed.

Prac. & Proc. Civ. §3013 (3d ed. 2025) (writ of execution can be served only "within the state in which the district court is held"); *cf. execution*, Black's Law Dictionary (12th ed. 2024) (defining "execution" as "[j]udicial enforcement of a money judgment, usu. by seizing and selling the judgment debtor's property").

In short, the district court's exercise of *in personam* jurisdiction to enter a turnover order is distinct from any subsequent exercise of *in rem* jurisdiction to order execution on specific property within its territorial jurisdiction. No one disputes that federal law (and common sense) would prohibit the district court from issuing a writ of execution ordering the U.S. Marshals to fly to Buenos Aires and seize property there to satisfy the judgment. But the territorial limitations that prevent a district court from exercising *in rem* jurisdiction to order execution on specific property abroad do *not* limit its exercise of *in personam* jurisdiction to order a judgment debtor to bring property into the jurisdiction to satisfy the judgment—a power that raises none of the concerns of forcible extraterritorial "judicial seizure." *Hoffman*, 324 U.S. at 35; *see, e.g.*, *Koehler*, 911 N.E.2d at 828-30; *Gryphon Dom. VI, LLC v. APP Int'l Fin. Co.*, 836 N.Y.S.2d 4, 8-9 (N.Y. App. Div. 2007).

b. Nor did pre-FSIA federal common law make foreign-sovereign property abroad absolutely immune from execution in any event—which is why, here as in *NML*, Argentina "cites no case holding that, before the [FSIA], a foreign state's extraterritorial assets enjoyed absolute execution immunity in United States courts."

25

573 U.S. at 144. The reality is more nuanced: Under settled law (again dating back to Chief Justice Marshall), "foreign sovereigns have no right to immunity in our courts," and instead enjoy immunity only as "a matter of grace and comity." *Republic of Austria v. Altmann*, 541 U.S. 677, 688-89 (2004) (citing *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812) (Marshall, C.J.)). As a result, before the enactment of the FSIA, courts deferred to the Executive Branch in deciding whether to apply sovereign immunity—and when the Executive Branch chose not to weigh in, courts determined for themselves "whether the ground of immunity is one which it is the established policy of the [State Department] to recognize," *Hoffman*, 324 U.S. at 36; *see Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486-88 (1983). In applying that analysis, courts *did* in fact sometimes reject claims of immunity with respect to property owned by foreign sovereigns. *See Hoffman*, 324 U.S. at 36-38 (discussing cases).

To be sure, "[u]ntil 1952, the State Department ordinarily requested immunity in all actions against friendly foreign sovereigns," and typically continued to request execution immunity for foreign-sovereign property in the United States even after adopting the "restrictive" theory of sovereign immunity in that year. *Verlinden*, 461 U.S. at 486-87. But Argentina offers no case—and Plaintiffs are aware of none— holding that under pre-FSIA federal common law, foreign sovereign property located

26

outside the United States was absolutely immune from execution.[3]  More to the point, Argentina offers no case remotely suggesting that pre-FSIA federal common law would have prevented a federal court from exercising its longstanding power to order a judgment debtor over which the court had personal jurisdiction to bring assets into the court's territorial jurisdiction, whether or not that judgment debtor was a foreign sovereign.  Argentina therefore finds no support in pre-FSIA federal common law for its challenge to the district court's order.

### 2. The FSIA confirms that a court can order a foreign sovereign to bring property into the jurisdiction to satisfy a judgment.

Even if (contrary to fact) Argentina could point to pre-FSIA federal common law that clearly prohibited a district court from ordering a foreign-sovereign judgment debtor to bring property into the court's jurisdiction, it would be to no avail.  As the Supreme Court has underscored, pre-FSIA federal common law no longer controls, and the FSIA provides Argentina no immunity.

In 1976, Congress "abated the bedlam" that had previously governed claims of foreign sovereign immunity by enacting the FSIA, "replacing the old executive-driven, factor-intensive, loosely common-law-based immunity regime" with a

---

[3] As the Supreme Court has explained:  "No surprise there.  Our courts generally lack authority in the first place to execute against property in other countries, so how could the question ever have arisen?"  *NML*, 573 U.S. at 144.  The cases that Argentina cites indicate that foreign-sovereign property within the United States was typically afforded execution immunity in the pre-FSIA era, but none specifically evaluates any pre-FSIA attempt to execute on foreign-sovereign property abroad.

"comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state." *NML*, 573 U.S. at 141. And "[t]he key word there— which goes a long way toward deciding this case—is *comprehensive*." *Id.* "After the enactment of the FSIA, the Act—and not the pre-existing common law— indisputably governs the determination of whether a foreign state is entitled to sovereign immunity." *Samantar v. Yousuf*, 560 U.S. 305, 313 (2010). "Thus, any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall." *NML*, 573 U.S. at 141-42.

That forecloses Argentina's argument. As the district court recognized, nothing in the FSIA "prevent[s] the Court from ordering [Argentina], a judgment debtor over which it has personal jurisdiction, to bring [assets] from outside of New York into New York to pay Plaintiffs." SA.25. The FSIA sets specific criteria for obtaining personal jurisdiction over a foreign sovereign (which, as this Court has already held, were met here, *see Petersen*, 895 F.3d at 204-09), and then sets specific criteria for executing on foreign-sovereign property in the United States (which are likewise met here, *see* 28 U.S.C. §1610(a)(2); SA.14-23). But the FSIA "imposes no limits on the equitable powers of a district court that has obtained jurisdiction over a foreign sovereign, at least where the district court's use of its equitable powers does not conflict with the separate execution immunities created by §1609." *NML Cap., Ltd. v. Argentina*, 699 F.3d 246, 263 (2d Cir. 2012). In particular, there is no

28

provision whatsoever in the FSIA prohibiting a district court from exercising its traditional authority to require a judgment debtor over which it has personal jurisdiction to bring property into the court's territorial jurisdiction. The FSIA instead treats foreign sovereigns exactly like all other judgment debtors in that regard: Once the district court has personal jurisdiction over a foreign sovereign in accordance with the FSIA's requirements, the court has the authority to order that foreign sovereign (like any other judgment debtor) to bring property into the jurisdiction to satisfy the judgment, just as it would have authority to order the sovereign defendant not to transfer assets outside the jurisdiction, provide an accounting, or take other steps to ensure that a duly entered judgment is not a practical nullity. *See EM Ltd. v. Argentina*, 695 F.3d 201, 209 (2d Cir. 2012) (recognizing that under the FSIA, "a district court's jurisdiction over a foreign sovereign extends to proceedings to enforce a valid judgment").

In short, "even if Argentina were right about the scope of the common-law execution-immunity rule," it would not matter, because it would still "be obvious that the terms of [FSIA] execution immunity are narrower." *NML*, 573 U.S. at 144. By its plain text, the FSIA "immunizes only foreign-state property '*in the United States*'"; it nowhere provides execution immunity for foreign-sovereign property abroad, which is why the Supreme Court in *NML* unanimously held that the FSIA does not "shield from discovery a foreign sovereign's extraterritorial assets." *Id.*

The same principle controls here: Because nothing in the text of the FSIA prohibits a district court from ordering a foreign-sovereign judgment debtor over which it has personal jurisdiction to bring property into the jurisdiction to satisfy the judgment, Argentina's sovereign-immunity defense to the district court's order "must fall." *Id.* at 142.

This Court has now twice concluded that the FSIA provides no execution immunity to foreign-sovereign assets abroad—let alone immunity against a turnover order like the district court's order here. Following *NML*, this Court recognized that the Supreme Court had "squarely rejected the argument that any common law execution immunity afforded to a foreign state's extraterritorial assets survived the enactment of the FSIA." *Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 90 (2d Cir. 2017); *see id.* at 89-94 (holding that the FSIA does not bar ordering a third party to bring foreign-sovereign property abroad to the United States for execution). While that decision was later vacated on other grounds, *Clearstream Banking S.A. v. Peterson*, 589 U.S. 1127 (2020), its reasoning remains persuasive—which is why (as Argentina entirely fails to mention) this Court *made the same point again* just last year, explaining once again that extraterritorial assets "possess no execution immunity" under the FSIA and can be "brought into the United States pursuant to a turnover order." *Peterson v. Bank Markazi* (*Peterson II*), 121 F.4th 983, 996 n.3 (2d Cir. 2024); *see* U.S.Br.17 n.4 (recognizing that *Peterson II* "suggested that foreign

state assets abroad have no execution immunity" and could be "brought into the United States pursuant to a turnover order"). The district court did not err by entering precisely that kind of turnover order here.

### 3.    Argentina's remaining arguments are unpersuasive.

a. Argentina's remaining efforts to escape the plain language of the FSIA and controlling precedent fare no better. Argentina primarily argues that the FSIA did not abrogate what Argentina describes as a "longstanding rule prohibiting execution against foreign-sovereign property outside the United States." Arg.Br.24 (emphasis omitted). But as already explained, execution against foreign-sovereign property outside the United States is not at issue here, and Argentina makes no attempt to show any longstanding rule against ordering foreign-sovereign judgment debtors over which the court has personal jurisdiction to bring property into the court's territorial jurisdiction. *See supra* pp.19-22. And even if there were any such pre-FSIA rule, it is beyond dispute that no such immunity defense appears in the text of the FSIA, and so any such defense today "must fall." *NML*, 573 U.S. at 142.

Argentina argues that in providing specific exceptions to execution immunity for foreign-sovereign property in the United States, the FSIA did not "silently abrogate" execution immunity for foreign-sovereign property outside the United States. Arg.Br.24; *see* U.S.Br.10-11. But that question-begging argument assumes, rather than substantiates, its premise. There was no common-law immunity from

31

orders to bring assets into the jurisdiction for the FSIA to abrogate, and once here, those assets are subject to the execution immunities expressly set forth in FSIA, nothing more and nothing less. *NML*, 573 U.S. at 144. Argentina's invocation of the *expressio unius* canon and the presumption against extraterritoriality cannot overcome clear Supreme Court precedent. *Contra* Arg.Br.25-26. Nor can Argentina's reliance on the rule that Congress typically "legislates against a background of common-law adjudicatory principles," Arg.Br.26—particularly when the FSIA was specifically enacted to "abate[] the bedlam" caused by "the old executive-driven, factor-intensive, loosely common-law-based immunity regime," *NML*, 573 U.S. at 141.

b. Argentina argues that the FSIA did not "occupy[] the entire field of potential foreign-sovereign immunities." Arg.Br.27. But both of the cases it cites show the opposite: that Congress "clearly intended to supersede the common-law regime for claims against foreign states" in civil actions. *Samantar*, 560 U.S. at 325; *see Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 272-73 (2023) (recognizing FSIA's "comprehensive scheme governing claims of immunity in civil actions against foreign states"). To be sure, federal common law can still apply in suits that are "not governed by the FSIA" at all, like criminal proceedings or suits against foreign officials. *Turkiye*, 598 U.S. at 280; *see id.* at 272-73 (FSIA "does not cover criminal cases"); *Samantar*, 560 U.S. at 325 (FSIA does not cover claims

against a foreign official "in his personal capacity"). But because claims of foreign sovereign immunity in civil cases against foreign states—like this case— indisputably *are* covered by the FSIA, federal common law has no role to play. *NML*, 573 U.S. at 141-42.

c. Argentina turns to international law, calling it "implausible" that Congress would have contravened "longstanding international law" by eliminating execution immunity for foreign-sovereign property abroad. Arg.Br.27-28; *see* U.S.Br.12-15. Again, Argentina conflates a turnover order directed to a party over which the court has personal jurisdiction and an execution order directed at a res. Argentina's authorities show at most a "historical and international antipathy" to the latter, *Conn. Bank of Com. v. Republic of Congo*, 309 F.3d 240, 252 (5th Cir. 2002), which is why the FSIA delineates the specific circumstances (satisfied here) in which such forcible seizure is permitted, *see* 28 U.S.C. §1610. They say nothing to suggest any international consensus against what the district court did here: namely, exercising its longstanding authority to order a judgment debtor to bring assets into the court's territorial jurisdiction, which then can be executed against if, but only if, that execution complies with the express terms of the FSIA. *See supra* pp.27-31.

d. Argentina's argument from legislative history is weaker still. Citing a single House Report, Argentina claims that Congress chose to only "partially lower the barrier of immunity from execution." Arg.Br.29 (brackets omitted). Of course,

"[l]egislative history is not the law." *CC/Devas*, 605 U.S. at 235. But in all events, no one is claiming the FSIA wiped away execution immunity entirely. And the best (and ultimately only) guide to how far Congress lowered the barriers lies in the text of the FSIA. That text provides no immunity against turnover orders, and the immunity it provides for property brought into the jurisdiction does not extend to the property here.

e. Argentina labels the resulting regime "absurd," because property abroad "would have no immunity" while property in the United States would have immunity "subject to the FSIA's narrow statutory exceptions." Arg.Br.29-30. Again, Argentina misses the point. Foreign-sovereign property abroad does not *need* execution immunity, because "[o]ur courts generally lack authority in the first place to execute against property in other countries." *NML*, 573 U.S. at 144. Instead, a court can typically order execution (meaning the seizure of property to satisfy a judgment) only on property within its territorial jurisdiction—which is precisely why a court must *first* enter a turnover order, to bring property into the jurisdiction, before it can order execution. *See Peterson II*, 121 F.4th at 996 n.3 (explaining that foreign-sovereign assets could be "brought into the United States pursuant to a turnover order," after which "it would then be necessary to conduct an execution immunity analysis under the FSIA").

The FSIA framework is thus perfectly coherent:  Once a district court has satisfied the FSIA's requirements for personal jurisdiction over a foreign sovereign, *see* 28 U.S.C. §§1330(a)-(b), 1605, it has the same powers regarding that party as it does regarding any other litigant, including the power to order it to bring property into the forum.  And once property has been brought into the forum, it faces the same conditions for execution under the FSIA as any other "property in the United States." 28 U.S.C. §§1610-1611.  That is precisely why the district court made sure those requirements would be met before entering the turnover order in the first place, since the turnover order would be pointless otherwise.  *See* SA.16-23.  Foreign-sovereign property abroad thus has no less protection under the FSIA than foreign-sovereign property in the United States; instead, once that property is brought to the United States by a turnover order, all the same FSIA requirements for execution apply. There is nothing "absurd" or "upside-down" about that straightforward and consistent statutory scheme.  *Contra* Arg.Br.29-30.

f. Argentina cannot escape *NML* and this Court's precedent.  It claims this Court has held "[f]or many years" that courts cannot execute on foreign-sovereign property abroad, and that other federal appellate courts "have uniformly held that same view."  Arg.Br.30-31.  Here too, Argentina misses the same point; its cases stand for the principle that courts cannot order execution (in the sense of forcible judicial seizure) on property abroad, but none of them holds that a court cannot order

a foreign-sovereign judgment debtor over which it has jurisdiction to bring property into the forum. The former proposition rests not any special immunity for foreign sovereigns, but on territorial limitations on the execution authority of domestic courts. Any distinct immunity from execution on sovereign property in the United States, whether brought here voluntarily or pursuant to a valid court order, is supplied by the FSIA. Argentina's own authorities underscore that reality by recognizing a district court's "power to conduct supplementary proceedings, involving persons indisputably within its jurisdiction, to enforce valid judgments." *EM*, 695 F.3d at 208.

Argentina misses the same distinction in claiming that *Peterson* "broke from" prior (and subsequent) precedent in approving a turnover order like the one here. Arg.Br.31; *see* Arg.Br.35. *Peterson* is perfectly consistent with the cases that Argentina cites, which recognize that courts generally cannot order forcible seizure of property abroad but do not diminish a court's power to order a party to bring property into the forum. As *Peterson* correctly held, the plain text of the FSIA and *NML* both confirm that foreign sovereigns have no special immunity from the latter power. *Peterson*, 876 F.3d at 90-94; *see NML*, 573 U.S. at 144. The fact that *Peterson* was later vacated on other grounds, *see* Arg.Br.31, does not undermine the persuasive force of its reasoning—particularly when this Court applied *precisely the*

*same reasoning* in a binding decision issued just last year, which Argentina remarkably fails to even mention. *Peterson II*, 121 F.4th at 996 n.3.

Argentina's efforts to distinguish *Peterson* are equally unavailing. It notes that the turnover order in *Peterson* was directed to a third party rather than the foreign sovereign, and that the assets were held in a third country. Arg.Br.32. But neither distinction affects the basic principle: Neither the FSIA nor federal common law prevents a court from ordering a party over which it has personal jurisdiction to bring foreign-sovereign assets abroad into the forum. *Peterson*, 876 F.3d at 90-94; *see Peterson II*, 121 F.4th at 996 n.3. If anything, that principle is *stronger* here, where the party subject to the order is the judgment debtor itself. *See supra* pp.19-22.

Argentina resorts to asserting that *Peterson* (and, apparently, *Peterson II*) misunderstood *NML*, claiming that *NML* addressed only discovery and had nothing to say about execution immunity. Arg.Br.33; *see* U.S.Br.17-19. But *NML* could not have been clearer: "[A]ny sort of immunity defense made by a foreign sovereign in an American court must stand on the [FSIA's] text. Or it must fall." 573 U.S. at 141-42. *Peterson* did not err by following that straightforward instruction. While federal common law may continue to apply in cases entirely outside the scope of the FSIA, like criminal proceedings and suits against foreign officials, it cannot provide

any sovereign-immunity defense in cases (like this one) that the FSIA governs. *Id.*; *see Turkiye*, 598 U.S. at 272-73; *Samantar*, 560 U.S. at 325. *Contra* Arg.Br.33-34.

Alternatively, Argentina asserts that *NML* itself erred, and that (despite what *NML* says) clear pre-FSIA law establishes that foreign-sovereign property abroad was "absolutely immune from execution." Arg.Br.34. Of course, this Court does not engage in "error correction" with respect to Supreme Court precedent. Regardless, it is Argentina, not the unanimous Supreme Court in *NML*, that gets the pre-FSIA common-law background wrong. *See supra* pp.25-27. And "even if Argentina were right about the scope of the common-law execution-immunity rule, then it would be obvious that the terms of [FSIA] immunity are narrower," *NML*, 573 U.S. at 144, and neither pre-FSIA common law nor the plain text of the FSIA prohibits the turnover order that the district court entered here.

## II. The District Court Correctly Held That New York Law Authorizes The Turnover Order.

The district court also correctly held that New York law authorized its turnover order. As a general rule, execution in federal court "must accord with the procedure of the state where the court is located." Fed.R.Civ.P. 69(a)(1). The district court therefore properly looked to New York law, which authorizes a court to order a judgment debtor to pay money or "deliver any … personal property" to satisfy a judgment, and to "order any person to execute and deliver any document necessary to effect payment or delivery." N.Y. C.P.L.R. §5225(a), (c); *see* SA.11-12. As the

New York Court of Appeals has explicitly held (consistent with longstanding law), that statute "contains no express territorial limitation," and so a court "with personal jurisdiction over a defendant may order him to turn over out-of-state property" by ordering him to bring "money or property into New York from another state or country." *Koehler*, 911 N.E.2d at 829-31; *see id.* at 830 (recognizing the longstanding rule that a court "has the authority to issue a turnover order pertaining to extraterritorial property, if it has personal jurisdiction over a judgment debtor in possession of the property"); *Gryphon*, 826 N.Y.S.2d at 4-5; SA.12-13. The district court accordingly had authority under New York law to order Argentina—a judgment debtor over which it has personal jurisdiction—to bring assets "from another state or country" into New York to satisfy the judgment. *Koehler*, 911 N.E.2d at 829; *see Peterson II*, 121 F.4th at 996 n.3; *Peterson*, 876 F.3d at 90-94.

Argentina does not (and cannot) dispute that as a general matter, §5225 authorizes a court to order a party over which it has personal jurisdiction to bring property into New York from abroad. Instead, Argentina argues that as a matter of statutory interpretation, the statute should be read to treat foreign-sovereign property differently—even though (as Argentina admits) the statutory text provides no basis for such differential treatment. Arg.Br.35-36. Underscoring the lack of any textual grounding for this argument, Argentina never raised it below. The argument is thus forfeited. *See, e.g.*, *Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.*, 82 F.4th

39

144, 160 (2d Cir. 2023) (applying the "well-established general rule that an appellate court will not consider an issue raised for the first time on appeal").

It is also meritless. Argentina admits that §5225 "says nothing about its application to foreign-sovereign property abroad," but attempts to turn that textual silence to its advantage by positing that "longstanding common law" makes foreign-sovereign property abroad immune from execution. Arg.Br.36-37; *see* Arg.Br.40-42. But the New York Court of Appeals has rejected precisely that kind of reasoning, holding that the absence of any "express territorial limitation" in §5225 confirms that the statute *does* reach property abroad. *Koehler*, 911 N.E.2d at 829. And just last year, this Court likewise rejected the argument (again by Argentina) that §5225 implicitly excludes foreign sovereigns, explaining that it "would make little sense" to read the statute to exclude foreign sovereigns when doing so "would cut them out of a normal part of civil litigation—judgment enforcement." *Attestor Master Value Fund LP v. Argentina*, 113 F.4th 220, 234 (2d Cir. 2024).

In any event, Argentina's argument suffers all the same flaws as its other efforts to view the turnover order as an execution order: While settled law typically prevented (and continues to prevent) courts from attaching or seizing assets abroad (more because of the territorial limits on jurisdiction over a res than any immunity), it *permits* courts to order parties over which they have personal jurisdiction to turn over such assets. *See Koehler*, 911 N.E.2d at 828-29; *supra* pp.19-22. Argentina

40

cites no domestic or international law establishing any different rule for foreign sovereigns, and the FSIA makes clear that no different rule exists.[4]

Argentina next reframes the same argument in the language of prescriptive comity (which it likewise never mentioned below), arguing that applying §5225 to foreign-sovereign property abroad conflicts with "customary international law" and threatens "reciprocal adverse treatment of the United States in foreign courts." Arg.Br.38-39. But Argentina cites no international law prohibiting a court from ordering a foreign sovereign over which it has personal jurisdiction to turn over commercial property to satisfy a judgment. And the United States does not typically privatize state enterprises or raise capital on foreign stock exchanges—but in the unlikely event it did and then committed a willful breach of its contractual obligations like Argentina's breach here, the United States would presumably pay the resulting judgment, without engaging in the kind of delay and obstruction to which Argentina has repeatedly resorted and that has required the district court's turnover order. *Cf. NML Cap., Ltd. v. Argentina*, 727 F.3d 230, 247 (2d Cir. 2013) (recognizing that Argentina has been a "uniquely recalcitrant debtor" in the past). But in the remarkably slim chance that all those what-ifs came to pass, no principle

---

[4] Argentina never explains whether it thinks §5225 excludes all foreign-sovereign property outside New York, or only foreign-sovereign property outside the entire United States—further underscoring that Argentina's invented exclusion has no basis in the statutory text.

of international law would render the United States (or any other sovereign) beyond the reach of the laws that prevent other judgment creditors from shirking their obligations.

Nor does the turnover order create any "host of problems under New York law." *Contra* Arg.Br.39-40. Argentina devotes all of three sentences to identifying three such purported problems. That cursory treatment forfeits those arguments and accords with their lack of seriousness. *See, e.g.*, *Kim v. Kimm*, 884 F.3d 98, 107 (2d Cir. 2018) (issues "not sufficiently argued" are forfeited). First, the district court did not order BNYM to "enter into a new commercial relationship," *contra* Arg.Br.40; it simply ordered Argentina to move its YPF shares into an account at BNYM, without imposing any obligations whatsoever on BNYM itself. SA.33. *Contra* Bank.Policy.Inst.Br.5, 7-12.[5] Second, New York law rather than Argentine law controls whether property can be "assigned or transferred" under C.P.L.R. §5201(b), and the YPF shares here are clearly transferable by their terms (as the Argentine share documentation confirms). SA.23-24; *see* JA___[Dist.Ct.Dkt.591.Mastro.Ex.1]. Third, especially given Argentina's decision to voluntarily avail itself of the NYSE, there is nothing novel about ordering Argentina to transfer the YPF shares to a New York account, and Argentina makes

---

[5] For similar reasons, New York's separate-entity rule is irrelevant. *Contra* Bank.Policy.Inst.Br.12-16.

no attempt to explain what "regulatory and bylaws requirements" that would violate. *Contra* Arg.Br.40.

In short, Argentina has no basis for attempting to rewrite New York law and eliminate a New York court's ability to require a person over which it has jurisdiction to bring property into New York to satisfy a judgment—which is why this Court has twice recognized that New York law authorizes courts to order turnover of foreign-sovereign property abroad. *Peterson II*, 121 F.4th at 996 n.3; *Peterson*, 876 F.3d at 90-94. Argentina gives no good reason to depart from the New York Court of Appeals' reasoning in *Koehler* and this Court's own prior analysis.

## III. The District Court Correctly Found That The FSIA's Requirements Are Satisfied Here.

The district court likewise correctly held that its order comports with the requirements of the FSIA. Under the FSIA, foreign-state property is subject to execution if it is (1) "in the United States," (2) "used for a commercial activity in the United States," and (3) "used for the commercial activity upon which the claim is based." 28 U.S.C. §1610(a)(2). As the district court found, each of those criteria is satisfied here. SA.16-23.[6]

---

[6] Because Petersen has carried its initial burden of producing evidence that an FSIA exception applies, it is Argentina, not Petersen, that "bears the ultimate burden of persuasion." *Swarna v. Al-Awadi*, 622 F.3d 123, 143 (2d Cir. 2010); *see Beierwaltes v. L'Office Federale de la Culture de la Confederation Suisse*, 999 F.3d 808, 816-17 (2d Cir. 2021). *Contra* Arg.Br.43.

### A. The District Court Correctly Found That the YPF Shares Will Be "in the United States."

To start, the district court correctly concluded that once Argentina complies with the court's order to transfer the YPF shares to an account in New York, and the question turns to execution, the YPF shares will be "in the United States." SA.26-27. Argentina's challenges to that straightforward conclusion are unpersuasive.

Argentina argues that entering a turnover order requiring it to bring the YPF shares back to New York—where many of them were previously traded as ADRs—would improperly "circumvent" the FSIA's requirement that property must be "in the United States" for execution. Arg.Br.43-44; *see* U.S.Br.22-25. But this Court has twice explicitly recognized that there is nothing improper about that procedure, explaining that the turnover order precedes the execution analysis such that first assets are "brought into the United States pursuant to a turnover order," and only then does it become "necessary to conduct an execution immunity analysis under the FSIA," under which they qualify as "assets 'in the United States.'" *Peterson II*, 121 F.4th at 996 n.3; *see Peterson*, 876 F.3d at 94. Distinguishing between the turnover order, which depends on personal jurisdiction rather than the location of the assets, and the execution, which focuses on the location of the assets, does not somehow impermissibly "end-run" the FSIA's "in the United States" requirement—any more than exercising that power with respect to a private judgment debtor would impermissibly "end-run" the normal rule that courts can only attach and execute on

44

property within their territorial jurisdiction. *See, e.g.*, *Hashemi*, 562 F.2d at 154-55 (affirming order requiring the defendant to bring assets into Connecticut "from their locations in other states, and indeed, even in other countries" for attachment); *Koehler*, 911 N.E.2d at 829-30 (court can compel a party over which it has personal jurisdiction to "turn over out-of-state assets" to satisfy a judgment, even though a court "cannot attach property not within its jurisdiction"). Unsurprisingly, none of the cases that Argentina cites holds that a court cannot order a foreign-sovereign judgment debtor to bring property into the jurisdiction to satisfy the judgment, or that property brought into New York under such an order is not "in the United States" under the FSIA. *Contra* Arg.Br.43-44.

Argentina briefly argues that its YPF shares "*cannot* be brought into the United States," because they are held in book-entry form in Argentina. Arg.Br.44-45. But as the district court explained, under New York law, "[o]nce the Shares are transferred into a global custody account at BNYM in New York," Argentina's "ownership interest in the Shares will qualify as security entitlements" that "will have a New York situs, because the global account will be held at the New York office of BNYM." SA.27; *see, e.g.*, *EM Ltd. v. Argentina,* 389 F.App'x 38, 43-44 (2d Cir. 2010) (summary order) (beneficial interests in trust had New York situs and were attachable under FSIA, despite representing interests in shares of Argentine corporation). Argentina offers no response.

45

**B.    The District Court Correctly Found That the YPF Shares Are "Used for a Commercial Activity in the United States."**

The district court also correctly determined that the YPF shares are "used for a commercial activity in the United States." SA.16-20. Here as below, Argentina "does not dispute that YPF sponsoring an ADR program for its Class D shares with BNYM in New York, listing its shares on the NYSE, registering its shares with the SEC, and selling its debt to United States institutional investors … all constitute 'commercial activity in the United States.'" SA.17. As the district court explained, Argentina plainly uses its YPF shares for that commercial activity, as "[s]ince April 2012, the Republic has controlled YPF's major business and financial decisions through its majority share ownership and generated value for the company through use of the United States' markets." SA.19. "Accordingly, the Republic's use of its controlling shares to direct YPF's commercial activity in the United States is sufficient to establish that the shares are 'used for a commercial activity in the United States.'" SA.20.

Argentina asserts that it used its YPF shares "exclusively in Argentina," such as "to vote at shareholders' meetings in Argentina." Arg.Br.45-47. But as the district court understood, the relevant inquiry under the FSIA is not whether the *property* was used "in the United States," but whether the property was used for "commercial activity in the United States." 28 U.S.C. §1610(a). What matters is not where the shares were used, but where the commercial activity happened. *See, e.g.*, *Exp.-Imp.*

46

*Bank v. Grenada*, 768 F.3d 75, 90-91 (2d Cir. 2014) (asking whether funds were used for "commercial activity that takes place in the United States"). The district court was entirely correct to find that Argentina used (and continues to use) its shares in Argentina for commercial activity in the United States, by controlling YPF's commercial activity here. *See* SA.17-20.

Argentina argues that "any commercial activity of YPF" in the United States "cannot be attributed to" Argentina itself, because Argentina and YPF are distinct legal entities. Arg.Br.47-48. That misses the point. Plaintiffs are not trying to pierce the corporate veil and hold Argentina liable for activity by YPF; instead, under the plain text of §1610, the question is simply whether Argentina has "used [the YPF shares] for a commercial activity in the United States," whether that commercial activity was carried out by Argentina itself or by a separate legal entity. 28 U.S.C. §1610(a). Argentina cites no authority for its assertion that a foreign-sovereign majority shareholder who uses corporate shares abroad to direct commercial activity in the United States has not "used [those shares] for a commercial activity in the United States," *id.*, and the district court correctly followed the statutory text and relevant precedent in reaching the opposite conclusion, SA.17-20.

Argentina points to *Aurelius Capital Partners, LP v. Argentina*, 584 F.3d 120 (2d Cir. 2009), but that case supports the district court's order. In *Aurelius*, the relevant funds had previously been used by private corporations for commercial

activity in the United States, but were transferred to Argentina shortly before the district court issued its execution order. *Id.* at 124-27, 130-31. On those facts, this Court held that the prior use of the funds for commercial activity was "irrelevant," because the funds were not being used "for any commercial activity whatsoever" when the execution order was issued. *Id.* at 131. Here, by contrast, Argentina *was* using the YPF shares to direct commercial activity in the United States when the turnover order issued, and continues to do so to this day. SA.17-20.

Argentina also criticizes the district court's reliance on *Crystallex*, *Foremost-McKesson*, and *650 Fifth Avenue*, but its criticisms are misplaced. In *Crystallex*, the Third Circuit held that Venezuela's state-owned oil company PDVSA "used" its shares in its subsidiary PDVH "for a commercial activity in the United States" by directing PDVH's commercial activity in the United States. *Crystallex Int'l Corp. v. Venezuela*, 932 F.3d 126, 149-51 (3d Cir. 2019) (emphasis omitted). As *Crystallex* makes clear, the key point is that PDVSA was using its shares to direct commercial activity that was occurring in the United States; the location of the PDVH shares, and the fact that PDVH was incorporated in the United States, played no role in the Third Circuit's analysis. *Contra* Arg.Br.49.

So too for *Foremost-McKesson* and *650 Fifth Ave.*, which likewise confirm that shareholders use their shares for commercial activity in the United States when they use them to control entities engaged in commercial activity in the United States.

48

*See Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 450 (D.C. Cir. 1990) (Iran engaged in commercial activity by "us[ing] its majority position to lock Foremost out of the management of" a company); *In re 650 Fifth Ave.*, 2014 WL 1284494, at *17 (S.D.N.Y. Mar. 28, 2014) (shares used to direct a partnership operating in New York were used for a commercial activity in New York), *vacated on other grounds sub nom. Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d 107 (2d Cir. 2016). The district court correctly applied the same principle here.

### C. The District Court Correctly Found That the YPF Shares Were "Used for the Commercial Activity Upon Which the Claim Is Based."

The district court likewise correctly found that the YPF shares were "used for the commercial activity upon which [Plaintiffs'] claim is based." 28 U.S.C. §1610(a)(2). As the court explained, Argentina "used its control of [the YPF] shares to effectuate the breach of the tender offer obligation because that control ensured that (1) the bylaws would never be enforced and (2) the Republic holds the Shares today." SA.21. And "following the enactment of the YPF Expropriation Laws, the Republic continued to use [the YPF] shares to breach its obligations—using the shares to vote at shareholder meetings, appoint a new Board, run the company, and evade the tender offer requirement." SA.22. In short, "by controlling [those] shares, the Republic stranded minority shareholders in a government-run enterprise—the

precise outcome against which the bylaws were designed to protect and therefore the crux of the Republic's breach." SA.23.

Argentina never responds to that analysis. Instead, it accuses Plaintiffs and the district court of inconsistency, claiming that both have "repeatedly disavowed" the position that Plaintiffs' claims "are in any way tied to the YPF Shares." Arg.Br.50-51. Not so. Plaintiffs have consistently maintained, and the district court correctly found, that Argentina's tender-offer obligation arises from the Bylaws and "not from the expropriated shares" themselves. Arg.Br.50; *see* SA.21 (explaining that "the tender obligation is not attached to the shares that [Argentina] acquired"). But there is no inconsistency whatsoever in saying both that the expropriated shares "were not the source of the tender offer obligation" that arises from the Bylaws, JA___[Dist.Ct.Dkt.437.at.53], and also that the shares were used "to effectuate the breach of the tender offer obligation" by doing what the Bylaws prohibited, SA.21. And Argentina's assertion that its breach "did not involve any contemporaneous or subsequent use of the YPF Shares to ensure that the bylaws would never be enforced," Arg.Br.51 (alterations omitted), just ignores the district court's explicit findings, *see* SA.21-23. The district court did not err in finding that once Argentina complies with the turnover order and brings the YPF shares to New York, they will be subject to execution under the FSIA.

**IV.    The District Court Correctly Held That Its Order Comports With International Comity And The Act-Of-State Doctrine.**

Argentina concludes by challenging the district court's conclusions that its order fully complied with international comity and the act-of-state doctrine.  The district court came nowhere near abusing its discretion on either point.

**A.    The District Court's Order Comports With International Comity.**

**1.    The district court's order does not conflict with Argentine law.**

As the district court explained, its order does not conflict with international comity principles.  To begin with, "the FSIA already reflects Congress's resolution of comity principles in execution proceedings against a foreign state," leaving no room for a separate international comity analysis.  SA.29 n.21; *see, e.g.*, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 479 (2003) (recognizing that the FSIA extends immunity to foreign sovereigns "as a gesture of comity").  Because the FSIA allows this suit to proceed, Congress has already determined the extent to which international comity should apply, and it is neither necessary nor appropriate for a court to decide for itself whether international comity principles warrant greater immunity.  *See NML*, 573 U.S. at 146 (by enacting the FSIA, Congress "forced [courts'] retirement from the immunity-by-factor-balancing business").  While courts may still take account of international comity considerations in deciding the propriety of particular discovery or execution requests, *see id.* at 146 n.6, those

considerations cannot afford Argentina the broad immunity that Argentina seeks here from *any* kind of order to turn over *any* of its property located abroad.

In any event, "international comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction," such that "compliance with the regulatory laws of both countries would be impossible." *In re Picard*, 917 F.3d 85, 102 (2d Cir. 2019) (brackets omitted). As the district court concluded, no such conflict exists here. Argentina does not dispute that nothing in Argentine law prohibits it from simply moving its YPF shares into a global custody account at BNYM in New York—a move that would merely alter the location of those shares, without any "transfer" of Argentina's ownership interest in those shares. Arg.Br.54. Indeed, many of the YPF shares were traded in the United States as NYSE-listed ADRs at the time of Argentina's breach, *see* SA.4, and nothing prevents the district court from restoring that situation. Once Argentina's ownership interest in the shares is back in New York, it will be subject to the district court's coercive attachment and execution authority, and the exercise of that authority will not require any "act in [Argentina] that is prohibited by the law of that state." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) (quoting Restatement (Third) of Foreign Relations Law §441 (1987)). In short, nothing in the district court's order remotely requires Argentina to "violate its own laws on its own soil." *Contra* Arg.Br.54.

None of Argentina's contrary arguments is persuasive. Argentina claims that the YPF Expropriation Law forbids any transfer of the YPF shares "without the permission of the National Congress by a two-thirds vote." Arg.Br.54 (citing S.A.48-49). But as Plaintiffs explained below, that law applies only to *voluntary* transfers of the YPF shares, not court-ordered ones. *See* JA__[Dist.Ct.Dkt.588.¶¶18-25] (restriction "only applies to a voluntary sale or privatization of YPF," not a domestic or foreign court order). In any event, the district court's order does not require any transfer of the YPF shares in Argentina; it simply requires Argentina to move the *situs* of its ownership interest back to New York, at which point the district court can execute on that interest in New York. *See* SA.33.[7] So even accepting Argentina's description of the YPF Expropriation Law, nothing in the district court's order would require Argentina to violate that law by transferring its shares in Argentina without supermajority approval from the Argentine Congress.

---

[7] Argentina also notes that the YPF Expropriation law designates 49% of the expropriated YPF shares for certain Argentine provinces. Arg.Br.54. But as the district court explained, that designation does not grant the provinces any current property interest in the shares, which is why YPF's annual Form 20-F and each proof of shares issued since 2014 confirms that Argentina itself owns all of the relevant shares. SA.6 n.7; *see* JA__[Dist.Ct.Dkt.591-1.Mastro.Ex.1]; JA__[Dist.Ct.Dkt.591-3.Mastro.Ex.3]; *see* JA__[Dist.Ct.Dkt.588.Bianchi.Decl.¶¶12-15, 50-58]. *Contra* Chubut.Br.5-7.

Even if the district court's order did involve some kind of transfer of ownership in Argentina (which it plainly does not), the district court also correctly concluded that there is "no unavoidable conflict" with the YPF Expropriation Law here because Argentina can comply with both. SA.30. Most obviously, Argentina could simply seek the two-thirds approval from the Argentine Congress that it claims the YPF Expropriation Law requires, SA.30—which, contrary to what Argentina suggests, would not "require changing Argentine law," Arg.Br.55; *see* Art.5, §78 Const. Nac. (Arg.) (new Argentine laws must be passed by both Houses of the Argentine Congress and approved by the Executive). And while the district court also observed that Argentina could choose to comply by changing its law or by reaching a private settlement, nothing in the court's order requires either of those outcomes. *Contra* Arg.Br.55-56.

In the alternative, Argentina briefly (in a single sentence) contends that Argentine law permits it to "make payments only on judgments that have become final, which the judgment here has not." Arg.Br.54. That cursory argument is forfeited. *See Kim*, 884 F.3d at 107. In any event, as Plaintiffs explained below, the law that Argentina cites is just a budgeting provision and "not a mandatory requirement," and gives way when Argentina "must comply with a judgment to pay a certain sum of money." JA__[Dist.Ct.Dkt.519¶¶9-10]; *see* JA__[Dist.Ct.Dkt.519¶¶4-5; Dist.Ct.Dkt.588¶49]. On top of that, the judgment here

*is* final for purposes of the law Argentina cites, even if Argentina is appealing it. JA\_\_[Dist.Ct.Dkt.526-2; Dist.Ct.Dkt.580.¶¶26-27 & n.5]. More to the point, even accepting Argentina's description of its law, the district court's order does not violate it. The court's order does not require Argentina to make any payment on the judgment in Argentina; it simply requires Argentina to move its ownership interest in the shares back to New York. SA.33. Even on Argentina's telling, the fact that Argentina's ownership interest will ultimately be subject to execution in New York does not require Argentina to violate any Argentine law in Argentina.

> **2.    The district court correctly found that the order comports with international comity principles regardless of any conflict with Argentine law.**

The district court also correctly determined that even if there were a "true conflict between Plaintiffs' requested relief and Argentine law," international comity principles would still "counsel in favor of granting Plaintiffs' requested relief." SA.30. "The United States has a strong interest in enforcing its judgments, and that interest outweighs any putative Argentine interest in avoiding execution on assets that are fully subject to execution under the FSIA." SA.30-31; *see, e.g.*, *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1478 (9th Cir. 1992) (recognizing the United States' "strong interest in enforcing its judgments"). After all, a foreign government "cannot simply override the exceptions to the FSIA by invoking its own law to shield its assets from execution in the United States." SA.31.

Otherwise, "every foreign state could render itself judgment-proof in United States courts just by passing a law requiring its own approval for any transfer of its property." SA.31. And extending international comity would be particularly unwarranted here, where Argentina has "refuse[d] to make any effort to honor the Court's unstayed judgment." SA.32. Put simply, "[c]omity is not a one-way street." SA.32.

Argentina has no good answer. It acknowledges that international comity typically requires balancing the relevant countries' interests, but claims there is a "bright-line rule" that a party cannot be required "to do an act in another state that is prohibited by the law of that state." Arg.Br.56 (emphasis omitted). But *Vitamin C* disproves that exact proposition: There, U.S. law would have required the Chinese defendants to stop fixing prices in China, while Chinese law required them to continue fixing prices. *In re Vitamin C Antitrust Litig.*, 8 F.4th 136, 143 (2d Cir. 2021). This Court nevertheless applied a balancing test, not any purported bright-line rule. *See id.* ("balancing the United States' interest … with [China's] interest"); *see also Motorola*, 388 F.3d at 61 (finding no "*per se* rule against setting aside or ignoring the orders of foreign courts"). In any event, nothing in the district court's order requires Argentina to violate any Argentine law *in Argentina*, as the transfer of Argentina's ownership interest will occur in New York. *See supra* pp.44-45.

Argentina next notes that the YPF Expropriation Law was passed in 2012, and so cannot be described as a "post-hoc" attempt to "shield its assets from execution in the United States." Arg.Br.56-57. That makes no difference. If the YPF Expropriation Law prohibits Argentina from satisfying the district court's judgment with property that is subject to execution under the FSIA, the FSIA and the United States' interest in enforcing its duly entered judgments must prevail, regardless of when the YPF Expropriation Law was enacted. SA.31-32.[8]

Argentina ends with a brief argument that the district court erred in relying on *Simon* and *de Csepel*, because (according to Argentina) those cases hold only that "the FSIA does not require prudential exhaustion." Arg.Br.57; *see Simon v. Republic of Hungary*, 911 F.3d 1172 (D.C. Cir. 2018), *vacated on other grounds*, 592 U.S. 207 (2021); *de Csepel v. Republic of Hungary*, 27 F.4th 736 (D.C. Cir. 2022). But as the district court correctly understood, both decisions stand for the principle that international comity cannot afford a foreign sovereign a "judicial grant of immunity" found nowhere in the FSIA's text. SA31-32 (quoting *Simon*, 911 F.3d at 1180); *see*

---

[8] Argentina also suggests the United States "cannot have an overriding interest" in enforcing its judgments because United States "has advocated against" the district court's order here. Arg.Br.57 (citing JA___[Dist.Ct.Dkt.679.at.1, 8]). But "it is the Legal Adviser of the Department of State," not the U.S. Attorney's Office for the Southern District of New York, "who expresses the Executive Branch's view on internationally significant cases and their ramifications for foreign relations." *Vitamin C*, 8 F.4th at 163 n.46.

*de Csepel*, 27 F.4th at 753. That same principle bars Argentina's attempt to rely on international comity here.

## B. The District Court's Order Comports With the Act-of-State Doctrine.

Last and least is Argentina's suggestion that the district court's order runs afoul of the act-of-state doctrine. As the district court recognized, under that doctrine, courts cannot "declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp. Int'l*, 493 U.S. 400, 405 (1990); *see* SA.28. And as the district court also understood, its order does no such thing. The order leaves in place Argentina's prior "expropriation of the [YPF] Shares as a valid act," and does nothing to invalidate that expropriation. SA.28. Quite the opposite: the order *depends on* the validity of the expropriation, since without that expropriation the YPF shares would not be "property … of [Argentina]" subject to execution under the FSIA. 28 U.S.C. §1610(a). Because the district court's order, like Plaintiffs' case on the merits, does not attempt to invalidate the expropriation, it does not violate the act-of-state doctrine.

Argentina does not dispute that the district court's order would not declare its expropriation of the YPF shares invalid or "null and void." *Kirkpatrick*, 493 U.S. at 406. Instead, it argues that the order would impermissibly "require [Argentina] to violate its own laws" and so "have the practical effect of nullifying those foreign

laws." Arg.Br.58. But as already explained, nothing in the district court's order requires Argentina to violate its laws in any way. *See supra* pp.52-55. Nor does the order somehow "reverse" the expropriation or direct Argentina to "change the law," *contra* Arg.Br.59; it simply requires Argentina to comply with its obligations under the unstayed judgment, by exercising the court's longstanding authority to order a judgment debtor to bring property into the forum to satisfy the judgment, as the FSIA contemplates. Especially in light of Argentina's ongoing campaign of delay and obstruction and its refusal to make any effort to satisfy the judgment, the district court's sensible and well-supported order should be swiftly affirmed.

## CONCLUSION

This Court should affirm.

Respectfully submitted,

| | |
|---|---|
| MARK C. HANSEN | s/Paul D. Clement |
| DEREK T. HO | PAUL D. CLEMENT |
| ANDREW E. GOLDSMITH | C. HARKER RHODES IV |
| KELLOGG, HANSEN, TODD, | NICHOLAS A. AQUART |
| FIGEL, & FREDERICK, P.L.L.C. | CLEMENT & MURPHY, PLLC |
| 1615 M Street, N.W., Suite 400 | 706 Duke Street |
| Washington, DC 20036 | Alexandria, VA 22314 |
| | (202) 742-8900 |
| | paul.clement@clementmurphy.com |

*Counsel for Plaintiffs-Appellees*

November 14, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Local R. 32.1(a)(4)(A) because it contains 13,998 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(f), as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the typestyle requirements of Fed.R.App.P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

November 14, 2025

s/Paul D. Clement<br>Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that, on November 14, 2025, an electronic copy of the foregoing brief was filed with the Clerk of Court using the ACMS system and thereby served upon all counsel appearing in this case.

<u>s/Paul D. Clement</u>
Paul D. Clement